# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

         **Plaintiff,**

v.

THE MOVIE STUDIO, INC.,
and GORDON SCOTT VENTERS,

         **Defendants.**

_____/

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") alleges:

## I.    INTRODUCTION

1.    From approximately August 2016 to March 2021, Defendant The Movie Studio, Inc. ("TMS" or the "Company"), a microcap company based in Fort Lauderdale, Florida, and its President and Chief Executive Officer ("CEO"), Defendant Gordon Scott Venters ("Venters") (together, the "Defendants"), issued materially false and misleading press releases regarding TMS' ownership, production, distribution and licensing of films, in order to induce investments in TMS. As a result, from approximately April 2017 to December 2020, TMS and Venters, who acted as an unregistered broker, raised at least $1,200,000 from at least 70 investors, many of whom were unsophisticated and elderly, in a continuous, unregistered securities offering.

2.    The Defendants then used the funds raised from investors, in part to pay for press releases and commissions to sales agents, and in part to fund Venters' lifestyle and to hide payments to an apparent paramour, identified in this Complaint as "Jane Doe," with whom he signed multiple sham consulting agreements.

3. Finally, the Defendants dumped shares of TMS stock on the unsuspecting public after issuing at least one of the false and misleading press releases.

4. By engaging in this conduct, the Defendants have violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.  Venters also violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].  Venters is also liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for TMS' violations of Section 10(b) and Rule 10b-5 of the Exchange Act.  Unless enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

## II.   **DEFENDANTS**

5. **TMS,** a Delaware corporation headquartered in Fort Lauderdale, Florida, has common stock quoted and traded on OTC Link, under the symbol MVES (and for two brief periods under the symbol MVESD).  On December 10, 2018, TMS' Form 1-A/A for its offering pursuant to Regulation A was qualified by the Commission for a period of 12 months.  Prior to November 2012, TMS was known as Destination Television, Inc. and traded under the symbol, DSTV.

6. **Venters**, 59, a resident of Fort Lauderdale, is TMS' President and CEO, and at all relevant times controlled TMS.  Venters also was TMS' Acting Chief Financial Officer ("CFO") until May 2020.  At all relevant times, Venters was not registered as a broker or associated with a registered broker-dealer.

- 2 -

III.    **JURISDICTION AND VENUE**

7.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

8.      This Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because, among other things, Defendants reside or transact business in this District, and many of the acts and transactions constituting the violations of the federal securities laws alleged in this Complaint occurred in this District.

9.      In connection with the conduct alleged in the Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

IV.    **FACTS**

A.      **Defendants' Materially False and Misleading Statements and Omissions with Respect to TMS' Ownership, Production, Distribution and Licensing of Films**

10.     From approximately August 2016 to March 2021, Defendants TMS and Venters issued numerous press releases to make it appear that TMS was a successful company in the film business with ongoing projects in development.  In reality, TMS has not been successful—it had an accumulated deficit of approximately $13.09 million as of March 31, 2021—and few of its projects have come to fruition.

11.     Venters drafted the materially false and misleading press releases himself, or authorized, provided information to, and paid third parties to issue the press releases on behalf of TMS.  Venters was often quoted in the press releases and listed as the TMS contact.

12.     As detailed below, in soliciting investors, Venters, and TMS' unregistered sales agents that he directed and supervised, made materially false and misleading oral and written statements, regarding TMS' ownership, production, distribution, and licensing of films.  Venters knew or was severely reckless in not knowing that the statements were false and misleading, as he oversaw TMS' day-to day operations, including signing agreements on behalf of TMS and drafting materials used by TMS' unregistered sales agents.

          1.     **Defendants' Materially False and Misleading Statements and Omissions Regarding TMS' Ownership of Films including the Arrowhead Film Library**

13.     Defendants misrepresented to existing and prospective investors how many movies TMS owned.  Sales agents, directed and supervised by Venters, told at least one investor that TMS owned hundreds of movies and told at least one other investor that TMS owned thousands of movies.  In reality, TMS owned only approximately seventeen films.

14.     Defendants, and sales agents supervised by Venters, also misrepresented to investors that TMS acquired a film library referred to as the Arrowhead Film Library. This purported acquisition included twelve films with well-known actors, including: (i) *Johnny Mnemonic* starring Keanu Reeves, (ii) *Never Talk to Strangers* starring Antonio Banderas, (iii) *A Shot at Glory* starring Robert Duvall, (iv) *I'll Sleep When I'm Dead* starring Clive Owens, (v) *Red Riding Hood* starring Henry Cavill, (vi) *Stander* starring Thomas Jane, (vii) *No Good Deed* starring Samuel L. Jackson, (viii) *Popstar* starring Aaron Carter, and (ix) *Supercross* starring Steve Howey.

15.     On April 20, 2016, Defendants executed an agreement for TMS to purchase the Arrowhead Film Library (the "Arrowhead Agreement") from the Arrowhead Target Fund Ltd. – In Liquidation as the Seller.  Although TMS never completed the acquisition, the Defendants, and sales agents directed by Venters, falsely told investors that TMS owned the films and used

marketing materials listing the Arrowhead Film Library as "A Film Library of The Movie Studio, Inc."

16.     For example, in May 2016, TMS publicly posted two "Sizzle Reel" videos on YouTube featuring clips from movies, including clips from the following movies from the Arrowhead Film Library: *Johnny Mnemonic*, *A Shot at Glory*, *I'll Sleep When I'm Dead*, *No Good Deed*, and *Never Talk to Strangers*.  The "Sizzle Reel" videos presented these films as TMS films by listing "The Movie Studio A Publicly Traded Company OTC: MVES" at the top of the clips, and gave no indication that TMS had not yet acquired them.

17.     A few months later, on August 16, 2016, Defendants issued a press release drafted by Venters entitled, "The Movie Studio to Acquire 12 Major Motion Pictures," that announced TMS' execution of the Arrowhead Agreement and falsely stated, "Based upon information provided by Seven Arts Entertainment, Inc., n/k/a Wireless Connect, Inc., on March 31st 2009, The Salter Group [an independent advisory firm] valued the Arrowhead Library between $2,500,000 - $3,300,000."

18.     The press release failed to disclose important limitations to the $2,500,000 to $3,300,000 valuation range as detailed by the Salter Group, including that the valuation: (i) was a draft for discussion purposes only, (ii) was solely for use by Seven Arts Entertainment without the Salter Group's prior written consent, which TMS did not obtain, (iii) included a thirteenth film that TMS was not acquiring, and (iv) was based on the assumption that there was "no pending or threatened litigation that would have a material effect on the value of the Assets or the Company," when in fact, at the time, there was such litigation pending in the New York Supreme Court, styled Arrowhead Target Fund v. Hoffman et al., No. 651481/2010.

19.     The August 16, 2016 press release announcing the Arrowhead Agreement also stated, TMS "expects to begin monetizing this acquisition in the 4th quarter of 2016," but omitted to state that TMS had already breached the Arrowhead Agreement by failing to make full payment as required.

20.     At least as early as 2016, Defendants began directing their unregistered sales agents to tell existing and prospective investors that TMS owned the Arrowhead Film Library.

21.     At least as early as 2016, Venters told at least one existing investor several times that TMS owned a film library that included the movie *Johnny Mnemonic*, in order to induce the investor to reinvest in TMS.  In addition, a TMS sales agent repeatedly told the same thing to another existing investor, who then reinvested in TMS.

22.     In or around the summer of 2016, Venters directed a sales agent to create a marketing flyer (the "Arrowhead Flyer"), which contained images of movie posters from some of the films in the Arrowhead Film Library, and listed it as "A Film Library of The Movie Studio A Publicly Traded Company."  Defendants began sending the Arrowhead Flyer to existing and prospective investors in or around late 2016, and directed sales agents to do the same.  An image of the front page of the Arrowhead Flyer is shown below.



23.     Defendants also knew other companies claimed to own certain films or the rights to certain films from the Arrowhead Film Library, but Defendants never disclosed this information to investors.  Indeed, Defendants knew as early as May 30, 2016, that another company claimed to own 50% of the copyright and all exploitation rights to *Stander* and *No Good Deed*, two of the films in the Arrowhead Film Library, having received a cease and desist letter from that company's counsel demanding that TMS "cease and desist any and all sales" of those two films and "any claims that you have the right to sell these films."  The letter also demanded that TMS forward any monies it had received from exploitation of these films; and refrain from further interference with

the company's copyright and exploitation rights in the two films.  Defendants also knew at least as early as July 16, 2018, that another company claimed to own three other films in the Arrowhead Film Library, specifically *Popstar*, *Red Riding Hood*, and *Supercross*.

24.     Despite knowing the issues described above, the Defendants, directly and indirectly through sales agents, continued to falsely tell existing and prospective investors that TMS owned the Arrowhead Film Library.

25.     On December 21, 2020, TMS published its Annual Report for the Year Ended June 30, 2020 on OTC.  In that annual report, TMS first disclosed that it would not be completing the acquisition of the Arrowhead Film Library, falsely claiming that it learned for the first time in June 2020 that the library had been sold to another party.

26.     Despite having known for some time that the Arrowhead Film Library had been sold to another purchaser, on July 31, 2020, Venters retained NetworkNewsWire to issue a press release announcing, "The Movie Studio Inc. (MVES) Benefits as Film Libraries See Valuations Skyrocket," which promotes TMS' 2016 agreement to acquire the Arrowhead Film Library without disclosing that the agreement was never consummated and thus, TMS had never acquired such film library.

27.     The Defendants have never corrected or clarified any press release announcing or touting the ownership of the Arrowhead Film Library or its films.

### 2.     Defendants' Materially False and Misleading Statements and Omissions with Respect to TMS' Film Production Operations

28.     Defendants also made false and misleading statements with respect to TMS' film production efforts, including with respect to its production studio space.

29.     TMS engaged in a pattern of releasing film trailers, issuing press releases touting films as "upcoming," and telling existing and prospective investors those films will be released

soon, when in reality, TMS only had filmed enough content for the trailer.  For example, Venters directed a sales agent to tell existing and prospective investors that two movies, *Cause and Effect* and *Pegasus*, were coming out soon.  However, at that time, TMS did not even have film scripts and only had completed trailers to show existing and prospective investors.

30.     In a March 28, 2018 press release, TMS described *Cause and Effect* and *Pegasus* as "2018 Upcoming Movies" when in fact, as Defendants knew, there was no reasonable possibility that either of these movies could be completed or released in 2018.

31.     On February 7, 2019, EmergingGrowth.com, which TMS authorized to issue press releases on its behalf, issued another press release regarding *Cause and Effect*, *Pegasus*, and a third movie, *The Last Warhead*, now describing those movies as a "Three Picture Package for 2019," with Venters quoted in the press release and stating how the three movies "round[ed] out [TMS'] proposed production slate for 2019."  Again, as Defendants knew, there was virtually no chance any of these films could be produced in 2019.

32.     Defendants also misled existing and prospective investors to believe TMS owned a production studio.  In reality, TMS has only occupied leased space, and it exaggerated the size and value of its leased space to existing and prospective investors.  In its November 19, 2018 Form 1-A/A for its offering pursuant to Regulation A, which was signed by Venters and filed with the SEC, TMS falsely stated that TMS "has its own studio facility that is used to make films, which is handled by the production company" and that:

> Most of the companies in the entertainment industry have never own[ed] their own studios, but have rented space from other companies.  There are also independently owned studio facilities, which have never produced a motion picture of their own because they are not entertainment companies or motion picture companies – they are companies who sell only studio space.

TMS, however, has never owned its own production studio facility and has only leased spaces.

33.     From at least September 2016 through at least early March 2018, TMS occupied only a small leased space at The Village at Gulfstream Park in Hallandale Beach, Florida. However, Defendants took a number of steps to give the appearance to investors that TMS either owned a production studio facility or occupied a much larger space than it actually did, including:

a.   forming a TMS subsidiary, Gulfstream Movie Studios, Inc., which TMS announced in a September 15, 2016 press release, in order to give the appearance that TMS owned a production studio;

b.   utilizing misleading marketing materials, which were sent to existing and prospective investors, stating that TMS "enjoys a 300-million-dollar 'back lot' at Gulfstream Park and production facility located in Hallandale Beach, Florida"; and

c.   utilizing a drone shot of The Village at Gulfstream Park's backlot, filmed by Venters, which he then showed existing and prospective investors and falsely told them TMS had the space for film production.

In fact, TMS did not occupy the backlot and only occupied a small portion of space during its time leasing space at Gulfstream Park.

34.     In that same September 15, 2016 press release, TMS also announced "the newest film to be produced by The Movie Studio," a movie called *Rainbows*, which "is being filmed at Gulfstream Park providing substantial production value to the Picture." As Defendants then knew, *Rainbows* was not being filmed at all, let alone at Gulfstream Park.

### 3.   <u>Defendants' Materially False and Misleading Statements and Omissions with Respect to TMS' Distribution and Licensing of Films</u>

35.     Defendants also made materially false and misleading statements to existing and prospective investors about TMS receiving revenue from Amazon and TMS' purported use of blockchain technology in distributing and licensing films.

36.     In or around 2018 and 2019, Venters told investors that TMS was receiving $4,000 a month from Amazon for TMS' films, *Bad Actress* and *Exposure*. As Defendants knew, this was false.

- 10 -

37.     In a March 18, 2021 press release, TMS falsely claimed to "Utilize[] Blockchain Technology for Licensing of Motion Picture in Spain Through 2027," with Venters quoted as stating:

> Establishing worldwide distribution agreements for our current library of new and aggregated revenue-shared titles through our blockchain application is a fundamental cornerstone of our proposed reverse engineering of future revenue-share aggregated titles that, when completed, could add significant economic scalability to the Company's revenue model.

There is no factual basis for these claims, and a TMS sales agent falsely told at least one investor that the SEC approved TMS' press releases, including this one.  On the day that press release was issued, TMS' stock opened at $0.033/share, surged up to $0.1653/share (approximately a 500% increase), before closing at $0.047/share (still approximately a 142% increase).  Defendants Venters and TMS sold TMS stock on March 18, 2021, earning trading profits of $17,476 and $9,600, respectively.

38.     Although there is no basis for Defendants to claim that TMS is using blockchain technology, TMS has made a number of public statements regarding TMS' use of blockchain technology, including:

    a.  a March 31, 2021 interview of Venters, posted to YouTube the next day, in which Venters described blockchain technology as the "other locomotive in our vertical" [sic] and how TMS has delivered video on demand via blockchain technology in three markets.  In the interview, Venters further stated, "if you look at the aggregation of content that we can move into that global landscape using blockchain, the capital increase for the company's balance sheet could be tremendous.";

    b.  a May 19, 2020 press release entitled, "The Movie Studio Utilizes Digital Marketplace Platform for Global Licensing, Distribution of Motion Picture Content," in which TMS announced "its integration with a digital content platform that brings sellers and distributors into one online digital marketplace."  The article also stated, "Blockchain technology is the key to the future profitability that helps establish the needed level of trust for greatly scaling subscription video-on-demand (SVOD) revenues.";

c.   a May 21, 2020 press release entitled, "The Movie Studio Announces Two Licensed Films Purchased for Distribution in Australia," which stated, "The Movie Studio's utilization of blockchain technology provides global marketing and licensor viewership on a 24-hour movie content access platform that expedites purchase and licensing decisions, title discovery, acquisition, sponsorship, delivery and payment that can be achieved within three to six days.";

d.   a May 28, 2020 press release entitled, "The Movie Studio Releases Corporate Overview," which announced to shareholders, "We are excited to share several major material events that have occurred as part of the expansion of our vertically integrated film production and distribution architecture utilizing over-the-top (OTT) distribution platforms and blockchain technology."  The press release then referenced and provided links to both the May 19, 2020 and May 21, 2020 press releases, described in sub-paragraphs (a) and (b) above; and

e.   a June 15, 2020 press release entitled, "The Movie Studio Inc. (MVES) Leveraging Blockchain Technology, Continues Expansion in Rapidly Growing VOD Industry," regarding TMS "using blockchain technology to address management of creative rights, digital piracy, [and] distribution complexity."

39.    Venters had ultimate authority for and knowledge of the above materially false and misleading statements made orally and in written documents and materials provided to existing and prospective investors, in order to induce investments in TMS.

**B.    Defendants' Offering and Selling of TMS' Restricted Stock in a Continuous, Unregistered Securities Offering**

40.    Since at least April 2017, TMS and Venters offered and sold investors restricted stock purportedly pursuant to either Rule 504 or Rule 506 of Regulation D of the Securities Act. TMS, however, never filed a Form D, "Notice of Exempt Offering of Securities," with the Commission. TMS engaged in general solicitation and advertising contrary to Rule 506(b) of Regulation D of the Securities Act, as described below.

41.    Although Rule 506(c) of Regulation D of the Securities Act requires stock to be sold only to accredited investors and for the issuer to take reasonable steps to verify that accreditation, in reality, TMS offered and sold stock to accredited and non-accredited investors in

the United States, Canada and Mexico, without taking reasonable steps to verify whether they were accredited.  From April 2017 to December 2020, Defendants raised at least $1.2 million from at least 70 investors in a continuous offering in violation of the offering registration provisions of the federal securities laws.

42.     From April 2017 to December 2020, Venters controlled every aspect of TMS' day-to-day business.  Venters recruited and hired sales agents, who were not registered brokers or associated with registered broker-dealers, in order to assist Defendants in offering and selling TMS' restricted stock to the investing public.  Venters told at least two sales agents that they did not need licenses to offer and sell TMS' restricted stock.

43.     Venters was also responsible for supervising and training the unregistered sales agents to offer and sell TMS' restricted stock.  In doing so, Venters provided the sales agents with scripts, talking points, an audio file with a sample pitch, and marketing materials.  Once the sales agents were trained, Venters directed them to solicit investors, including (a) soliciting investors from a previous job in which Venters sold gold investments, (b) cold calling persons with no connections to TMS or its employees, and (c) seeking additional investments from existing TMS shareholders.

44.     Before Venters or the sales agents he supervised called prospective investors to offer TMS' restricted stock or called existing investors to reload them and seek additional investments in TMS, Venters typically either issued a press release regarding TMS, or paid a third party to issue a press release regarding TMS, even recycling old news, with press releases typically issued on a quarterly, if not more frequent, basis.

45.     TMS' sales agents were compensated, in part, through commissions, which were not always disclosed to existing and prospective investors.  Venters also took commissions for himself, in addition to his salary.

46.     While TMS' sales agents often made the initial calls to existing and prospective investors to discuss the merits of investing in TMS, Venters often "closed" the deal when an interested investor was identified and gave advice directly to investors on the merits of investing in TMS in order to finalize the purchase.  Once Venters or a sales agent finalized a sale, TMS sent materials, including marketing materials, to the investor via email or U.S. mail.  TMS then had investors return a signed subscription agreement and an investor questionnaire either via email or U.S. mail and submit their funds, typically via wire transfer or a mailed check.  Venters frequently edited the private placement memoranda and subscription agreements used.

47.     When offering restricted stock, Venters and the TMS sales agents he supervised did not always disclose to investors that the stock would be restricted and often falsely told them that after six to twelve months the shares would be "freely tradeable" and could be sold on the open market.  TMS failed to disclose to investors that the stock would remain restricted unless the investors took steps to get the restrictive legends removed, including paying for an attorney opinion letter.

48.     As of today, many TMS investors have been unable to get the restrictive legends removed from their stock after twelve months have passed, despite asking Defendants for help.

49.     At all relevant times, Venters did not hold securities licenses and was not registered as a broker or associated with a registered broker-dealer.  Further, no registration statement was in effect or had been filed with the Commission in connection with the sale of these securities, and

no exemption from registration was available to Defendants.  Thus, the Defendants were not permitted to sell these securities.

### C.   Defendants' Misappropriation of Investor Funds

50.   TMS' annual reports for the 2016-2020 fiscal years, all published on OTC, reflected that TMS had "no source of revenue."  As a result, Defendants used investor funds and loans to cover TMS' operational costs, including Venters' salary and the commissions he took and paid to TMS sales agents.  Only a small portion of investor funds appears to have gone towards TMS' projects, such as the production and acquisition of films, despite existing and prospective investors frequently being told their funds would be used for such projects.

51.   In addition to utilizing investor funds for TMS' operational costs, the Defendants engaged in deceptive acts by misappropriating TMS investor funds for both Venters' benefit and Jane Doe's benefit.

52.   As TMS' President and CEO, the only signatory on TMS' bank accounts, and the only person with access to TMS' debit card at least through April 2020 (when TMS retained a new acting CFO), Venters both knew about and was responsible for the misappropriation of TMS investor funds to both himself and Jane Doe.

53.   Venters does not appear to have set salary payments from TMS, and instead, appears to withdraw and transfer money from TMS' bank accounts for himself, whenever wanted, taking at least $527,211 between April 2017 and March 2021.  Venters also charged personal expenses to TMS and used TMS funds to pay his credit card bill, which contained a mixture of business and personal expenses.

54.   Venters also used TMS funds for the benefit of Jane Doe, including paying for her meals, trips, living expenses, car, and other incidentals.  Venters also funneled TMS stock and funds to Jane Doe through multiple sham consulting agreements with her.  In signing those

agreements on behalf of TMS, Venters knew that she would not be performing the roles or providing the services described in the agreements. Venters further provided stock and funds to her under the agreements despite knowing that she had not performed the services described in the agreements.  From approximately April 2017 through July 2019, Venters caused TMS to pay Jane Doe at least $84,433.

55.     All of the misleading statements and omissions set forth herein, individually and in the aggregate, were material.  There is a substantial likelihood that a reasonable investor would have considered the misrepresented facts and omitted information regarding TMS' ownership, production, distribution and licensing of films, the fact that the stock being purchased was restricted, and Venters' misappropriation of investor funds, to be important.

56.     In addition, the deceptive acts, described herein, were both in connection with the purchase or sale of securities and in the offer or sale of securities because the Defendants were selling TMS' stock while making materially false and misleading statements.

57.     Finally, Defendants obtained investors' money by means of misrepresentations and omissions in the offer and sale of TMS' securities, as described above, and Defendants took investor funds under false pretenses, sold stock after issuing at least one misleading press release, and misappropriated investor funds.

V.     **CLAIMS FOR RELIEF**

**COUNT I**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

58.     The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

59.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by TMS and Venters as described in this Complaint, and no exemption from registration existed with respect to these securities.

60.     From in or about April 2017 through at least December 2020, the Defendants, directly and indirectly:

      a.  made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

      b.  carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

      c.  made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

61.     By reason of the foregoing, the Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

## Violations of Section 17(a)(1) of the Securities Act

62.     The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

63.     From in or about August 2016 through at least March 2021, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

64.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT III**

**Violations of Section 17(a)(2) of the Securities Act**

65.     The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

66.     From in or about August 2016 through at least March 2021, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

67.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**COUNT IV**

**Violations of Section 17(a)(3) of the Securities Act**

68.     The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

69.     From in or about August 2016 through at least March 2021, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

70.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT V

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)

71.     The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

72.     From in or about August 2016 through at least March 2021, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly employed devices, schemes or artifices to defraud.

73.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Securities Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

## COUNT VI

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

74.     The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

75.     From in or about August 2016 through at least March 2021, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Securities Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

## COUNT VII

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)

77.     The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

78.     From in or about August 2016 through at least March 2021, the Defendants, TMS and Venters, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities.

79.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Securities Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## COUNT VIII

### (Against Venters Only)

### Control Person Liability as to Venters under Section 20(a) of the Exchange Act for TMS' Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

80.     The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

81.     From in or about August 2016 through at least March 2021, Venters has been, directly or indirectly, a control person of Defendant TMS for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

82.     From in or about August 2016 through at least March 2021, Defendant TMS violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

83.    As a control person of TMS, Venters is jointly and severally liable with and to the same extent as TMS for each of the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

84.    By reason of the foregoing, Venters, directly and indirectly, has violated, and unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## COUNT IX

### (Against Venters Only)

### Violations of Section 15(a)(1) of the Exchange Act

85.    The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

86.    Venters, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or when he was not associated with an entity registered with the Commission as a broker-dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

87.    By reason of the foregoing, Venters, directly and indirectly, has violated, and unless enjoined, is reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.      Permanent Injunction

Issue a Permanent Injunction enjoining Defendants TMS and Venters, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and enjoining Venters from violating Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### B.      Disgorgement and Prejudgment Interest

Issue an Order directing Defendants TMS and Venters to disgorge all ill-gotten gains or proceeds received, with prejudgment interest thereon, resulting from the acts and/or courses of conduct complained of herein.

### C.      Civil Monetary Penalties

Issue an Order directing Defendants TMS and Venters to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### D.      Officer and Director Bar Against Venters

Issue an Order pursuant to, as applicable, Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], permanently prohibiting Venters from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

### E.      Penny Stock Bar Against Venters

Issue an Order pursuant to, as applicable, Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], which bars Venters

from participating in any offering of a penny stock, including acting as a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock; or inducing or attempting to induce the purchase or sale of any penny stock.

### F.      Further Relief

Grant such other and further relief as may be necessary and appropriate.

### G.      Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VI.      <u>DEMAND FOR JURY TRIAL</u>

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated:  August 13, 2021                    Respectfully submitted,

By:      s/Alise Johnson
         **Alise Johnson, Esq.**
         Senior Trial Counsel
         Florida Bar No. 0003270
         Direct Dial:  (305) 982-6385
         Email: johnsonali@sec.gov
         *Lead Attorney*
         *Attorney To Be Noticed*

         **Michelle Bosworth, Esq.**
         Counsel
         Special Bar No. A5502690
         Direct Dial:  (305) 982-6387
         Email: bosworthb@sec.gov

         **ATTORNEYS FOR PLAINTIFF**

**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154