UNITED STATES DISTRICT COURT SOUTHERN DISTRICT
OF FLORIDA

CASE NO.: 0:21-cv-61686-DPG

SECURITIES AND EXCHANGE COMMISSION,
      Plaintiff,
  v.
  THE MOVIE STUDIO, INC.
  and GORDON SCOTT VENTERS,
      Defendants.
_____/

## DEFENDANT GORDON SCOTT VENTER'S and THE MOVIE STUDIO, INC.'S SECOND AMENDED MOTION TO DISMISS OR ALTERNATIVELY MOTION FOR A MORE DEFINITE STATEMENT OR TO STRIKE PLAINTIFF'S COMPLAINT

Defendants The Movie Studio, Inc., (hereafter known as TMS or Defendants if jointly responding) and Gordon Scott Venters, (hereinafter known as Venters or Defendants if jointly responding) by and through their undersigned counsel, files this Defendant Gordon Scott Venter's and The Movie Studio, Inc's 2nd Amended Motion to Dismiss or Alternatively Motion for a More Definite Statement or to Strike Plaintiff's Complaint (DE1) filed by "Plaintiff," "The Commission," or the "SEC" pursuant to Fed.R.CivPro., Rule 12(b)(6) and (e ) and (f), et.al., as follows:

1.     Defendants TMS and Venters, jointly, file this 2nd Amended Motion to Dismiss or Alternatively Motion for More Definite Statement and to Strike, pursuant to Fed.R.CivPro., Rule 12(b)(6) and (e ) and (f), et.al.as follows:

2.     The allegations in the Complaint are a quintessential 'shotgun pleading,' complex, compound, confusing, and impossible to respond to with simple admissions or denials. Many of the allegations combine so many issues, parties, or non-parties, that it cannot be responded to appropriately.

## 'PARAMOUR' 'JANE DOE' 'INVESTOR' 'INVESTORS' 'SALES AGENT' OR 'SALES AGENTS' ARE IMPROPER PLEADINGS

3.       The Plaintiff refers to a "Paramour" and "Jane Doe" and it does not disclose who she/he is, and Plaintiff made numerous scandalous allegations as regards this unnamed individual, which must be stricken.   See below from Complaint Paragraph Nos. 2, 51, 52, and 54 wherein the purported "Paramour" or "Jane Doe" is not identified and from the wording of the complaint, it cannot be responded to without assumptions, speculation, and Defendant making a guess or determination of who it is.  The SEC must identify *with specificity and particularity* whom they are referring to in the allegations. Further the allegations referring to "Jane Doe" and 'Paramour' are scandalous and inappropriate as alleged.

4.       The Complaint also does not identify the purported "Investor or Investors." See Complaint Paragraph Nos.  21, 32, 36, 37, 39, 40, 44, 45, 47, 48, 57, and 58 cited below. Without a more factual and specific identification, The Defendant cannot respond to the allegations as pled. The SEC must identify *with specificity and particularity* whom they are referring to in the allegations.

5.       Neither does the Complaint identify who is the purported "Sales Agent" or "Sales Agents." See Complaint Paragraph Nos. 13, 14, 15, 20, 21, 22, 24, 29, 42, 43, 44, 45, 46, and 47.  The SEC must identify *with specificity and particularity* whom they are referring to in the allegations.

6.       As to the shotgun, compound, confusing allegations; they run throughout the Complaint. The allegations contain more than one issue, or one thought, or contain improper legal conclusions, and vague references to investors, or sales agents, or others.  See some examples in Complaint Paragraph Nos. 5, 12, 13, 15, 18, 22, 23, 25, 26, 29, 31,32, 33, 34, 37, 41, 42, 43, 44, 46, 47, 49, 50, 53, 54, and 57 cited herein below for convenience.

7.       It is requested that this Honorable Court dismiss the Complaint and order the allegations to be broken down into single issues, a set of single facts or thoughts per paragraph number, and an allegation per Defendant. Further, it is requested the SEC be ordered to identify the 'Jane Doe'

'investor' or 'sales agent,' the source or the information, or identify the specific documents referred to, the specific content, specific people, specific sales agents, or specific investors. Additionally, the Plaintiff needs to specifically identify the person or persons whom they are referring to overall, so a proper response and defense can be presented without Defendants making an assumption that could be incorrect.

8.      As to the numerous counts, each count fails to include the relevant factual basis or the necessary elements of the counts. There is no individual wherefore clause or claim for relief in each count, the counts realleged all the facts inappropriately, disgorgement is inappropriate jointly and severally and does not reduce the amount by legitimate business expenses, and the statute of limitations has run as alleged. The claim for relief is improperly bundled at the end of the complaint requesting global relief against all Defendants or Defendant without it being applicable to the relief allowed under law per each theory of law.

9.      The Commission alleges that TMS and Venters violated securities laws by engaging in two schemes to defraud and by making certain material misrepresentations and omissions to investors. However, (1) Venters did not misappropriate or misuse investor funds with the intent to defraud; (2) the press releases identified in the Complaint regarding TMS' ownership, production, distribution and licensing of films were not materially misleading or made with scienter; (3) the sale of the securities at issue were exempt from registration; and (4) Venters did not receive or pay transaction-based compensation in connection with the issuance of TMS stock.

10.     Below we address each individual allegation to the complaint that is relevant.

11.     The SEC alleges: the Defendants have violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and

Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder. The SEC further alleges that Venters also violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]. Venters is also liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for TMS' violations of Section 10(b) and Rule 10b-5 of the Exchange Act. And finally allege that unless enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

## LEGAL STANDARD

12.     To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" _Hunt v. Aimco Properties, L.P._, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged. See _Chaparro v. Carnival Corp._, 693 F.3d 1333, 1335 (11th Cir. 2012); A_shcroft v. Iqbal_, 556 U.S. 662, 678 (2009). Although the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." _Twombly_, 550 U.S. at 555 (quotation omitted); _Iqbal_, 556 U.S. at 678. Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. _S.E.C. v. City of Miami, Fla._, 988 F. Supp. 2d 1343, 1353 (S.D. Fla. 2013). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Eleventh Circuit has explained that: While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what

statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud. *FindWhat Inv. Grp. v. FindWhat.com,* 658 F.3d 1282, 1296 (11th Cir. 2011). Under Rule 9(b), it is "sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

13.      Has the SEC sufficiently alleged violations of the antifraud provisions of the Securities Acts? The Court must turn to whether the SEC has sufficiently alleged violations of the Securities Acts' antifraud provisions. The SEC alleges that Defendants' actions violated Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act. These statutes are very similar. The main difference is "that § 10(b) and Rule 10b-5 apply to acts committed in connection with a purchase or sale of securities while § 17(a) applies to acts committed in connection with an offer or sale of securities." *S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995) (emphasis in original); see also *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 795 (11th Cir. 2015) ("Though Rule 10b-5 regulates a different activity, i.e., the "purchase or sale" of securities rather than their "offer or sale," it borrows much, though not all, of its language from § 17(a)."). Rule 10b-5 and Section 17(a) both include three subsections. Rule 10b-5(a) makes it unlawful to "employ any device, scheme, or artifice to defraud"; subsection (b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading"; and subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or

deceit upon any person." 17 C.F.R. § 240.10b-5(a)-(c). Similarly, Section 17(a)(1) makes it unlawful "to employ any device, scheme, or artifice to defraud"; § 17(a)(2) makes it unlawful "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading"; and § 17(a)(3) makes it unlawful "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

14.     In some cases, the Eleventh Circuit has indicated that violations of Section 10(b), Rule 10b-5, and Section 17(a) require a showing of "material misrepresentations or materially misleading omissions." See _S.E.C. v. Merch. Cap., LLC,_ 483 F.3d 747, 766 (11th Cir. 2007); _S.E.C. v. Radius Cap. Corp._, 653 F. App'x 744, 749 (11th Cir. 2016). However, the Eleventh Circuit has also clarified that a defendant may be liable under both Section 17(a)(1) and (3) and Rule 10b-5(a) and (c) without making a material misrepresentation. See _Big Apple Consulting_, 783 F.3d at 796 (indicating that subsections (1) and (3) in § 17(a) and subsections (a) and (c) in Rule 10b–5 "prohibit schemes to defraud and fraudulent courses of business" and "do not use the word 'make' or even address misstatements"); _S.E.C. v. Monterosso_, 756 F.3d 1326, 1334 (11th Cir. 2014) ("The operative language of section 17(a) does not require a defendant to "make" a statement in order to be liable . . . Likewise, subsections (a) and (c) of Rule 10b–5 'are not so restricted' as subsection (b), because they are not limited to 'the making of an untrue statement of a material fact.'"); see also _S.E.C. v. Strebinger_, 114 F. Supp. 3d 1321, 1331 (N.D. Ga. 2015) ("[S]ubsection (a) and (c) of Rule 10b-5, unlike subsection (b), do not require an individual 'make' a false statement to establish liability."); _S.E.C. v. Contrarian Press, LLC_, No. 16-06964, 2019 WL 1172268, at *4 (S.D.N.Y. Mar. 13, 2019) ("While Rule 10b-5(b) targets misleading disclosures, Rules 10b-5(a) and (c) target deceptive conduct."). Accordingly, to allege claims

under Section 17(a)(1)-(3), Section 10(b), and Rule 10b-5(a)- (c), the SEC must show: (1) a device, scheme, artifice to defraud; a material misrepresentation or omission; or an act, practice, or course of business which would operate as a fraud or deceit; (2) in the offer of or in connection with the purchase or sale of a security; and (3) in interstate commerce. See *S.E.C. v. Quiros,* No. 16-21301, 2016 WL 11578637, at *12 (S.D. Fla. Nov. 21, 2016). For claims under Section 17(a)(1) and Rule 10b-5, the SEC must also allege facts supporting scienter. *Merch. Cap.*, 483 F.3d at 766. The SEC need only demonstrate negligence for claims under Sections 17(a)(2) and (3). *Id.* There is "considerable overlap among the subsections of the Rule and related provisions of the securities laws"—i.e., they prohibit some of the same conduct. *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1102 (2019). However, Rule 10b-5(b) and § 17 (a)(2) specifically require misrepresentation. And Rule 10b-5(b)—but not § 17(a)(2)— requires that the defendant be the "maker" of the misrepresentation or omission, meaning the defendant has "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011); *Big Apple Consulting*, 783 F.3d at 797 (holding that Section 17(a)(2) cannot be read to include the "maker" restriction present in Rule 10b–5(b)).

15.     The Court must first address whether the SEC has sufficiently alleged material misrepresentations or omissions in violation of Rule 10b-5(b) and § 17(a)(2). The Court must then analyze whether the SEC has adequately pleaded violations of Rule 10b-5(a) and (c) and §§ 17(a)(1) and (a)(3).  In this case the SEC did not sufficiently, nor clearly allege misrepresentations or omissions. The allegations are not clear, are compound and confusing and are legal conclusions. Whether the SEC has sufficiently alleged violations of Rule 10b-5(b) and Section 17(a)(2) As noted above, to establish a violation of Rule 10b-5(b), the SEC must prove that the

defendant made a material misrepresentation or materially misleading omission in connection with the sale or purchase of securities with scienter. Section 17(a)(2) requires a showing of a material misrepresentation or materially misleading omission in connection with an offer or sale of securities made with negligence.

16.     The Court must focus its analysis on: (i) whether the SEC has sufficiently pleaded material misrepresentations or omissions made with scienter and negligence; and (ii) whether the SEC's allegations concerning the circumstances constituting fraud satisfy the heightened pleading requirements of Rule 9(b). In the securities fraud context, the test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." _Merch. Cap._, 483 F.3d at 766 (quoting _S.E.C. v. Carriba Air_, 681 F.2d 1318, 1323 (11th Cir. 1982)). In other words, a statement or omission is material where "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the 'total mix of information available.'" _S.E.C. v. Monterosso_, 768 F. Supp. 2d 1244, 1263 (S.D. Fla. 2011), aff'd, 756 F.3d 1326 (11th Cir. 2014) (quoting _S.E.C. v. DCI Telecommunications, Inc._, 122 F. Supp. 2d 495, 498 (S.D.N.Y. 2000)). Materiality is a mixed question of law and fact—and a complaint should not be dismissed on materiality grounds unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." _Ganino v. Citizens Utilities Co._, 228 F.3d 154, 162 (2d Cir. 2000). Here, as alleged, Defendants are unable to respond.

17.     Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." _S.E.C. v. Ginsburg_, 362 F.3d 1292, 1297 (11th Cir. 2004) (internal quotations and citation omitted). Scienter can be established by a showing of knowing misconduct or severe recklessness.

*Monterosso*, 756 F.3d at 1335. To show severe recklessness, the SEC must demonstrate "that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. (quoting *Carriba Air*, 681 F.2d at 1324). Circumstantial evidence may be used to support a strong inference of scienter. *City of Miami*, 988 F. Supp. 2d at 1360. The SEC need only plead scienter generally. *S.E.C. v. Levin*, No. 12-21917, 2013 WL 5588224, at *13 (S.D. Fla. Oct. 10, 2013). However, it must still "allege plausible facts or suggest reasonable inferences that, if taken as true, would support a finding of scienter." *S.E.C. v. Mannion*, 789 F. Supp. 2d 1321, 1342 (N.D. Ga. 2011); see also *S.E.C. v. Ustian*, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017) ("In SEC enforcement actions, Rule 9(b) allows mental states to be alleged generally, yet there must still be some basis for believing the plaintiff could prove scienter.") (quotation omitted). The Court determines scienter by examining all allegations in the aggregate rather than sole allegations in isolation. *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016-17 (11th Cir. 2004). Typically, scienter is an issue left to the trier of fact. *Monterosso*, 756 F.3d at 1335.4 To establish negligence for purposes of Sections 17(a)(2)-(3), the SEC must show a failure to exercise a standard of reasonable care. *City of Miami*, 988 F. Supp. 2d at 1362; see also *S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3d Cir. 1997) (describing negligence in securities context as the failure to exercise reasonable care or competence). Factual allegations supporting an inference of scienter will also satisfy the lower standard of negligence required for claims under Sections 17(a)(2) and (3) of the Securities Act. *S.E.C. v. Coplan*, No. 13-62127, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014).

18.     In the instant case, due to the confusing shotgun, complex, compound nature of the allegations, it is impossible as alleged to decipher which actions are supportive of the claims.

Here, the SEC must meet the benchmark announced by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), under which a complaint survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Again, as alleged herein, this inference of scienter is not clear due to the way the allegations are pled due to the compound, complex, and confusing sentences combining many different levels of scienter and different combinations of confusing thoughts with vague or unidentified persons or documents.

19.     The SEC also did not sufficiently allege Venters has controlling person liability under Section 20(a). Section 20(a) "imposes joint and several liability on '[e]very person who, directly or indirectly, controls any person liable' for violation of the securities laws." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1276 (11th Cir. 2016) (quoting 15 U.S.C. § 78t(a)). It is a type of secondary liability and "cannot exist in the absence of a primary violation." Id. (quoting *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004)). A defendant is liable as a controlling person under Section 20(a) if he or she "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . and had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996) (quotation and alteration omitted). A controlling person is derivatively liable under Section 20(a) if the controlling person "acted recklessly in failing to do what he could have done to prevent the violation." *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 722 (11th Cir. 2008) (quotation omitted). The SEC's allegations are confusing, compound, and sometimes so confusing that Defendants are unable to determine who did what or when.

## THE COMPLAINT MUST BE DISMISSED AS A SHOTGUN PLEADING

20.    Defendants contend that the SEC's Amended Complaint constitutes an impermissible

shotgun pleading because the antifraud provisions contained in Counts I-IX do not state with

particularity which specific allegations apply to which specific count and instead state that "the

Commission repeats and realleges paragraphs 1 through 57 of this Complaint." See ¶¶ 58, 62, 65,

68, 71, 74, 77, 80 and 85. In the case of Wagner *v. First Horizon Pharmaceutical Corp.*, 464 F.3d

1273, 1279 (11th Cir. 2006) the Eleventh Circuit found that the elements of the securities fraud

claims in plaintiff's complaint were insufficiently linked to the large fact section that preceded

the counts. The Eleventh Circuit noted that the complaint was "the proverbial **shotgun pleading**,"

which are "those that incorporate every antecedent allegation by reference into each subsequent

claim for relief or affirmative defense." *Id.* Importantly, however, the Eleventh Circuit has

explained that "[t]he essence of a shotgun pleading is 'that it is virtually impossible to know

which allegations of fact are intended to support which claim(s) for relief.'" *Vujin v. Galbut*, 836

F. App'x 809, 814 (11th Cir. 2020) (quoting *Anderson v. District Bd. of Trustees of Cent. Florida

Cmty. Coll.*, 77 F.3d 364, 366 (11th Page 42 of 47 1996)). The Eleventh Circuit has identified

four types of pleadings that produce this problem: (1) "complaints that contain multiple counts

where each count adopts the allegations of all preceding counts, causing each successive count

to carry all that came before and the last count to be a combination of the entire complaint"; (2)

"complaints that are replete with conclusory, vague, and immaterial facts not obviously

connected to any particular cause of action"; (3) "complaints that do not separate each cause of

action or claim for relief into separate counts"; and (4) "complaints that assert multiple claims

against multiple defendants without specifying which of the defendants are responsible for which

acts or omissions, or which of the defendants the claim is brought against." Id. at 815 (quoting

_Weiland v. Palm Beach Cty. Sherriff's Off._, 792 F.3d 1313, 1321-23 (11th Cir. 2015)) (internal quotations omitted).  This instant complaint violates 2, 3, and 4 above in that the complaint is replete with conclusory, vague, and immaterial facts, it does not separate the claims for relief into separate counts and asserts multiple claims against multiple defendants.

**DISGORGEMENT IS IMPROPER**

21.    On page 22 of the Complaint in the request for relief, request (B), the SEC in its request for relief is demanding disgorgement of <u>all</u> the income to TMS and Venters, and 'Jane Doe' and it is unclear of the basis or amount.  This is inappropriate and must be stricken, as legitimate business expenses are allowed.  Further, it is believed that there is no intention of refunding any funds to the investors, although the SEC knows each and every investor from its pre-filing, years long, non-public investigation.  The SEC is not acting in the best interest of the investors and has not properly alleged a basis for this relief.  The SEC in the Complaint did not identify the 'investors' or 'sales agents' or 'Jane Doe' with enough specificity to properly defend. In this classic 'shotgun pleading.'

22.    <u>As to the disgorgement issues overall</u>, on June 22, 2020, in _Liu et al. v. Securities and Exchange Commission_, 591 U.S. ___ (2020), the Supreme Court upheld the SEC's authority to obtain disgorgement as equitable relief under 15 U.S.C. § 78u(d)(5), but with some <u>notable limitations</u>. In short, the Court found in _Liu_ that disgorgement constitutes proper equitable relief rather than an improper penalty, provided that the amount disgorged does not exceed the wrongdoer's net profits and the disgorged proceeds are awarded to investors as "equitable relief." The Court's decision is significant because it resolved the "antecedent question" reserved in _Kokesh v. SEC_, 581 U.S. ___ (2017), about whether the SEC has authority "in the first instance" to obtain disgorgement. Op. at 1. While the opinion places certain limitations on

disgorgement, the Court could have ruled that the SEC lacked authority to obtain any disgorgement at all. Instead, the Court reaffirmed the equitable nature of the remedy and the agency's longstanding policy of denying wrongdoers "the fruits of their ill-gotten gains." *Id.* at 15.

23.     As to the SEC's failure to return funds to the investors:  Under 15 U.S.C. § 78u(d)(5), Congress has expressly limited the SEC's ability to seek equitable relief to what "may be appropriate or necessary for the benefit of investors." In practice, however, the SEC does not always return the entirety of recovered funds to investors. In some cases, the amount awarded is not sufficient to justify the costs of a distribution (i.e., the administrative costs of distribution exceed the amount to be distributed) or it is difficult to identify the specific investors injured by the misconduct, such as when insider trading occurs. In those cases, the Commission transmits to the U.S. Treasury funds that it cannot otherwise distribute to injured investors. *Id*. at 14. Whether this practice is consistent with equitable principles, or the term of the statute is a question left to the Ninth Circuit. Nonetheless, the Court indicated that the SEC's equitable remedies "must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." *Id*. at 16. In doing so, the Court did not address the Government's argument that depositing funds with the Treasury is permissible where the distribution of an award to victims is impracticable or not feasible, going so far as to expressly decline to take a position as to whether feasibility should be a factor here. *Id*.

24.     Further, the disgorgement award that is requested must be stricken as it 'imposes joint and several liability' against all Defendants improperly. Second, the SEC historically has required disgorgement payments from all defendants who realize ill-gotten gains, including on a joint and several basis. The Court indicated that this practice is "seemingly at odds with the common-law

rule requiring individual liability for wrongful profits," but also acknowledged that the common law did permit liability for partners acting in concert. *Id.* at 17–18. Because there is a "wide spectrum of relationships between participants and beneficiaries of unlawful schemes—from equally culpable codefendants to more remote, unrelated tipper-tippee arrangements"—the Court declined to articulate guidance as to the specific circumstances where a disgorgement remedy would be considered impermissibly punitive as applied to multiple defendants. Accordingly, the Ninth Circuit on remand will need to determine whether Liu and Wang should be subjected to joint liability. The Court did note, however, that (1) the couple is married, (2) Liu formed business entities and solicited investments, which he misappropriated, and (3) Wang held herself out as an executive of the entity to which Liu directed misappropriated funds. *Id.* at 18. Herein the SEC's request for disgorgement is impermissibly punitive as alleged.

25.   The disgorgement request herein 'declines to deduct business expenses from the award' improperly, as the SEC is attempting to punitively take all the income from TMS and Venters jointly and severally.  Finally, with some exceptions in the context of heavily negotiated, settled cases, the SEC has typically disallowed the deduction of expenses from disgorgement awards under the theory that such expenditures are made in furtherance of the illegal conduct or scheme. Significantly, the Court in *Liu* now holds that legitimate expenses must be deducted before awarding disgorgement under § 78u(d)(5). *Id.* at 19. Specifically, courts must determine "whether expenses are legitimate or whether they are merely wrongful gains 'under another name'" to ensure that disgorgement awards "fall[] within the limits of equity practice." *Id.* The Court further noted that, while there may be some schemes in which all expenditures might be appropriately characterized as fraudulent, there were expenditures in the instant case that "arguably have value independent of fueling a fraudulent scheme." *Id.* This, too, will need to be examined on remand.

For instance, Liu and Wang made lease payments and payments toward cancer-treatment equipment. Such items might be considered legitimate expenses meriting deduction from the disgorgement figure.

**IMPROPER 'JANE DOE' RELIEF DEFENDANT DISGORGEMENT**

26.        The SEC is attempting to disgorge the funds paid to a "Jane Doe," 'Sales Agents,' and 'Venters'among other un-named individuals or entities; specifically, every single penny TMS raised during the time at issue.  Although a federal court may add a person who is not accused of wrongdoing in a securities enforcement action as a relief defendant when that person (1) has received ill-gotten funds and (2) does not have a legitimate claim to those funds. *S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *FTC v. Transnet Wireless Corp*., 506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007), that is not applicable here as alleged. The person or entity is known as a "relief defendant" or a "nominal defendant"—someone who is not accused of violating the securities laws but who is nevertheless in possession of funds that the violator passed along to him or her. *S.E.C. v. Merrill*, No. 18-2844, 2021 WL 1117280, at *4 (D. Md. Mar. 23, 2021). In the securities context, to have no legitimate claim to the ill-gotten funds means that an individual gave no consideration for the funds and thus received them as a gift. *S.E.C. v. Nat. Diamonds Inv. Co.*, No. 19-80633, 2019 WL 2583863, at *7 (S.D. Fla. June 11, 2019). "Alleging that the proposed relief defendant has 'no legitimate claim' to the ill-gotten funds is sufficient to satisfy the second pleading requirement at the motion to dismiss stage of the proceeding." *Fed. Trade Comm'n v. IAB Mktg. Assocs., LP*, No. 12-61830, 2013 WL 11331001, at *1 (S.D. Fla. Aug. 20, 2013) (citations omitted). The allegations concerning 'Jane Doe' and Venters are not sufficient at the pleading stage to establish that Defendants and "Jane Doe" "received or otherwise benefitted from" proceeds of the unlawful practice and the relief defendant had "no legitimate

claim" to those funds); As alleged in _United States Commodity Futures Trading Comm'n v._
_Gresham,_ No. 09-00075, 2010 WL 11506864, at *3 (N.D. Ga. Apr. 28, 2010) it does not apply,
where the court (denying relief defendant's motion to dismiss where plaintiff alleged that relief
defendant received over $400,000 from … scheme and did not provide any services in exchange
for the funds, or in the alternative, the services he provided did not warrant the substantial
payments received). Defendants herein maintain that the SEC has pleaded insufficient facts to
establish that the allegations regarding Defendants and the un-named persons conduct in the
context of the nonfraud Relief Defendant must still be pleaded with particularity under Rule 9(b).
_Id_. at 28-29. The SEC has not even identified any individuals properly as stated above. In its
attempt to disgorge all the funds raised by TMS. As a result, this case must be dismissed.

## TIME BARRED CLAIMS

27.      The SEC's claims time-barred under 28 U.S.C. section 2462.  Defendants argue that many
of the SEC's claims are time-barred because they are based on conduct that occurred outside the
five-year statute of limitations period set forth in 28 U.S.C. section 2462. Specifically,
Defendants argue that any non-equitable remedies, including penalties and disgorgement,
requested by the SEC for conduct arising prior to five years prior to the date of the Complaint
must be dismissed. The Court may only penalize violations that occurred within five years of the
filing of the Complaint and award disgorgement for ill-gotten gains received during that period.
Defendants' link the statute of limitations to "conduct," asserting that section 2462 is tied to the
accrual of a "claim," and the Court may not therefore impose a penalty for any violation where
at least one of the elements occurs outside the limitations period. If the SEC's claims included
violations occurring outside the five-year limitations period, it would be appropriate for the Court
to partially dismiss the claims to the extent they seek time-barred relief. See _S.E.C. v. Cohen_, 332

F. Supp. 3d 575, 587-88 (E.D.N.Y. 2018). Here most of the conduct alleged, at least elements thereof, were initiated or began prior to the 5 years prior to filing, and the SEC tries to allege all the elements occurred fully within the previous 5 years. That is clearly not the case as alleged, and the case must be dismissed.

28.     Although the Complaint must be dismissed for all the reasons stated above, Defendants have laid some further responses to specific allegation below as alleged with responses to each numbered allegation for the Court's reference.

## SPECIFIC ALLEGATIONS IN THE COMPLAINT

29.   The allegations in paragraph number one of the complaint, this allegation, as well as most of the allegations in this Complaint, contain numerous independent facts clumped together, that involve many theories of law and potential causes of action.  It cannot be responded to as alleged as it is compound, complex, and confusing as it contains allegations concerning press releases, ownership, unregistered brokers, that investors are elderly, unregistered securities, et.al.

30.     In the allegations in paragraph number 2, the SEC alleges funds raised from investors, in part to pay for press releases and commissions to sales agents, and in part to fund Venters' lifestyle and to hide payments to an apparent paramour, identified in this Complaint as "Jane Doe," it again combines numerous separate and distinct actions and distinct frauds that cannot be responded to as alleged. It also contains Jane Doe, investor, press releases, agents in one sentence. It is unclear as alleged what portion is at issue as to the total amount of disgorgement that is being requested. Further, there are no specifics as to what funds were used, the source of this information, nor why any consulting agreements were a sham.  Also, as stated above, "Jane Doe" is not identified, and it could be any 'paramour' to any person. The Commission alleges that Venters misappropriated $527,211.00 between April 2017 and March 2021 for his own personal

benefit in violation of Section 10(b) of the 1934 Act and Rule 10b-5 thereunder, as well as Section 17(a)(1). *See* Compl. at ¶ 53; *see also id.* at ¶¶ 50–54. The Commission must prove that Venters did so with an "intent to deceive, manipulate, or defraud." *See Aaron v. SEC*, 446 U.S. 680, 701 (1980) (explaining that scienter is a necessary element under Section 17(a)(1) and 10(b) and Rule 10b-5 promulgated thereunder.) There are no particular allegations as to 'intent to deceive,' 'manipulate,' or to 'defraud.' There are no specifics that can be responded to as alleged. The Commission alleges that Venters misappropriated investor funds for his benefit and for the benefit of another person referred to as "Jane Doe." Specifically, the complaint alleges that from "approximately April 2017 through July 2019, Venters caused TMS to pay Jane Doe at least $84,433" and that Venters did so pursuant to "sham consulting agreements." *See id.* at ¶¶ 2, 54. The Commission also alleges that Defendants paid her expenses and other incidentals and paid her nTMS stock. *Id.* at ¶ 54. While the Commission makes several allegations, the Commission never alleges that "Jane Doe" did not perform the services referenced in the agreements. The SEC never stated with the proper particularity what 'Jane Doe' did or did not do that caused her/his pay to be improper or why the consulting agreements were a sham. As to the 'commission's' allegations, again, they are too vague and compound to properly respond. Since the SEC did not identify with the necessary particularity the people at issue, it is impossible to defend the Defendant's action without assuming who the SEC is referring to. Again, as to the allegations about Venters supporting his 'lifestyle,' the allegations are not alleged with sufficient particularity to defend, again, without guessing what is meant by lifestyle. The allegations are vague and ambiguous and cannot be responded to appropriately. The calling of 'Jane Doe' as a 'paramour' must be stricken from the complaint as scandalous and inappropriate classification.

31.    In paragraph number 3 of the Complaint wherein the SEC alleges that: "Finally, the Defendants

dumped shares of TMS stock on the unsuspecting public after issuing at least one of the false and misleading press releases."  It does not state when this dump took place and what press release was used to achieve this dump.  What does dump mean?

32.     Paragraph number 4 of the Complaint, the SEC alleges numerous violations clumped together in one sentence without the underlying factual basis.

33.     In paragraph 10 of the Complaint, the SEC alleges again compound allegations with more than one action that cannot be responded to as alleged. It combined Defendants TMS and Venters issued numerous press releases to make it appear that TMS was a successful company in the film business with ongoing projects in development with "In reality, TMS has not been successful— it had an accumulated deficit of approximately $13.09 million as of March 31, 2021—and few of its projects have come to fruition."

34.     The allegations in paragraph number 11 the SEC alleges "Venters drafted the materially false and misleading press releases himself, or authorized, provided information to, and paid third parties to issue the press releases on behalf of TMS. Venters was often quoted in the press releases and listed as the TMS contact." Again, as alleged it combines numerous thoughts and facts without specificity as to what was false and misleading or who the third parties are, and it is impossible to respond.

35.     The SEC alleges in paragraph 12: "As detailed below, in soliciting investors, Venters, and TMS' unregistered sales agents that he directed and supervised, made materially false and misleading oral and written statements, regarding TMS' ownership, production, distribution, and licensing of films. Venters knew or was severely reckless in not knowing that the statements TMS are false and misleading, as he oversaw TMS' day-to day operations, including signing agreements on behalf of TMS and drafting materials used by TMS' unregistered sales agents."  Once again it

improperly combines numerous statements without proper factual basis and combines numerous distinct actions that cannot be responded to as alleged. It does not allege who the purported sales agent is, what the statements were specifically, or who was unregistered.

36. The SEC allegations in paragraph 13 do not state who the investors are, and what was said or when and how this communication took place.  There is no way to respond to the statements without specificity.

37.   In paragraph number 14, the SEC alleged "Defendants, and sales agents supervised by Venters, also misrepresented to investors that TMS acquired a film library referred to as the Arrowhead Film Library.  This does not state what the misrepresenting is so it cannot be responded to as alleged. Additionally, generally as to the related paragraphs in the Complaint, The Commission alleges that Defendants misrepresented to existing and prospective investors that TMS acquired a film library referred to as the Arrowhead Film Library. *Id.* at ¶¶ 13–27.3. Once again, the allegations are not specific enough to respond to. The Commissions' allegation that a sales agent "supervised by Venters" told one investor that TMS owed hundreds, or thousands of movies is simply not actionable. *Id.* at ¶13. The SEC cannot simply attribute a statement to Venters, much less TMS, because an individual the SEC claims was "supervised" by Venters makes a statement, even if that statement is materially false. The SEC must at minimum allege facts supporting that Venters *authorized* the unnamed sales agent to make these alleged statements *knowing* they were materially false.  Further, the purported agents or investors are not identified to be able to respond.  Further, the SEC alleged that the valuation report issued by the Salter Group was a draft for discussion purposes only and intended for another entity, *see* Compl. at ¶¶ 17–18. There is no allegation specific enough to respond to that TMS *knew* or was reckless in not knowing that the valuation was misleading or inaccurate. Moreover, the alleged misrepresentations are not

actionable. Courts have defined materiality as, "information that is substantially likely to be important to a reasonable investor in deciding whether to purchase, sell, or hold securities." *See* <u>*SEC v. Kirkland*</u>, 521 F. Supp. 2d 1281, 1303 (M.D. Fla. 2007). This Circuit has explained that "materiality is proved by showing a 'substantial likelihood' that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See* <u>*SEC v. Ginsburg*</u>, 362 F.3d 1292, 1302 (11th Cir. 2004) (citations omitted); *see also* <u>*Basic, Inc. v. Levinson*</u>, 485 U.S. 224 (1988).

To the extent that the Commission contends that TMS failed to disclose the thirteenth film that TMS was not acquiring with the Arrowhead library, *see* Compl. at ¶ 18, the Commission neglects to consider whether this alleged omission is material. The thirteenth film referenced in the Complaint is a film entitled *Red Riding Hood*. Even if this film was not included in the valuation, the difference in the value of the library would be less than a 10% differentiation and was covered in the variation of the valuation. This differentiation could not have possibly "significantly altered the 'total mix' of information made available." *See* <u>*Ginsburg*</u>, 362 F.3d at 1302. Lastly, the Commission seeks to hold the Defendants liable for failure to disclose that the reported valuation "was based on the assumption that there was no 'pending or threatened litigation that would have a material effect on the value of the Assets or the Company.'" *See* Compl. at ¶ 18. Defendants cannot be held liable for a genuine belief that they thought to be true at the time. Defendants were never made aware during the relevant time period by relevant parties, including their counsel handling the transaction, that there was any pending litigation associated with the Arrowhead Target Funds.

38.     The allegations in paragraph number 15 again are complex, combined numerous separate claims and cannot be responded to as alleged. The SEC alleged an agreement for TMS to purchase the Arrowhead Film Library, that TMS never completed the acquisition, the Defendants, and sales

21

agents directed by Venters, falsely told investors that TMS owned the films and used marketing materials listing the Arrowhead Film Library as "A Film Library of The Movie Studio, Inc. Again, no sales agent is disclosed, no investors are disclosed, no dates, times, or specific allegations that can be responded to as alleged. It is overbroad.

39.     The allegations in the SEC Complaint in paragraph 18 are combining numerous allegations improperly combining many separate and distinct actions, which makes it once again, impossible to respond to as alleged as it also deals with attorney-client privilege, a separate litigation, and numerous distinct actions which must be alleged individually.

40.     The allegations in the SEC Complaint in paragraph 19 again combining two separate thoughts and breaches and must be broken down into two separate allegations with more specificity.

41.     The allegations in paragraph number 20 do not disclosure enough information about who the purported unregistered sales agent is, or who the investors are or when and where these statements were purportedly made.

42.     The allegations in paragraph number 21 "At least as early as 2016, Venters told at least one existing investor several times that TMS owned a film library that included the movie *Johnny Mnemonic*, in order to induce the investor to reinvest in TMS. In addition, a TMS sales agent repeatedly told the same thing to another existing investor, who then reinvested in TMS." This allegation does not provide specificity to determine who is the investor, what was said or when it was said, who the second investor is, or who the sales agent is.

43.     The allegations in paragraph number 22 SEC alleged Venters directed a sales agent to create a marketing flyer (the "Arrowhead Flyer"), which contained images of movie posters from some of the films in the Arrowhead Film Library and listed it as "A Film Library of The Movie Studio A Publicly Traded Company." Defendants began sending the Arrowhead Flyer to existing and

prospective investors in or around late 2016 and directed sales agents to do the same. An image of the front page of the Arrowhead Flyer is shown below." Same argument as paragraph 48 and others above: lack of specificity of sales agent, investor, dates and times, and content.

44.     The allegations in paragraph number 23 "Defendants also knew other companies claimed to own certain films or the rights to certain films from the Arrowhead Film Library, but Defendants never disclosed this information to investors." It also contains 5 separate and distinct allegations, making it too convoluted to properly respond to.  It alleges another company claimed to own 50% of the copyright and all exploitation rights to *Stander* and *No Good Deed*, cease and desist letter from that company's counsel, and that another company claimed to own three other films in the Arrowhead Film Library.

45.     The allegations in paragraph number 24 again do not identify the purported sales agents, the existing and prospective investors, making it impossible to respond to as alleged.

46.     The allegations in paragraph number 25 cannot be responded to as alleges as it combines "TMS published its Annual Report for the Year Ended June 30, 2020, on OTC" with disclosure, and then, falsely claiming that it learned for the first time in June 2020 that the library had been sold to another party.

47.     The allegations in paragraph number 26 combines three separate and distinct allegations which must be broken down into individual paragraphs to be able to properly respond.

48.     The allegations in paragraph number 27 – 36 are again improperly combined and impossible to respond to. Paragraph 29 does not identify existing and prospective investors.  Then it adds for example, amount of content, unidentified purported sales agents and investors, film scripts, and only had completed trailers to show existing and prospective investors.

49.     The allegations in paragraph 30 contain conclusions of law without any ultimate facts that

can be responded to. The allegations in paragraph number 29-36 once again combine numerous allegations which must be broken down and contain legal conclusions. It improperly combines press releases with timing of film productions. As to the allegations in paragraphs 29-36, that Venters and TMS knowingly make materially false claims regarding its TMS' Film Production Operations. It also alleged Commission alleges that Defendants misrepresented to existing and prospective investors regarding upcoming production efforts, including that: Defendants falsely claimed that TMS would be releasing movies *Cause and Effect* and *Pegasus*. ¶¶ 29–31. And Defendants made misleading statements regarding TMS's ownership of a production studio. ¶¶ 32–36. The SEC's allegation does not sufficiently allege which production facility, which investors, and contains conclusions of law without proper factual foundations.

50.     The allegations in paragraph 32 do not identify the occupied leased space, what exaggerations were made to whom and when, nor does it identify the existing and prospective investors. It improperly combines separate allegations concerning the Form 1- A/A, with claims TMS falsely stated that TMS have its own studio facility, all without any ultimate facts.

51.     As to the allegations in paragraph 33, a-c, the complaint again improperly combines distinct allegations without enough specificity or ultimate facts, such as what number of steps to give the appearance to investors that TMS either owned a production studio facility or occupied a much larger space than it actually did. Further, SEC includes legal conclusions inappropriately in the allegations by combining the forming of a TMS subsidiary, Gulfstream Movie Studios, Inc., in order to give the appearance that TMS owned a production studio. This improper allegation cannot be responded to as is and contains inappropriate legal conclusions.  As to paragraph 33(b), it alleges TMS utilizing misleading marketing materials, which TMS sent to existing and prospective investors, without identifying what is misleading or who the investors are. As to the allegations in

paragraph 33(c), once again inappropriate combination of facts and legal conclusions and lack of identification of who, what, where, and when.

52.     The allegations in paragraph number 34 the SEC again doubles up on the allegations and include legal conclusions without specificity.

53.     The allegations in paragraph number 35 "Defendants also made materially false and misleading statements to existing and prospective investors about TMS receiving revenue from Amazon and TMS' purported use of blockchain technology in distributing and licensing films." Once again combine four distinct thoughts and actions (representations, blockchain, investors, etc.) along with a legal conclusion and does not identify the investors. In paragraph 36 the SEC alleged: "In or around 2018 and 2019, Venters told investors that TMS was receiving $4,000 a month from Amazon for TMS' films, *Bad Actress* and *Exposure*. As Defendants knew, this was false." As alleged, the time frame is not specific enough, the purported investor is not identified so no defense can be prepared, and it contains a legal conclusion that defendants knew it was false.  Once again, a convoluted of an allegation. This entire complaint is nothing but numerous convoluted allegations without specific facts and containing improper conclusions of law and intent of defendants. The entire complaint is riddled with inaccuracies and inconsistencies and lacks important context.

54.     The allegations in paragraph number 37 are so convoluted that no response is possible as alleged.  It once again combines press releases, blockchain, that there is no factual basis for these claims, that sales agent falsely told at least one investor that the SEC approved TMS' press releases. It again does not identify place, time, the purported sales agent or investor, et.sec.

55.     The allegations in paragraph number 38 a – e, combine numerous distinct actions, and contain improper legal conclusions. It alleges blockchain, a you tube video, and there is no basis

to claim blockchain; all without the proper factual basis and with improper conclusions of law. It further combines numerous press releases into one set of allegations.

56.     The allegations in paragraph number 39 that "Venters had ultimate authority for, and knowledge of the above materially false and misleading statements made orally and in written documents and materials provided to existing and prospective investors, in order to induce investments in TMS," once again combine improperly numerous distinct acts, imply a legal conclusion, fail to identify the statements, the investors, or who made the statement and the when, where, and why.

57.     The allegations in paragraph number 40 improperly combines the selling to investors of restricted stock, with TMS engaging in general solicitation and advertising contrary to Rule 506(b) of Regulation D of the Securities Act. Again, no specifics, improperly combined allegations and legal conclusions, and no identification of the investors or the specifics.

58.      The allegations in paragraph number 41 of the complaint: "Although Rule 506(c) of Regulation D of the Securities Act requires stock to be sold only to accredited investors and for the issuer to take reasonable steps to verify that accreditation, in reality, TMS offered and sold stock to accredited and non-accredited investors in the United States, Canada and Mexico, without taking reasonable steps to verify whether they were accredited. From April 2017 to December 2020, Defendants raised at least $1.2 million from at least 70 investors in a continuous offering in violation of the offering registration provisions of the federal securities laws."  Once again, the complaint does not identify the investors, and contains improper legal conclusions as to the steps taken or not taken. As to the allegations in paragraphs 40-41 generally in regard to Complaint Section B. The TMS Restricted Securities Were Exempt from Registration. See S*ection 5 of the Securities Act.* The Commission alleges that Defendants violated Section 5(a) and 5(c) of the

Securities Act because "[f]rom April 2017 to December 2020, Defendants raised at least $1.2 million from at least 70 investors in a continuous offering in violation of the offering registration provisions of the federal securities laws." *See* Compl. at ¶ 41. Notably, the Commission agrees that Defendants are relying on Rule 504 or Rule 506 of Regulation D of the Securities Act. *See id.* at ¶¶ 40–41.

59.     To establish a prima facie case, the Commission must show that: (1) the Defendants offered to sell or sold a security; (2) the Defendants used the mails or interstate means to sell or offer to sell the security; and (3) no registration statement was filed, or in effect as to the security. *See* SEC *v. Continental Tobacco Co. of South Carolina*, 463 F.2d 137, 155–56 (5th Cir. 1972). The Commission does not need to prove that Defendants acted knowingly or with the intent to defraud. *See SEC v. Corp. Relations Group, Inc.*, No. 6:99-CV-1222, 2003 WL 25570113, at *14, 17 (M.D. Fla. Mar. 28, 2003) ("scienter is not an element of a Section 5 violation"). However, a defendant is not liable under Section 5 if there is an applicable exemption from registration. *See SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 807 (11th Cir. 2015) (explaining that "Section 5 of the Securities Act prohibits the "'sale' and 'offer for sale' of any securities unless a registration statement is in effect or there is an applicable exemption from registration."). The restricted securities were exempt pursuant to Regulation A and Section 4(a)(2) of the Securities Act of 1933.

60.     Further, Regulation A is an exemption from registration for public offering that is divided into two tiers. Tier 1 represents offerings of up to $20 million and Tier 2 represents offerings of up to $50 million. *See Lindeen v. SEC*, 825 F.3d 646, 652 n.9 (D.C. Cir. 2016) (explaining the revisions of the law). To qualify for an exemption under Regulation A, the Company needed to file a Form 1-A, Offering Statement, with the Commission. TMS received a SEC qualified Reg A+ Tier 1 Registration Statement on December 10, 2018.

27

https://www.sec.gov/Archives/edgar/data/1109067/999999999418000280/9999999994-18-000280-index.htm

61.     Section 4(a)(2) exempts from the Securities Act registration requirements "transactions by an issuer not involving any public offering." *See* Section 77(d)(2). To determine whether an exemption applies, courts consider: (1) the number of offerees; (2) the relationship of the offerees to each other and the issuer; (3) the manner of the offering (e.g., solicitation); (4) information disclosure or access; and (5) the sophistication of the offerees. *See* <u>SEC v. Life Partners</u>, 912 F. Supp. 4, 10 (D.D.C. 1996). The threshold inquiry is "whether the particular class of persons affected need the protection of the [Securities] Act." *See* <u>Faye L. Roth Revocable Trust v. UBS PaineWebber, Inc.</u>, 323 F. Supp. 2d 1279, 1296 (S.D. Fla. 2004). As alleged in the Complaint, Defendants' issuance of restricted securities was limited to just 70 investors in total over a more than three-year period. TMS did not engage in any general solicitation to obtain the investors. Defendants' satisfaction of the requirements under Section 4(a)(2) is corroborated by a legal opinion issued by prior counsel.

62.     The allegations in paragraph number 42 the SEC Complaint in paragraph 42 allege "Venters controlled every aspect of TMS' day- to-day business. Venters recruited and hired sales agents, who were not registered brokers or associated with registered broker-dealers, in order to assist Defendants in offering and selling TMS' restricted stock to the investing public. Venters told at least two sales agents that they did not need licenses to offer and sell TMS' restricted stock." Once again, combined allegations, legal conclusions, no identification of the purported sales agent, which two purported agents were told they did not need licensing. This is too convoluted to respond to as alleged.

63.     The allegations in the SEC Complaint in paragraph 43 again fail to identify the purported

sales agents, the actual marketing materials they are discussing, and the specifics. This allegation contains legal conclusions and no time frame or specifics that can be responded to.

64.     The allegations in paragraph number 44 are also a convoluted run allegation riddled with legal conclusions and unsupported factual basis and must also be stricken.

65.     The allegations in paragraph number 45 fails to identify the purported sales agents, who were purportedly compensated with commissions, and combines Venter's salary all into one run on sentence.

66.     The allegations in paragraph number 46 fails to identify the purported sales agents, fails to identify the purported investors, contains no time frame for the contact with the investors via mail or email, does not attach the documents in violation of the pleading requirements, and contains improper legal conclusions without the ultimate facts.

67.     Generally, as to the allegations in paragraphs 36-42, the Commission also alleges that Venters violated Section 15(a)(1) because Venters "acted as an unregistered broker, raised at least $1,200,000 from at least 70 investors."   Also s*ee* Complaint at ¶'s 42-46.  The complaint does not properly allege the purported sales agents, nor are the time frames identified. The complaint fails to state who are the purported sales agents, where are the purported scripts and marketing materials, lacks a time frame, and improperly combined independent allegations with legal conclusions. The complaint failed to identify purported sales agents, investors, and improper combination of issues. The Commission further alleges that Venters "closed' the deal," and once he finalized the sale, TMS received the signed subscription agreements, investor questionnaire, and investment funds. *See id.* at ¶ 46.

A "Broker" is defined as "any person engaging in the business of effecting transactions in securities for the account of others." *See* <u>SEC v. Kramer</u>, 778 F. Supp. 2d 1320, 1333 (M.D. Fla.

2011) (citing 15 U.S.C. § 78c). To assist with this inquiry, courts consider whether the person: (1) actively solicited investors; (2) advised investors as to the merits of an investment; (3) acted with a certain "regularity of participation in securities transactions"; and (4) received commissions or transaction-based [remuneration]. *Id.* at 1334.

First, Venters sold securities pursuant to SEC Rule 144. Rule 144 is a safe harbor exemption to the public resale of restricted and control securities. *SEC. v. Tuchinsky*, No. 89-6488-CIVRYSKAMP, 1992 WL 226302, at *5 (S.D. Fla. June 29, 1992). This provision permits an affiliate or control person who, like Venters, has received shares from a company to resell the securities into the public market. *Id.* To qualify under Rule 144, the affiliate or control person must satisfy certain conditions including: (1) the prescribed holding period; (2) the way in which they were sold; (3) the amount that can be sold at any one time; (4) current information about the issuer must be publicly available; and (5) the seller must file a Form 144 with the Commission.

Venters, President and CEO of TMS, resold the shares as an affiliate of the company pursuant to Rule 144. The transactions were properly processed through a Transfer Agent and never exceeded the amount allotted under Rule 144. Venters did not receive commission. Venters received compensation pursuant to his employment as CEO for TMS. The Commission is required to show more than just payments going to Venters. The Commission must demonstrate that these payments were transaction-based compensation. Moreover, contrary to the Commission's position, neither TMS nor Venters paid commissions to any purported sales agent. The associates were paid a fixed salary for services rendered, which was calculated based on performance and never on the amount of investor money raised. The SEC's own investigative testimony demonstrates that the associates received finders' fees for introducing strategic partners to the Company. This is not within the context of finding investors, and thus, the associates likewise did

not receive transaction-based compensation.

74.     The allegations in paragraph number 47 in the SEC Complaint: "When offering restricted stock, Venters and the TMS sales agents he supervised did not always disclose to investors that the stock would be restricted and often falsely told them that after six to twelve months the shares would be "freely tradeable" and could be sold on the open market. TMS failed to disclose to investors that the stock would remain restricted unless the investors took steps to get the restrictive legends removed, including paying for an attorney opinion letter."   This contains multiple allegations, fails to disclose the investors or the purported sales agents, and is a legal conclusion. TMS/Venters sold the shares pursuant to Rule #144 that requires the removal of the restrictive legend, and our CFO was processing all requests for Opinion letters requested until August 1st, 2021, and issued Opinion letters to all requested shareholders for removal of the legend removing the disclosed restriction period and currently processing Opinion of Counsel letters.

75.     The allegations in paragraph number 48 that: "As of today, many TMS investors have been unable to get the restrictive legends removed from their stock after twelve months have passed, despite asking Defendants for help." This allegation fails to disclose who the investor is, when was the help requested, and to whom, it contains no proper time frame and has legal conclusions.

76.     The allegations in the SEC Complaint in paragraph 49 that "At all relevant times, Venters did not hold securities licenses and was not registered as a broker or associated with a registered broker-dealer. Further, no registration statement was in effect or had been filed with the Commission in connection with the sale of these securities, and no exemption from registration was available to Defendants. Thus, the Defendants TMS are not permitted to sell these securities." This allegation combines numerous separate and distinct violations, and most egregious a legal conclusion without ultimate facts.

77.     The allegations in paragraph number 50: "TMS' annual reports for the 2016-2020 fiscal years, all published on OTC, reflected that TMS had "no source of revenue." As a result, Defendants used investor funds and loans to cover TMS' operational costs, including Venters' salary and the commissions he took and paid to TMS sales agents. Only a small portion of investor funds appears to have gone towards TMS' projects, such as the production and acquisition of films, despite existing and prospective investors frequently being told their funds would be used for such projects."  This allegation is convoluted, combines numerous distinct allegations in one sentence, contains no ultimate facts and improper legal conclusions. This is nothing but a hodgepodge of improper allegations and legal conclusions without any ultimate facts or specificity.

78.     The allegations in paragraph number 51: "In addition to utilizing investor funds for TMS' operational costs, the Defendants engaged in deceptive acts by misappropriating TMS investor funds for both Venters' benefit and Jane Doe's benefit."  This must be stricken as it contains the unidentified "Jane Doe," contains no ultimate facts, contains improper legal conclusions, and contains numerous separate and distinct allegations in one sentence.

79.     The allegations in the SEC Complaint in paragraph 52, this must be stricken as it contains the unidentified "Jane Doe," contains no ultimate facts, contains improper legal conclusions, and contains numerous separate and distinct allegations in one sentence. This complaint must be dismissed as it does not properly allege in isolated, one issue numbered sentences. The sloppy pleadings combining numerous thoughts by a coma makes it impossible to respond to.

80.     The allegations in paragraph number 53, this allegation improperly combines numerous thoughts into one sentence and does not contain the necessary ultimate facts needed.

81.     The allegations in paragraph number 54 again contain the improper scandalous Jane Doe allegations. It also accuses this unidentified Jane Doe of participating in funneling TMS stock and

funds to Jane Doe through multiple sham consulting agreements with her. In the same allegation the SEC also accuses Jane Doe, the unidentified non-party, of signing those agreements on behalf of TMS claiming that Venters knew that she would not be performing the roles or providing the services described in the agreements. The SEC further alleges that Venters further provided stock and funds to her under the agreements despite knowing that she had not performed the services described in the agreements. From approximately April 2017 through July 2019, Venters caused TMS to pay Jane Doe at least $84,433." This is an improper and scandalous allegation that accuses the parties and non-parties of a conspiracy to defraud without the proper factual basis and containing improper legal conclusions.

82.     The allegations in paragraph number 55, once again materiality is an issue as argued above. Further, there is no specificity to the statements alleged, nor whom the purported investors are who relied on anything alleged.  To try to overcome the materiality factor, the SEC is improperly bundling together numerous unsupported and scandalous allegations.

83.     The allegations in paragraph number 56, once again, that the purported materially false statements have never been properly or clearly alleged with specificity and were alleged as conclusions of law.

84.     The allegations in paragraph number 57, again, this allegation is improperly combining numerous issues, legal conclusions, and fails to allege proper ultimate facts.

85.     As to Count 1- violations of Section 5(a) and 5 (c) of the securities act and all the subsequent counts, the allegations in paragraph 58 through 61, the SEC repeats and realleges Paragraphs 1 through 57 of its Complaint, even if not relevant to the particular count.

86.     This count, as well as all the other counts, has no facts to support the allegations and is missing the necessary elements as well as a proper request for relief.

87.     Defendants allege that this count, as well as all the subsequent count must be dismissed for failure to state a cause of action, and for improperly including all the factual allegations in paragraph 1 – 57, even if not relevant to the count. Defendants also request this Court to grant the dismissal based on the improper pleadings filed by Plaintiff, through its use of shotgun pleadings, compound and confusing allegations that cannot be properly responded to by Defendants. Plaintiffs combined numerous unrelated, individual, and separate factual allegations with unrelated issues in one sentence or paragraph. By combining so many thoughts in each numbered paragraph, it is impossible for Defendants to admit or deny the compounded allegation, or to prepare a proper and organized response as alleged.

88.     As to count II, violation of Section 17(a)(1), as to the allegations in paragraph 62 through 64, the SEC alleges: "From in or about August 2016 through at least March 2021, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud. And further alleges: By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]." On July 15, 2022, the United States Court of Appeals for the Second Circuit affirmed the dismissal by the United States District Court for the Southern District of New York of a Securities and Exchange Commission ("SEC") enforcement action alleging that Rio Tinto plc, Rio Tinto Limited, and its executive officers had engaged in securities fraud.[1] In so doing, the Second Circuit held that a 2019 Supreme Court decision, *Lorenzo v. SEC*, did not change the scope of scheme liability under Rule 10b-5 and Section 17(a). That is, merely making a materially misleading statement, without something more, cannot constitute scheme liability. **Section 17(a)**

of the Securities Act of 1933 and Rule 10b-5 promulgated thereunder describe three forms of unlawful conduct.  Rule 10b-5 declares that it is unlawful for any person, in connection with the sale of any security, to use interstate commerce directly or indirectly (a) to "employ any device, scheme, or artifice to defraud," (b) to "make any untrue statement of a material fact or to omit to state a material fact," or (c) to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."[2] Section 17(a) contains three nearly identical prongs.[3] While the middle prong specifically mentions materially misleading statements and omissions, the first and third prongs describe fraudulent conduct more generally.  Courts typically analyze the first and third prongs together and refer to them as "scheme liability." The Second Circuit has long held that plaintiffs cannot plausibly allege scheme liability "where the sole basis for [scheme liability] claims is alleged misrepresentations or omissions."[4] That is, plaintiffs may not conflate the "misstatement" liability outlined in subsection (b) of Rule 10b-5 and Section 17(a) with "scheme" liability.  This distinction serves in part as a rejection of the SEC's attempt to use subsections (a) and (c) as a "back door into liability for those who help others make a false statement of omission in violation of subsection (b)."[5] Therefore, scheme liability must involve "performance of an inherently deceptive act that is distinct from an alleged misstatement."[6] Examples of such conduct include a scheme where one broker would send a price to a second broker, who would then report the same price back to the first broker as an "independent" quote, or where a defendant defrauded customers into paying prices that included excessive markups.[7] But the SEC may not use scheme liability merely as an attempt to hold a defendant responsible for misstatements, particularly where the defendant did not actually "make" those misstatements.

89.    Defendants incorporate the arguments made in paragraph 86 and 87 herein above. allege

that this count must be dismissed for failure to state a cause of action, and for improperly including all the factual allegations in paragraph 1 – 57, even if not relevant to the count.  Defendants also request this Court to grant the dismissal based on the improper pleadings filed by Plaintiff, through its use of shotgun pleadings, compound and confusing allegations that cannot be properly responded to by Defendants. Plaintiffs combined numerous unrelated, individual, and separate factual allegations with unrelated issues in one sentence or paragraph. By combining so many thoughts in each numbered paragraph, it is impossible for Defendants to admit or deny the compounded allegation, or to prepare a proper and organized response as alleged.

90.     As to Count III- violations of Section 17(a)(2), the allegations in paragraph 65 through 67, the Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.  and additionally alleged 2 sentences that are not legally sufficient. Defendant reincorporates the arguments in paragraph 86 and 87 herein.

91.     As to Count IV, Violations of Section 17(a)(3) of the Securities Act, the allegations in paragraph 68 through 70, the Commission alleges the following in Count IV, The Commission repeats and realleges Paragraphs 1 through 57 of its Complaint and again only alleges 2 paragraphs. Defendants reincorporate the allegations in paragraph numbers 86 and 87 herein and allege that this count must be dismissed for failure to state a cause of action, and for improperly including all the factual allegations in paragraph 1 – 57, even if not relevant to the count. Defendants also request this Court to grant the dismissal based on the improper pleadings filed by Plaintiff, through its use of shotgun pleadings, compound and confusing allegations that cannot be properly responded to by Defendants. Plaintiffs combined numerous unrelated, individual, and separate factual allegations with unrelated issues in one sentence or paragraph. By combining so many thoughts in each numbered paragraph, it is impossible for Defendants to admit or deny the

compounded allegation, or to prepare a proper and organized response as alleged.

92.     As to Count V, Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), the allegations in paragraph 71 through 73, the Commission repeats and realleges Paragraphs 1 through 57 of its Complaint with 2 additional sentences. Defendants reincorporate the arguments from paragraph 86 and 87 herein above. Defendants also request this Court to grant the dismissal based on the improper pleadings filed by Plaintiff, through its use of shotgun pleadings, compound and confusing allegations that cannot be properly responded to by Defendants. Plaintiffs combined numerous unrelated, individual, and separate factual allegations with unrelated issues in one sentence or paragraph. By combining so many thoughts in each numbered paragraph, it is impossible for Defendants to admit or deny the compounded allegation, or to prepare a proper and organized response as alleged.

93.     As to Count VI, Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b), as to the allegations in paragraph 74 through 76, the Commission realleges Paragraphs 1 through 57 of its Complaint, as well as 2 additional sentences. Defendants realleges the arguments in paragraphs 86 and 87 hereinabove.

94.     As to Count VII - Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c) the allegations in paragraph 77 through 79, the Commission realleges Paragraphs 1 through 57 of its Complaint. Defendants reallege the arguments in paragraphs 86 and 87 herein above. By combining so many thoughts in each numbered paragraph, it is impossible for Defendants to admit or deny the compounded allegation, or to prepare a proper and organized response as alleged.

95. As to Count VIII, (Against Venters Only) Control Person Liability as to Venters under Section 20(a) of the Exchange Act for TMS' Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the allegations in paragraph 80 through 84, the Commission repeats and

realleges Paragraphs 1 through 57 of its Complaint. Defendant Venters realleges that this count must be dismissed for failure to state a cause of action, and for improperly including all the factual allegations in paragraph 1 – 57, even if not relevant to the count or to Venters individually. Defendant incorporates the previous arguments from paragraphs 86 and 87 herein above.

96. Further most of the allegations comingle Defendants TMS and Venters so it is impossible to decipher which parts of the allegation are relevant to this count and to Venters only.

97.  As to the allegations in Count IX, (Against Venters Only) Violations of Section 15(a)(1) of the Exchange Act paragraph 85 through 87, the Commission repeats and realleges Paragraphs 1 through 57 of its Complaint.

98. Defendant Venters realleges that this count must be dismissed for failure to state a cause of action, and for improperly including all the factual allegations in paragraph 1 – 57, even if not relevant to the count or to Venters individually. Defendant Venters also realleges the arguments in paragraph 86 and 87 herein above. Plaintiffs combined numerous unrelated, individual, and separate factual allegations with unrelated issues in one sentence or paragraph. By combining so many thoughts in each numbered paragraph, it is impossible for Defendant Venters to admit or deny the compounded allegation, or to prepare a proper and organized response as alleged.

99.    As to all the counts, most of the allegations comingle Defendants TMS and Venters so it is impossible to decipher which parts of the allegation are relevant to this count and to Venters only.

100.    As to the single combined relief requested by the Plaintiff at the end of the complaint by the SEC, it must be denied as it improperly combines the requests for all counts into one request for relief. The request to issue a Permanent Injunction enjoining Defendants TMS and Venters,

and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and enjoining Venters from violating Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)] is improperly requesting injunction on counts it is not a proper relief. The disgorgement and Prejudgment Interest must also be denied for the reasons argued previously. The civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] must also be denied as alleged. The Order pursuant to, as applicable, Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], permanently prohibiting Venters from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act must also be denied as alleged. The Order pursuant to, as applicable, Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], which bars Venters from participating in any offering of a penny stock, including acting as a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock; or inducing or attempting to induce the purchase or sale of any penny stock  is also an improper request for relief.

101.    Defendants request that the relief requested in all the counts must be denied as the proper allegations for each individual count and each Defendant has not been properly alleged.

102.    TMS and Venters request the request for relief be stricken and that the Court orders the

SEC to properly plead the request for relief per count and per Defendant, as well as strike the disgorgement as punitive as alleged, and for any other relief deemed fit and proper.

103.    Defendants have retained the undersigned and have agreed to pay reasonable fees and costs for the defense of this Complaint.  It is requested the SEC be required to compensate TMS and Venters for all reasonable attorneys' fees and costs expended in the defense of this Complaint.

104.    This Complaint has caused irreparable harm to TMS and Venter's reputations, as well as all parties to TMS agreements and shareholders. This negligently investigated and filed Complaint has caused significant damage to all involved. Due to the filing of this Complaint, TMS had to vacate the Galleria Mall Studio and corporate office, which has significantly impacted the day-to-day operations of the company. This has created substantial material losses due to the SEC's allegations.

105.    This must be stricken as it contains the unidentified "Jane Doe," unidentified purported sales agents and investors, lacks properly pled ultimate facts, contains improper legal conclusions, and contains numerous separate and distinct allegations in one sentence. This complaint must be dismissed as it does not properly allege in isolated, one issue numbered sentences. The sloppy pleadings combining numerous thoughts by a coma makes it impossible to respond to. This complaint contains scandalous allegations as to a paramour with no identification, which must be stricken. The complaint lacks proper time frames and does not attach one relevant document.  This complaint is riddled with inaccuracies and inconsistencies and lacks important context.

WHEREFORE, Defendants respectfully requests the case be dismissed with prejudice, alternatively for a more definite statement be filed by Plaintiff, for attorney's fees and costs, and for any other relief deemed fit and proper.

**Counsel for the moving party shall certify either: (A) that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so; or (B) that counsel for the movant has made reasonable efforts to confer with all parties or non-parties who may be affected by the relief sought in the motion, which efforts shall be identified with specificity in the statement (including the date, time, and manner of each effort), but has been unable to do so. If certain of the issues have been resolved by agreement, the certification shall specify the issues so resolved and the issues remaining unresolved.**

**Counsel certifies that the SEC agreed to the extended pages as it was previously filed; however the undersigned had edited the motion down to the 40 pages of document. Excluding the header and signature pages.**

Dated: May 5, 2023,                     Respectfully submitted,

                                        */s/ Inger M. Garcia, Esq.*
                                        Inger M. Garcia, Esq.
                                        Florida Litigation Group
                                        7040 Seminole Pratt Whitney Rd. #25, Box

43

                                        Loxahatchee, FL 33470
                                        (954) 394-7461
                                        attorney@ingergarcia.com
                                        serviceIMGlaw@yahoo.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 5, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

 **SERVICE LIST**
Inger M. Garcia, Esq.
Florida Litigation Group, P.A. 4839 Volunteer Road, #514
Davie, Florida 33330 Via
Email:attorney@ingergarcia.com  and serviceimglaw@yahoo.com
Counsel for Gordon Scott Ventures and counsel for The Movie Studio, Inc.

Christine Nestor
Senior Trial Counsel
Telephone: (305) 982-6367

Facsimile: (305) 536-4154
E-mail: nestorc@sec.gov

Attorneys for Plaintiff Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131

Alise Johnson, Esq.
Senior Trial Counsel
Direct Dial: (305) 982-6385
Email: johnsonali@sec.gov

Attorneys for Plaintiff Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131

Michelle Bosworth, Esq.
Counsel Special
Direct Dial: (305) 982-6387
Email: bosworthb@sec.gov

Attorneys for Plaintiff Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131