UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-61686-GAYLES/STRAUSS

**SECURITIES AND EXCHANGE COMMISSION,**

    Plaintiff,

v.

**THE MOVIE STUDIO, INC.,** *et al.***,**

    Defendants.
_____/

## REPORT AND RECOMMENDATION[1]

THIS MATTER came before the Court upon Defendants' Second Amended Motion to Dismiss or Alternatively Motion for a More Definite Statement or to Strike Plaintiff's Complaint ("Motion") [DE 55]. I have reviewed the Motion, the Response thereto [DE 56], and all other pertinent portions of the record.[2] For the reasons discussed herein, I respectfully recommend that the Motion [DE 55] be **DENIED**.

## BACKGROUND[3]

The SEC brings this action against The Movie Studio, Inc. ("TMS") and its President/CEO, Scott Venters ("Venters"), who oversaw TMS's day-to-day operations, accusing them of violating various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. *See* Complaint [DE 1].

---

[1] This case has been referred to me for a ruling on all pre-trial, non-dispositive matters and a report and recommendation on all dispositive matters [DE 65].

[2] Defendants did not file a reply, and the time for a reply has passed.

[3] For purposes of considering the Motion, I accept the factual allegations in the Second Amended Complaint as true and view them in the light most favorable to Plaintiff. *See Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1229 (11th Cir. 2019).

First, the Complaint alleges that Defendants made false and misleading statements regarding TMS's ownership of films, including in press releases. *See id.* ¶¶ 11-27. Although TMS only owned approximately 17 films, TMS sales agents, who were directed and supervised by Venters, represented to at least two investors that TMS owned hundreds or thousands of movies. *Id.* ¶ 13. Defendants also misrepresented to investors that TMS acquired the Arrowhead Film Library, an acquisition that included the rights to 12 films with well-known actors ("Arrowhead Films"). *Id.* ¶ 14. While TMS did enter into an agreement in April 2016 to purchase the Arrowhead Film Library, it never completed the acquisition. *Id.* ¶ 15. In fact, by August 2016, TMS had already breached the agreement by failing to make full payment thereunder. *Id.* ¶ 19. Moreover, by the end of May 2016, Defendants knew that another company claimed to own certain rights to two films in the Arrowhead Film Library. *Id.* ¶ 23.

Nonetheless, Defendants told investors that TMS owned the Arrowhead Films, and Defendants used marketing materials, including a flyer they began sending to investors in late 2016, listing the Arrowhead Film Library as "A Film Library of The Movie Studio." *Id.* ¶¶ 15, 22. Defendants also issued a misleading press release in August 2016 regarding a valuation of the Arrowhead Film Library. *See id.* ¶¶ 17-18. That press release – which Defendants issued even though they had already failed to make payment under the Arrowhead agreement – also stated that TMS "expects to begin monetizing this acquisition in the 4th quarter of 2016." *Id.* ¶ 19. Defendants continued to issue false or misleading press releases into 2020 regarding their agreement to acquire the Arrowhead Film Library, even after learning that another purchaser acquired the Arrowhead Film Library. *Id.* ¶ 26. In fact, the first time Defendants disclosed that TMS would not complete the acquisition of the Arrowhead Film Library was in an annual report

in late 2020. *Id.* ¶ 25. That report falsely claimed that Defendants first learned in June 2020 that the library had been sold to another party. *Id.*

Second, the SEC accuses Defendants of making false and misleading statements regarding TMS's production of films. *See id.* ¶¶ 28-34. For instance, Venters directed sales agents to tell investors that two movies would be released soon even though, at that time, TMS did not have the film scripts for those movies and had only filmed trailers. *Id.* ¶ 29. Additionally, in a March 2018 press release, Defendants described the two movies as "2018 Upcoming Movies" despite knowing that neither movie was likely to be completed in 2018. *Id.* ¶ 30. And in a February 2019 press release, they indicated that the same two movies, as well as a third movie, would be produced in 2019, despite knowing production was very unlikely to be completed in 2019. *Id.* ¶ 31. Aside from their false and misleading statements regarding TMS's production of these films, Defendants also made misleading statements indicating that TMS owned its own production studio facility when it did not. *See id.* ¶ 32. Additionally, they made misleading statements regarding a space that TMS did occupy between September 2016 and March 2018, and they falsely stated in a September 2016 press release that a film called Rainbows was being filmed at that space, even though they knew Rainbows was not being filmed at all. *Id.* ¶¶ 33-34.

Third, the SEC alleges that Defendants made false and misleading statements to investors regarding TMS's receipt of revenue from Amazon and TMS's use of blockchain technology. *Id.* ¶ 35. Regarding Amazon, Venters falsely told investors that TMS was receiving $4,000 per month from Amazon in connection with two TMS films. *Id.* ¶ 36. As to TMS's use of blockchain technology, TMS included various false and misleading statements in at least five 2020 press releases (which a TMS sales agent falsely told at least one investor the SEC approved), and Venters made other misleading statements in a March 2021 interview. *See id.* ¶¶ 37-38. On the date of

3

one of the press releases (in March 2020), Defendants sold TMS stock, earning profits of more than $27,000. *Id.* ¶ 37.

Fourth, the SEC accuses Defendants of selling restricted stock to investors – without filing a Form D, "Notice of Exempt Offering of Securities" – and engaging in solicitation and advertising contrary to Rule 506(b) of Regulation D of the Securities Act. *Id.* ¶ 40. Even though Rule 506(c) of Regulation D only permits stock to be sold to accredited investors and requires the issuer to take reasonable steps to verify accreditation, TMS offered and sold stock to both accredited and non-accredited investors, without verifying accreditation. *Id.* ¶ 41. Between April 2017 and December 2020 (when Venters controlled all aspects of TMS's day-to-day operations), Defendants raised at least $1.2 million from 70 or more investors in a continuous offering that violated federal securities laws. *Id.* ¶¶ 41-42.

Venters hired sales agents, who were not registered brokers or associated with registered broker-dealers, to assist with offering and selling the restricted stock. *Id.* ¶ 42. Venters, who was also not registered or affiliated, was responsible for training and supervising the sales agents and provided them with scripts, talking points, and marketing materials. *Id.* ¶¶ 43, 49. He directed the sales agents to solicit investors from a previous job of his, to cold call other people unconnected to TMS, and to solicit additional investments from existing TMS shareholders. *Id.* Prior to soliciting investors, Venters typically issued a press release regarding TMS, sometimes recycling old news. *Id.* ¶ 44.

When soliciting investors, Venters and the sales agents did not always disclose that the stock would be restricted. *Id.* ¶ 47. They also falsely represented to several investors that the shares would be "freely tradable" and could be sold on the open market after 6-12 months. *Id.* Defendants failed to disclose that investors would need to take certain actions to have the

4

restrictions removed, and many investors have been unable to obtain removal of such restrictions. *Id.* ¶¶ 47-48. When Venters and sales agents finalized a sale to an investor, TMS sent marketing materials and other materials to the investor via U.S. mail or email. *Id.* ¶ 46. TMS then had investors return certain materials via mail or email and had them send payment, typically by sending a wire transfer or mailing a check. *Id.*

In addition to the conduct described above, the SEC alleges that Defendants also misappropriated investor funds. *See id.* ¶¶ 50-54. Despite telling investors that their funds would be used for TMS projects, including the production and acquisition of films, only a small portion of investor funds was used for TMS projects. *Id.* ¶ 50. Substantial investor funds were instead used to cover operational costs, including to pay Venters' salary and to fund commissions paid to Venters and sales agents. *Id.* Additionally, investor funds were transferred to Venters and were also used to pay for various personal expenses of Venters. *See id.* ¶¶ 51-53. Between April 2017 and March 2021, Venters withdrew, or transferred to himself, more than $527,000. *Id.* ¶ 53. Venters also used the funds to pay for meals, trips, living expenses, and other expenses of his paramour (identified in the Complaint as "Jane Doe"). *Id.* ¶¶ 2, 54. Additionally, Venters funneled money and TMS stock to Jane Doe through consulting agreements, knowing, when he signed the agreements on behalf of TMS, that Jane Doe would not perform the services described in the agreements. *Id.* ¶ 54. Between April 2017 and July 2019, Venters caused TMS to pay Jane Doe more than $84,000. *Id.*

## **LEGAL STANDARD**

At the pleading stage, a complaint must contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). Although Rule 8(a) does not require "detailed factual allegations," it does require "more than labels and conclusions"; a

"formulaic recitation of the cause of action will not do." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007). When a claim sounding in fraud is alleged, the complaint "must satisfy the heightened pleading standards embodied in Federal Rule of Civil Procedure 9(b), which requires the plaintiff to 'state with particularity the circumstances constituting fraud.'" *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1216 (11th Cir. 2020) (citation omitted). To do so, a plaintiff must allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiff[ ]; and (4) what the defendants gained by the alleged fraud." *Id.* (citation omitted).

To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 556 U.S. at 679)).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). Courts must accept the factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Cambridge Christian Sch.*, 942 F.3d at 1229; *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1236 (11th Cir. 2019). But "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citation omitted); *see also*

*Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

## ANALYSIS

Defendants have failed to carry their burden of showing that dismissal is warranted.[4] Significantly, a party seeking dismissal under Rule 12(b)(6) "bears the burden to show that the complaint should be dismissed." *Jimenez v. Holiday CVS, LLC*, No. 22-CV-24242, 2023 WL 4251176, at *3 (S.D. Fla. June 29, 2023) (quoting *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1228 (S.D. Fla. 2014)); *see also Cohen v. Bd. of Trustees of the Univ. of the D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (recognizing that Rule 12(b)(6) places the burden of persuasion on the moving party). "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it." *Madinya v. Portfolio Recovery Assocs., LLC*, No. 18-CV-61138, 2018 WL 4510151, at *5 (S.D. Fla. Sept. 20, 2018) (quoting *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)); *see also Clear Spring Prop. & Causalty Co. v. Viking Power LLC*, 608 F. Supp. 3d 1220, 1229 n.3 (S.D. Fla. 2022) (same).

It is not entirely clear from the Motion all of the specific grounds that Defendants are raising for dismissal. The Motion is organized in a few parts. It begins by making what appear to be introductory remarks on the first 3 pages. It then contains a "Legal Standard" section on pages 4-10, followed by a "Shotgun Pleading" section on pages 11-12, followed by a "Disgorgement is Improper" section on pages 12-15, followed by a section entitled "Improper 'Jane Doe' Relief Defendant Disgorgement" section on pages 15-16, followed by a "Time Barred Claims" section

---

[4] They have also failed to show that a more definite statement (under Rule 12(e)) or the striking of any allegations of the Complaint (under Rule 12(f)) is warranted. In fact, the Motion does not address the legal standards applicable to Rule 12(e) and (f) or cite any law to support Defendants' Rule 12(e) and (f) arguments. Also, Defendants' alternative request for a more definite statement is solely mentioned in a perfunctory manner on pages 1 and 40 of the Motion.

7

on pages 16-17. Then, the final 20-plus pages of the Motion complain – in a section entitled "Specific Allegations in Complaint" – about the allegations contained in individual paragraphs of the Complaint.

First, the Legal Standard section of the Motion appears to be largely copied and pasted from *Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d 1309 (S.D. Fla. 2021) – without citing that case even a single time in the Motion. *Compare* Motion at 4-10, *with Complete Bus. Sols.*, 538 F. Supp. 3d at 1320-21, 1328-31 & n.4, 1339. While the Legal Standard section is extensive, it provides no cogent analysis applying the law set forth therein to the Complaint in this case. Rather, Defendants merely add a few conclusory arguments regarding certain issues. For instance, in paragraph 15 of the Motion, Defendants argue that "the SEC did not sufficiently [or] clearly allege misrepresentations or omissions" and that the allegations are unclear, compound, confusing, and legal conclusions. But Defendants do not elaborate. At any rate, while a few of the longer paragraphs of the Complaint perhaps could have been broken down into multiple paragraphs, the Complaint generally sets forth an organized presentation of the relevant factual allegations, while at the same time adhering to the "short and plain statement" requirement of Rule 8. Moreover, the Complaint clearly alleges numerous alleged misrepresentations, including, among other information, who made the statements – and/or was responsible for making them – and when (i.e., the exact date) and how they were made. Simply stated, the Complaint clearly satisfies both Rule 8 and Rule 9.

The Legal Standard section also includes a few other conclusory arguments. At the end of paragraph 16 of the Motion, Defendants simply state (regarding the issue of scienter), "[h]ere, as alleged, Defendants are unable to respond." Then, in paragraph 18 of the Motion, Defendants argue in a conclusory fashion that the "inference of scienter is not clear" because the allegations

are "compound, complex, and confusing." But Defendants do not provide further explanation or attempt to engage with any of the case law they cite. Regardless, the Complaint sets forth extensive factual allegations regarding Defendants' specific false statements, Defendants' knowledge regarding the falsity of the statements, and Venters' involvement in the relevant conduct. Thus, the allegations are more than sufficient to give rise to, at a minimum, a reasonable inference of scienter.

Second, Defendants include a section contending that the Complaint should be dismissed as a shotgun pleading. The Eleventh Circuit has identified four types of shotgun pleadings: (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (2) a complaint "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) "a complaint that does not separate 'each cause of action or claim for relief' into a different count"; and (4) a complaint asserting "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Barmapov v. Amuial*, 986 F.3d 1321, 1324-25 (11th Cir. 2021) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321-23 (11th Cir. 2015)).

Again, the bulk of the shotgun pleading section of the Motion is copied and pasted from *Complete Bus. Sols. Compare* Motion at 11, *with Complete Bus. Sols.*, 538 F. Supp. 3d at 1340-41. Defendants do add in a conclusory sentence at the end of the section arguing that the Complaint in this case violates the second, third, and fourth types of shotgun pleadings, but Defendants do not expound on their conclusory argument. Regardless, it is evident from my review of the Complaint that it is not a shotgun pleading. The Complaint separates different claims into different

counts, and this is not a situation where claims are brought against multiple defendants in a manner that leaves one guessing about who allegedly did what. Rather, the Complaint is solely brought against *two* Defendants, a company and the individual who allegedly controlled all day-to-day aspects of the company. Also, the allegations in the Complaint appear to be directly relevant to the claims asserted. At the very least, Defendants have failed to show that the Complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action."

Third, Defendants include a section with the heading "Disgorgement is Improper."[5] While commenting on the Supreme Court's decision in *Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936 (2020), the disgorgement section of the Motion does not present law or argument showing why it is appropriate to strike or dismiss Plaintiff's request for disgorgement in this case. Moreover, regardless of the potential issues described in the Motion regarding the extent and propriety of Plaintiff's sought disgorgement remedy, it is likely premature at this stage to decide the propriety of disgorgement as a remedy in this case. *See, e.g.*, *Sec. & Exch. Comm'n v. Church-Koegel*, No. CV 20-8480 FMO (JCX), 2021 WL 6104157, at *2 (C.D. Cal. Sept. 29, 2021) ("At the pleading stage, it is 'premature to determine whether the specific forms of disgorgement sought by the SEC are prohibited as a matter of law.'" (quoting *Sec. & Exch. Comm'n v. Levin*, 232 F.R.D. 619, 625 (C.D. Cal. 2005) & citing *S.E.C. v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 310 (S.D.N.Y. 2015))); *Sec. & Exch. Comm'n v. Drake*, No. 2:17-CV-06204-CAS(GJSx), 2017 WL 6507766, at *7 (C.D. Cal. Dec. 18, 2017); *S.E.C. v. Wall St. Commc'ns, Inc.*, No. 8:09-CV-1046-T-30TGW, 2009 WL 2579310, at *3 (M.D. Fla. Aug. 19, 2009); *In re*

---

[5] This section appears to be almost entirely copied and pasted from an article written by attorneys at Arnold & Porter: https://www.arnoldporter.com/en/perspectives/advisories/2020/06/supreme-court-upholds-sec-disgorgement-authority.

10

*Michaels Stores, Inc. Sec. Litig.*, No. 3:03-CV-0246-M, 2004 WL 7344746, at *13 (N.D. Tex. Dec. 13, 2004); *see also Martinez v. Ford Motor Co.*, No. 22-CV-1082-MMA (BGS), 2023 WL 2977727, at *7 (S.D. Cal. Apr. 17, 2023); *Fed. Trade Comm'n v. Hornbeam Special Situations, LLC*, 308 F. Supp. 3d 1280, 1295 (N.D. Ga. 2018).

Fourth, Defendants include a section in the Motion labeled "Improper 'Jane Doe' Relief Defendant Disgorgement." This section describes criteria for seeking disgorgement of funds received by a person not accused of wrongdoing herself.[6] However, while Defendants include a conclusory argument at the end of the section claiming that the allegations regarding Jane Doe's alleged receipt of funds are insufficient, Defendants fail to explain why the allegations are insufficient. Moreover, the factual allegations plausibly establish Jane Doe's receipt of ill-gotten gains without having a legitimate claim to the funds. Succinctly, the Complaint alleges that certain funds were used to pay for Jane Doe's meals, trips, living expenses, and other expenses, and that money and stock were funneled from TMS to Jane Doe through consulting agreements that were a sham given that Jane Doe performed no services under such agreements (and it was never intended that she would perform under the agreements). *See* Complaint ¶ 54. Additionally, the Complaint very specifically alleges that between approximately April 2017 and July 2019, Jane Doe received at least $84,433. *Id.* Ultimately, Defendants fail to carry their burden of demonstrating that the factual allegations regarding Jane Doe's receipt of ill-gotten gains are insufficient.[7]

---

[6] This section is, again, largely copied and pasted from *Complete Bus. Sols. Compare* Motion at 15-16, *with Complete Bus. Sols.*, 538 F. Supp. 3d at 1341-42. Notably, the Motion even copies an argument that the court rejected in *Complete Bus. Sols.*, without acknowledging that the argument was rejected or attempting to explain why the outcome should be different in this case.

[7] Defendants also argue in certain parts of the Motion that Plaintiff is required to identify Jane Doe and each investor by name in the Complaint. However, Defendants point to no law to support

Fifth, Defendants argue that the claims in this case are time-barred.[8]  "[D]ismissal for failure to state a claim on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Karantsalis v. City of Miami Springs, Fla.*, 17 F.4th 1316, 1319-20 (11th Cir. 2021) (citation and internal quotation marks omitted). Defendants contend – again through a conclusory argument without pointing to specific allegations in the Complaint – that Plaintiff's claims fall outside the 5-year statute of limitations. Plaintiff responds that the events at issue fall within any 5-year limitations period and also contends that the statute of limitations has been extended to 10 years for certain relief sought.

At a minimum, it is not apparent from the face of the Complaint that any of Plaintiff's claims fall outside of any 5-year statute of limitations. The Complaint was filed on August 13, 2021. As the Background section above makes clear, nearly all of the relevant conduct allegedly occurred on or after August 16, 2016 (just under 5 years before the filing of the Complaint). There does appear to be one allegation referencing an alleged misleading statement from a few months before August 2016. *See* Complaint ¶ 16. Nonetheless, all other conduct giving rise to the claims brought in this case allegedly occurred during and after August 2016. In fact, the counts in the Complaint indicate that the events giving rise to the claims occurred no earlier than August 2016. *See* Complaint ¶¶ 60, 63, 66, 69, 72, 75, 78, 81, 82. Thus, the Complaint appears to indicate that the relevant conduct falls within any 5-year limitations period. At the very least, I cannot conclude from the Complaint that any of the claims are premised upon conduct that occurred more than 5

---

their argument that Plaintiff is required to do so in the Complaint, and identifying 70-plus non-party investors by name would arguably run counter to the short and plain statement requirement of Rule 8. At any rate, Defendants can seek such information through discovery (and amend their Answer, if necessary, after discovering such information).

[8] This section of the Motion is largely copied and pasted from *Complete Bus. Sols. Compare* Motion at 16-17, *with Complete Bus. Sols.*, 538 F. Supp. 3d at 1343-44.

years before the Complaint was filed. Therefore, it is not apparent from the face of the Complaint that Plaintiff's claims are time-barred.

Finally, Defendants spend the second half of the Motion complaining about, or otherwise responding to, individual allegations of the Complaint. Motions to dismiss under 12(b)(6) are generally focused on whether the factual allegations in a complaint, considered as a whole, state a plausible claim. But the second half of the Motion focuses on trying to nitpick individual allegations without considering the Complaint as a whole.[9] Defendants' repeated refrain is that the identified allegations are either too vague to respond to or combine too many different allegations to respond to. However, it is evident from my review of the Complaint that the allegations by and large are not confusing or overly complex or vague as Defendants contend. Moreover, the Complaint satisfies Rule 8's short and plain statement requirement, provides fair notice of the claims brought and the grounds upon which they rest, and includes sufficient factual allegations to render those claims plausible. Defendants can, and should be required to, promptly file an Answer. To the extent any paragraphs in the Complaint include multiple sentences addressing different matters, Defendants can and should admit portions that are true and deny any portions they believe in good faith are not true.

---

[9] To the extent that the second half of the Motion attempts to provide examples of the alleged deficiencies described in the first half of the Motion, it does so in a completely disorganized fashion (arranging its criticisms in paragraph-by-paragraph order rather than attempting to group examples by substantive arguments). Also, certain portions appear to copy and paste content from other sources (without citing the sources) and without applying the discussed case law to this particular Complaint. *See, e.g.*, Motion ¶ 88 (copying and pasting content from https://www.pbwt.com/securities-enforcement-litigation-insider/scheme-liability-under-rule-10b-5-and-section-17a-still-requires-something-more-than-mere-misstatements-analysis-of-the-second-circuits-opinion-in-sec-v-rio-tinto).

## CONCLUSION

For the reasons discussed above, I respectfully **RECOMMEND** that the Motion [DE 55] be **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 18th day of August 2023.

Jared M. Strauss
United States Magistrate Judge