**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-CV-61686-GAYLES/STRAUSS**

**SECURITIES AND EXCHANGE COMMISSION,**

      Plaintiff,

v.

**THE MOVIE STUDIO, INC.,** *et al.***,**

      Defendants.

_____/

**REPORT AND RECOMMENDATION**[1]

THIS MATTER came before the Court upon Plaintiff's Motion for Summary Judgment ("Motion") [DE 107].  I have reviewed the Motion, the response [DE 125] and reply [DE 139] thereto, Plaintiff's Statement of Material Facts ("PL SMF") [DE 108; *see also* DE 135], Defendants' Opposition to Plaintiff's Statement of Material Facts ("DEF SMF") [DE 126; *see also* DE 129], Plaintiff's Reply to Defendants' Statement of Material Facts [DE 136], and all other pertinent portions of the record.  For the reasons discussed herein, I respectfully **RECOMMEND** that the Motion [DE 107] be **GRANTED IN PART and DENIED IN PART**.

**INTRODUCTION**

In this civil enforcement action, the Securities and Exchange Commission ("SEC" or "Plaintiff") accuses The Movie Studio, Inc. ("TMS") and its President/CEO, Scott Venters ("Venters"),[2] of violating various registration and antifraud provisions of the Securities Act of

---

[1] This case has been referred to me for a ruling on all pre-trial, non-dispositive matters and a report and recommendation on all dispositive matters [DE 65].

[2] The parties do not dispute that Venters is TMS's President and CEO and that he controlled TMS "at all relevant times."  PL SMF ¶ 4 (undisputed).

1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").   TMS describes itself as "a vertically integrated motion picture production and distribution Company with completed motion picture and production assets" that "acquires, develops, manufactures, and distributes independent motion picture content for worldwide consumption in Theatrical, Video on Demand (VOD), Foreign Sales and on various media devices."   [DE 108-14]; *see also* [DE 108-4] at 19 (describing TMS's business).

In its nine-count Complaint, the SEC accuses Defendants of three types of violations.   First, in Count I, the SEC alleges that Defendants violated sections 5(a) and 5(c) of the Securities Act by selling unregistered securities.   As discussed in Part I of the Analysis section below, there is no genuine dispute that Defendants sold unregistered securities.   However, Defendants claim that they were exempt from registration.   For the reasons discussed below, they have failed to establish that any exemption applies.   As such, the SEC is entitled to summary judgment on Count I.

Second, the SEC accuses Venters – in Count IX of the Complaint – of violating section 15(a)(1) of the Exchange Act by selling securities as an unregistered broker.   As discussed in Part II of the Analysis section below, although it is undisputed that Venters was not *registered* as a broker, the SEC has failed to establish that Venters acted as a broker.   Therefore, the Motion must be denied as to Count IX.

Finally, the bulk of the claims in the Complaint, and the bulk of the alleged facts presented in connection with the Motion, pertain to the alleged violations of the antifraud provisions. Specifically, the SEC accuses Defendants of violating section 17 of the Securities Act (Counts II-IV), as well as section 10(b) of the Exchange Act and SEC Rule 10b-5 (Counts V-VII).   And in Count VIII, the SEC alleges that Venters is a "control person" of TMS under section 20(a) of the Exchange Act and that he is, therefore, jointly and severally liable with TMS for any section 10(b)

and Rule 10b-5 violations.  All of the counts alleging that Defendants violated the antifraud provisions require, among other things, a material misrepresentation (or materially misleading omission).  The SEC accuses Defendants of making six different categories of material misrepresentations.  However, as discussed in Part III of the Analysis section below, the SEC has failed to establish that any reasonable jury would conclude that Defendants made any of the alleged material misrepresentations underpinning Counts II-VIII of the Complaint.  That is not to say that the SEC will not be able to establish one or more of the alleged misrepresentations at trial – only that it has not satisfied its burden in connection with the Motion for certain representations, and that factual disputes exist with respect to other representations.

## SUMMARY JUDGMENT STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The movant may meet this burden by demonstrating that the nonmoving party has failed to present

sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at 322-23); *see also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)).  Provided that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Hornsby-Culpepper*, 906 F.3d at 1311-12.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242).  Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted).  Moreover, all reasonable doubts regarding the facts must be resolved in favor of the non-moving party. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

## ANALYSIS

### I.   SECTIONS 5(a) & 5(c) OF THE SECURITIES ACT

The SEC is entitled to summary judgment on Count I of the Complaint, which alleges that Defendants violated sections 5(a) and 5(c) of the Securities Act.  "Section 5 of the Securities Act prohibits the use of any means of interstate commerce or the mails to offer to sell or offer to buy

any security without having first filed a registration statement with the SEC as to such security." *Sec. & Exch. Comm'n v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017) (citing 15 U.S.C. § 77e(a), (c)); *see also U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 806 (11th Cir. 2015) ("Subsections (a) and (c) of § 5 prohibit the 'sale' and 'offer for sale' of any securities unless a registration statement is in effect or there is an applicable exemption from registration.").  The SEC must prove three elements to establish a prima facie case under Section 5: "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *Levin*, 849 F.3d at 1001 (citation omitted); *see also Big Apple Consulting*, 783 F.3d at 806-07 ("In order to establish a prima facie case for a violation of § 5 of the Securities Act, the SEC must demonstrate that (1) the defendant directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect." (quoting *S.E.C. v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004))).  Scienter is not required.  *Calvo*, 378 F.3d at 1215.  "Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption." *S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013) (citation omitted); *see also Big Apple Consulting*, 783 F.3d at 807. "[E]xemptions must be narrowly viewed because, as remedial legislation, the Securities Act is entitled to a broad construction." *Levin*, 849 F.3d at 1001.

It is evident from the parties' briefing and the record that what is in dispute is whether an exemption applies.  However, there is plainly no genuine dispute that the three elements of a prima facie case are satisfied here.

First, TMS sold or offered to sell securities.  In its statement of facts, the SEC states – pointing to support in the record – that "[s]ince at least April 2017, TMS offered and sold investors restricted stock purportedly pursuant to either Rule 504 or Rule 506 of Regulation D of the Securities Act."  PL SMF ¶ 58.  Although TMS indicates in its response statement of facts that the foregoing statement is "disputed," TMS does not actually dispute that it sold securities; rather, TMS adds that it also sold securities through other avenues.  *See* DEF SMF ¶ 58.  Moreover, in response to the SEC's argument that Defendants sold and offered restricted securities, Defendants merely state (in their response) that they "contest in their Declarations and Exhibits . . . that they have legitimate exemptions."  [DE 125] at 15.  Thus, Defendants' only response to the first element is not that the element is not satisfied.  Rather, Defendants seem to acknowledge that they offered or sold securities (or at least do not dispute that they did).  They simply claim that one or more exemptions apply, which is a separate issue from whether the SEC has established a prima facie case.[3]

Second, Defendants also do nothing to raise a genuine dispute regarding the use of interstate communications (once again, they just argue that exemptions apply).  *See* [DE 125] at 15-16.  In fact, in their Answer, Defendants "admit that they used instruments of communication in interstate commerce."  [DE 100] ¶ 60.

Third, no registration statement was in effect.  In fact, in their response statement of facts, Defendants acknowledge that it is "undisputed" that "[n]o registration statement was in effect or

---

[3] Defendants also acknowledge that Venters sold securities.  To demonstrate that Venters sold securities, the SEC must show that he was a "necessary participant" or "substantial factor" in TMS's sale of securities.  *Calvo*, 378 F.3d at 1215.  Significantly, Defendants concede in their response that Venters was "a 'necessary participant' and 'substantial factor' by serving as a designated investor contact, supervising, facilitating the issuance of shares, and playing a major role in inducing securities purchases."  [DE 125] at 16.

had been filed with the Commission in connection with the sale of these securities." PL SMF ¶ 79; DEF SMF ¶ 79. Likewise, in their Answer, they "admit that no registration statement was filed or in effect." [DE 100] ¶ 59. Thus, the SEC has established a prima facie case.

Because the SEC has established a prima facie case, it is Defendants' burden to establish that an exemption from the registration requirements applies. *See Sec. & Exch. Comm'n v. GenAudio Inc.*, 32 F.4th 902, 939-43 (10th Cir. 2022); *Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, No. 20-CIV-81205-RAR, 2021 WL 5743108, at \*3-4 & n.2 (S.D. Fla. Dec. 2, 2021). As an initial matter, the only exemptions Defendants appear to have adequately pled in their affirmative defenses are exemptions provided under Rule 506 of Regulation D. *See* 17 C.F.R. § 230.506. Nonetheless, in their summary judgment response, Defendants also appear to assert that the exemptions under section 4(a)(2) of the Securities Act[4] and under Rule 701 (17 C.F.R. § 230) apply.[5]

---

[4] As discussed below, an issuer that satisfies Rule 506 is entitled to the private-offering exemption under section 4(a)(2). However, Rule 506 is not the only way to establish entitlement to the exemption. Therefore, an issuer that cannot establish entitlement to the exemption based on Rule 506's elements may still be able to establish entitlement to a section 4(a)(2) exemption in some other manner. In other words, the failure to satisfy Rule 506 does not necessarily preclude an issuer from establishing that it is entitled to an exemption under Rule 4(a)(2) for other reasons. *See* 17 C.F.R. § 230.500(c) ("[A]n issuer's failure to satisfy all the terms and conditions of rule 506(b) (§ 230.506(b)) shall not raise any presumption that the exemption provided by section 4(a)(2) of the Act (15 U.S.C. 77d(2)) is not available."); *see also Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 807 F.2d 1052, 1064 (D.C. Cir. 1986) ("Securities offerings not in compliance with Regulation D may nonetheless be exempt from registration as "not involving any public offering.").

[5] Defendants' summary judgment response [DE 125] is far from coherent and is largely comprised of content copied and pasted from the SEC's Motion and other sources. The portion of Defendants' response that discusses exemptions from registration starts at the bottom of page 16 and ends at the top of page 21 (though significant portions are copied and pasted from elsewhere). The first four paragraphs of the exemption section, [DE 125] at 16-18, were all apparently largely copied from the SEC's Motion, with Defendants occasionally changing words. *Compare, e.g.*, [DE 107] at 15 ("Here, TMS did not qualify under Regulation D because . . . ."), *with* [DE 125] at 17 ("Here, TMS did qualify under Regulation D because . . . ."). Indeed, the heading at the bottom

As discussed herein, Defendants have failed to show that any of the foregoing exemptions apply or that any genuine dispute of material fact exists regarding the applicability of the exemptions.  In other words, the SEC has argued that there is an absence of evidence to support the existence of any exemption, and Defendants (who have the burden of proving an exemption applies) have failed to point to evidence sufficient to allow a reasonable jury to conclude that any exemption applies.

### A.  SECTION 4(a)(2) & RULE 506

Section 4(a)(2) provides that "[t]he provisions of section 77e of this title [i.e., section 5 of the Securities Act] shall not apply to . . . transactions by an issuer not involving any public offering."  15 U.S.C. § 77d(a)(2).  Thus, section 4(a)(2) provides an exemption from registration for private offerings.  *GenAudio*, 32 F.4th at 940.  "An offering is considered private only if limited to investors who have no need for the protection provided by registration."  *Id.* (citation omitted).  "The so-called private offering exemption is an affirmative defense which must be raised and proved by the defendant."  *Id.* (quoting *Swenson v. Engelstad*, 626 F.2d 421, 425 (5th Cir. 1980)).

Rule 506 of Regulation D "implements the statutory exemption involving securities that are not public offerings."  *Levin*, 849 F.3d at 1001; *see also* 17 C.F.R. § 230.506.  "Offers and sales of securities by an issuer that satisfy the conditions in [§ 230.506(b) or § 230.506(c)] shall

---

of Defendants' page 16 appears smeared by somehow overlapping with content from the SEC's Motion.  Following the first four paragraphs, Defendants copy and paste a significant amount of content from an article on a law firm's website, without ever citing that website.  *Compare* [DE 125] at 18-19, *with What is the Difference Between Section 4(a)(2) and Regulation D?*, Johnston Allison Hord (Mar. 23, 2022), https://www.jahlaw.com/what-is-the-difference-between-section-4a2-and-regulation-d-news-and-events/.  This is not the first time that Defendants' counsel has plagiarized content from other sources in this case.  *See* [DE 67] at 8-13 & nn. 5, 6, 8, & 9.  Also, the last paragraph of the section discussing exemptions in Defendants' response also appears to be copied from somewhere given that the paragraph contains several statements that do not make sense in the context of this case – *e.g.*, "the fact that *PREMIER* did not file a form" and "Defendant's offer and sale to *just one entity, Plaintiff*."  [DE 125] at 20-21.

be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2)."  17 C.F.R. § 230.506(a).  Rule 506 provides a safe-harbor exemption under which an issuer must satisfy certain elements to take advantage of the exemption.  *See GenAudio*, 32 F.4th at 942; *Mark v. FSC Sec. Corp.*, 870 F.2d 331, 334 (6th Cir. 1989).  If complied with, Rule 506 "provides a safe-harbor that will qualify the offering for the Section 4(2) exemption and therefore will not be considered a public offering."  *McKim v. NewMarket Techs., Inc.*, 370 F. App'x 600, 605 (6th Cir. 2010); *see also Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 905, 913 (6th Cir. 2007) (noting that Rule 506 is "a safe harbor provision authorized by Section 4(2)" and that "Rule 506 was promulgated pursuant to Section 4(2)").

### 1.  Rule 506(b)

To come within Rule 506(b)'s exemption, an issuer must satisfy the terms and conditions of 17 C.F.R. §§ 230.501 and 230.502, as well as the specific conditions set forth in § 230.506(b)(2)(i) and (b)(2)(ii).  *See* § 230.506(b).  Among other things, "the issuer of the security must . . . have a reasonable basis for believing that no more than thirty-five purchasers were not accredited investors, and it must provide an audited balance sheet to 'any purchaser that is not an accredited investor.'"  *GenAudio*, 32 F.4th at 942 (citations omitted).[6]  With respect to the limitation on the number of non-accredited purchasers, the version of § 230.506(b)(2)(i) in effect

---

[6] *See also Brown*, 481 F.3d at 913-14 ("Rule 506 was promulgated pursuant to Section 4(2) of the 1933 Securities Act, 15 U.S.C. § 77d(2), and exempts certain 'limited offers and sales' so long as the rule's conditions are met: (1) all terms and conditions of Rules 501 and 502, 17 C.F.R. §§ 230.501-502, must be met, including the provision of audited balance sheets to unaccredited investors; (2) the issuer 'must reasonably believe that there are no more than 35 purchasers of securities' who are *not* 'accredited investors' as defined by Rule 501, 17 C.F.R. § 230.501, though there are no limits on the number of accredited investors; (3) each non-accredited investor must meet certain qualifications as recited in 17 C.F.R. § 230.506(a)(2)(ii); and (4) the offers or sales of securities registered under Regulation D must be integrated as part of a single offering, and so no offers or sales may be made more than six months before, or six months after, the offering itself." (internal footnotes omitted)).

during the relevant period – April 2017 through approximately December 2020, *see* [DE 1] ¶ 60 – required that "[t]here are no more than or the issuer reasonably believes that there are no more than 35 purchasers of securities from the issuer in any offering under this section."[7]

Plaintiff argues that Defendants have not established the applicability of the 506(b) exemption because, among other issues, (1) they have failed to provide evidence showing that they complied with the limitation on the number of non-accredited purchasers, and (2) they have failed to show that they provided the financial statement information required under § 230.502(b) to non-accredited investors. I agree.

First, it is wholly unclear how Defendants have satisfied the 35-non-accredited-investor requirement. As indicated above, much of Defendants' response and Defendants' response statement of facts is incoherent and sloppily copies and pastes content from other sources. When Defendants do address specific issues, they generally do so vaguely without providing record support. For instance, they provide no record support for their contention that there were fewer than 35 non-accredited investors. *See* [DE 125] at 17. And as the SEC notes, Venters states in his declaration that there were 52 non-accredited investors. [DE 126-2] ¶ 6. Although the same paragraph of Venters' declaration states that there were fewer than 35 non-accredited investors during each 90-day period, this assertion is conclusory. *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) ("'This court has consistently held that conclusory allegations without specific supporting facts have no probative value' for a party resisting summary judgment." (quoting *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000))).

---

[7] As of March 15, 2021, the language of § 230.506(b)(2)(i) was changed to: "There are no more than, or the issuer reasonably believes that there are no more than, 35 purchasers of securities from the issuer in offerings under this section in any 90–calendar-day period."

Moreover, the 90-day language in Rule 506(b) only became effective on March 15, 2021 (after the period relevant in this case). *See supra* note 7.

Second, Defendants have also failed to show that they provided the requisite financial statement information or to establish any genuine dispute of material fact in this regard. Relevant to this issue, the SEC argues in its Motion,

> TMS did not qualify under Regulation D because it accepted unaccredited investors without providing them with the required financial statements, such as audited financials, as TMS did not have audited financial statements or other certified statements. (SMF at ¶ 72). Defendants have produced no evidence that non-accredited investors were ever provided with audited or certified financial statements as required under Regulation D.

[DE 107] at 15. Defendants, pointing to paragraph 72 of their RSF, respond that they provided "the required financial statements, such as certified statements through the emails, links to the financials, on the website and otherwise." [DE 125] at 17. In paragraph 72 of their response statement of facts, Defendants appear to acknowledge that they did not provide audited financials because no audit had been "completed during the relevant time period." DEF SMF ¶ 72. However, they seem to vaguely assert that they sent links containing hundreds of pages of certified financial statements. *See id.* What Defendants do not do, though, is explain what specific financials were provided to non-accredited investors, provide any proof that these specific financials were sent to those investors, or elaborate on how such financials were "certified." Nor do they attempt to explain how whatever they did provide satisfies § 230.502(b) – and thus Rule 506(b). Thus, Defendants have plainly failed to satisfy their burden of showing that the Rule 506(b) exemption applies here.

### 2.  Rule 506(c)

Rule 506(c)'s exemption requires satisfying the terms and conditions of §§ 230.501, 230.502(a), 230.502(d), and the specific conditions set forth in § 230.506(c)(2).  *See* § 230.506(c). For Rule 506(c)'s exemption to apply, all purchasers must be accredited investors.  § 230.506(c)(2)(i).  Accredited investors do include investors who the issuer "reasonably believes" are accredited.  § 230.501(a).  But Rule 506(c) also requires the issuer to "take reasonable steps to verify that purchasers . . . are accredited investors."  § 230.506(c)(2)(ii).

Although Defendants' summary judgment response mentions Rule 506(c) in passing on a few occasions, Defendants do not appear to actually argue that this exemption applies.  As noted in the preceding section, Defendants acknowledge that there were 52 non-accredited investors. Likewise, they acknowledge in their summary judgment response that they sold stock to non-accredited investors (as well as accredited investors) across the United States, Canada, and Mexico.  [DE 125] at 17.  Defendants do contend that they took reasonable steps to verify whether investors were "accredited or otherwise sophisticated."  *Id.*[8]  But they do not argue that they had a reasonable belief all investors were accredited; and, again, they acknowledge that they knew that not all investors were accredited.  *See* § 230.506(c)(2)(ii) (noting that the exemption does not apply if the issuer has knowledge that any investor is not accredited).  Therefore, Rule 506(c) plainly does not apply.

---

[8] Defendants do not explain what reasonable steps they supposedly took beyond providing a subscription agreement and questionnaire to investors.  *See* DEF SMF ¶ 60.  And they have not explained (or even attempted to show) that simply providing a subscription agreement and questionnaire, without more, qualifies as "reasonable steps" under Regulation D.

### 3. Section 4(a)(2)

The "Private Placement Exemption" under section 4(a)(2) "recognizes that sophisticated private investors generally need fewer protections and can 'fend for themselves' in the market." *Chatham Cap. Holdings, Inc. v. Conru as Tr. for Andrew B. Conru Tr.*, 92 F.4th 107, 109 (2d Cir. 2024) (citing *Sec. & Exch. Comm'n v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953)). Courts consider several factors in evaluating whether the exemption applies, such as: (1) the "number of offerees and their relationship to each other and to the issuer"; (2) the "number of units offered"; (3) the "size of the offering"; and (4) the "manner of the offering." *Swenson*, 626 F.2d at 425 (quoting *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 158 (5th Cir. 1972)) (footnotes omitted); *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 900 (5th Cir. 1977); *see also GenAudio*, 32 F.4th at 940 (noting the following relevant factors: "(1) the number of offerees; (2) the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement; and (3) the manner of the offering"). Ultimately, though, whether the exemption is available turns on "whether the particular class of persons affected need the protection of the Act." *Swenson*, 626 F.2d at 425 (quoting *Cont'l Tobacco*, 463 F.2d at 158). "For this reason, . . . the defendant must establish that each and every offeree either had the same information that would have been available in a registration statement or had access to such information." *Id.* at 425-26 (citations omitted).

It is difficult to glean from Defendants' largely incoherent response the factual basis upon which Defendants contend they are entitled to an exemption under section 4(a)(2). They appear to loosely address the issue on pages 18-19 of their response [DE 125]. But aside from their Rule 506 arguments (which fail for the reasons discussed above), Defendants only appear to claim that they are entitled to the section 4(a)(2) exemption because, according to Defendants, "the investors

were suitable, there were only 170 investors, there was no general solicitation, [and] the investors were provided financial information." [DE 125] at 19. But Defendants fail to provide record support for the foregoing contentions, fail to explain the factual basis for their assertion that no general solicitation occurred, and fail to explain what financial information was provided. On page 8 of their response, Defendants do indicate that paragraph 177 of Venters' declaration supports their contention regarding the absence of general solicitation. However, paragraph 177 of Venters' declaration states in a conclusory manner that TMS did not "engage in general solicitation." It does not set forth facts, based on personal knowledge, that support Venters' conclusion regarding whether or not TMS engaged in general solicitation.[9]

Moreover, Defendants do not attempt to analyze the relevant factors set forth above. And, importantly, they do not provide evidence regarding (among other things) the actual number of *offerees*, which is the relevant figure here (as opposed to the number of *purchasers*). *See Doran*, 545 F.2d at 900. Notably, "[D]efendants' 'failure to adduce any evidence regarding the number of offerees (is) fatal' to a private offering defense." *Swenson*, 626 F.2d at 427 (quoting *Doran*, 545 F.2d at 901). Additionally, Defendants do not provide any evidence regarding the characteristics and sophistication of most (if not all) offerees. Ultimately, Defendants have fallen woefully short of their burden of establishing that they are entitled to the section 4(a)(2) exemption.

**B. RULE 701**

It is wholly unclear from Defendants' response how Rule 701 applies here. Rule 701 "exempts offers and sales of securities . . . under a written compensatory benefit plan (or written compensation contract) established . . . for the participation of" employees, consultants, and others.

---

[9] *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

17 C.F.R. § 230.701(c).  "Rule 701 is designed to 'allow[ ] privately-held companies to compensate their employees with securities without incurring the obligations of public registration and reporting.'"  *Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727, 736 (5th Cir. 2019) (citation omitted). As the SEC notes, among other issues, Defendants have not provided any evidence showing that any employees or consultants received stock in TMS *under any written compensatory benefit plan or written compensation contract*.  Thus, Defendants have failed to point to any evidence upon which a jury could conclude that Rule 701 applies here.

## II.   SECTION 15(a) OF THE EXCHANGE ACT

The Court should deny summary judgment on the SEC's section 15(a) claim.  Section 15(a) of the Exchange Act makes it "unlawful for any broker . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker . . . is registered . . . ."  15 U.S.C. 78o(a)(1).  This "broker registration requirement serves as the keystone of the entire system of broker-dealer regulation because a registered broker must abide by numerous regulations designed to protect prospective purchasers of securities."  *U.S. Sec. & Exch. Comm'n v. Murphy*, 50 F.4th 832, 840 (9th Cir. 2022) (internal quotation marks and citation omitted); *see also Sec. & Exch. Comm'n v. Almagarby*, 92 F.4th 1306, 1315 (11th Cir. 2024) ("Registration is one of the primary enforcement mechanisms of the Exchange Act, and it obligates dealers to provide regulators with adequate information for oversight." (citation omitted)).  "Section 15(a) is a strict liability statute; neither scienter nor negligence is required to prove its violation."  *Sec. & Exch. Comm'n v. VerdeGroup Inv. Partners, Inc.*, No. 2:21-CV-07663-SB-ADS, 2022 WL 2200409, at *3 (C.D. Cal. Jan. 14, 2022) (quoting *SEC v. Qi*, No. CV 17-08856-CJC(JCX), 2018 WL 5263187, at *7 (C.D. Cal. Mar. 21, 2018)); *see also Almagarby*, 92 F.4th at 1322 ("[S]ection 15(a) of the Exchange

Act does not contain a scienter element."); *S.E.C. v. Merch. Cap., LLC*, 311 F. App'x 250, 252 (11th Cir. 2009).

The dispute here turns on whether Venters is a "broker" (it is undisputed that he was not "registered"). "A broker is 'any person engaged in the business of effecting transactions in securities for the account of others.'" *Sec. & Exch. Comm'n v. Morrone*, 997 F.3d 52, 61 (1st Cir. 2021) (quoting 15 U.S.C. § 78c(a)(4)). "[A] person may 'effect transactions,' among other ways, by assisting an issuer to structure prospective securities transactions, by helping an issuer to identify potential purchasers of securities, or by soliciting securities transactions." *Id.* (citation omitted). "A person can be 'engaged in the business' of doing so 'by receiving transaction-related compensation or by holding itself out as a broker-dealer.'" *Id.* (citation omitted). In evaluating whether someone is a "broker," courts consider several nonexclusive factors, including "whether the person: 1) actively solicited investors; 2) advised investors as to the merits of an investment; 3) acted with a certain regularity of participation in securities transactions; and 4) received commissions or transaction-based compensation."[10] "A person may be found to be acting as a broker if she participates in securities transactions 'at key points in the chain of distribution.'" *Coplan*, 2014 WL 695393, at *6 (quoting *Mass. Fin. Servs. Inc. v. Secs. Investor Protection Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976)). "Evidence that tends to establish someone has acted as a broker includes 'regular participation in securities transactions, . . . history of selling the securities of other issuers, involvement in advice to investors and active recruitment of investors.'" *S.E.C. v. Imperiali, Inc.*, 594 F. App'x 957, 961 (11th Cir. 2014) (quoting *Sec. & Exch. Comm'n*

---

[10] *Sec. & Exch. Comm'n v. Caputo*, No. 22-CV-61693, 2023 WL 3740926, at *3 (S.D. Fla. May 17, 2023), *report and recommendation adopted*, 2023 WL 3737711 (S.D. Fla. May 31, 2023) (quoting *SEC v. Walker*, No. 20-cv-62564, 2021 WL 5088854, at *2 (S.D. Fla. Aug. 16, 2021)); *see also S.E.C. v. Coplan*, No. 13-62127-CIV, 2014 WL 695393, at *6 (S.D. Fla. Feb. 24, 2014).

*v. George*, 426 F.3d 786, 797 (6th Cir. 2005)).  "[R]egularity of participation is often viewed as the primary indicia of being engaged in the business."  *Quantum Cap., LLC v. Banco de los Trabajadores*, No. 1:14-CV-23193-UU, 2016 WL 10536988, at *6 (S.D. Fla. Sept. 8, 2016) (internal quotation marks and citations omitted).  "[T]ransaction-based compensation, or commissions are [also] one of the hallmarks of being a broker-dealer." *Id.* at *7 (citations omitted). Ultimately, though, determining whether someone is a broker is generally a fact-intensive inquiry that depends on the totality of the circumstances.[11]

Here, a reasonable jury could conclude that Venters is not a broker.  In arguing otherwise, the SEC contends that Venters: (1) solicited investors to buy TMS stock; (2) hired, directed, and supervised account agents to solicit investors; (3) acted as a "closer" by speaking with investors to complete sales (after agents spoke with the investors); and (4) received most of the proceeds from stock sales because investor funds were used to pay his salary and commissions to agents.  *See* [DE 107] at 17-18.  Venters responds that although he was selling securities for TMS (without being registered as a broker), he was not a broker.  According to Venters, that is because TMS was engaged in the business of making and distributing films, with selling TMS stock merely being "an aside to the main business of TMS."  [DE 125] at 21.  Additionally, Venters asserts that he never received transaction-based compensation or denies that most investor funds went towards his salary.  Venters also denies paying commissions to account agents.

Although Defendants' response on this issue is largely unhelpful – because, among other things, none of Defendants' factual assertions are supported by evidentiary citations, and

---

[11] *See Murphy*, 50 F.4th at 843; *U.S. Sec. & Exch. Comm'n v. Feng*, 935 F.3d 721, 731 (9th Cir. 2019); *Cliff Co., Inc. v. Performance Rehab, Inc.*, No. 3:22CV7947-TKW-HTC, 2022 WL 19408077, at *3 (N.D. Fla. Aug. 23, 2022); *Urvan v. TVP Ventures, LLC*, No. 1:20-CV-153-TCB, 2021 WL 8648896, at *11 (N.D. Ga. Mar. 25, 2021).

Defendants fail to discuss any case law – the SEC's Motion does not carry the day (for summary judgment purposes) on the SEC's section 15(a) claim.  While there is evidently no genuine dispute regarding the SEC's first three points above – regarding Venter's solicitation of investors, Venter's use of account agents, and Venters acting as a "closer" – there is very little undisputed evidence beyond that to show that Venters qualifies as a broker.  First, Venters does not appear to have received commissions or transaction-based compensation for the sale of stock.  In fact, Venters affirmatively states in his declaration that he did not receive such compensation, *see* Venters Decl. ¶¶ 180, 183, and the SEC has not demonstrated otherwise (the SEC even recognizes in the Motion that Venters denies receiving transaction-based compensation).  Second, to the extent that it is material, a factual dispute exists regarding whether account agents received commissions or transaction-based compensation for stock sales.  *Compare* PL SMF ¶ 69, *with* Venters Decl. ¶¶ 47, 51, 180.  Third, although the SEC states in the Motion that "[t]he sale of securities was [] done over a several year period on a regular basis," [DE 107] at 18, the SEC does not cite any evidence to support this statement.  In other words, the SEC has provided no evidence to demonstrate that Venters (or TMS) *regularly* participated in securities transactions.  Nor has the SEC explained why Venters' conduct amounted to "regular" participation as a matter of law.

For the foregoing reasons, when the Court views the evidence and reasonable factual inferences in the light most favorable to Defendants (as the nonmoving parties), the Court must conclude that the hallmarks of transaction-based compensation and regularity of participation are not present here.  Thus, while the evidence does show that Venters effected transactions in securities for the account of others, it does not show – viewed in the light most favorable to Defendants – that Venters was *engaged in the business of* effecting transactions in securities for

the account of others.[12]   Therefore, the SEC has not established that it is entitled to summary judgment on its section 15(a) claim.

### III.   SECTION 17(a) OF THE SECURITIES ACT, SECTION 10(b) OF THE EXCHANGE ACT, & RULE 10b-5

#### A. ELEMENTS

The SEC must establish the following to show that Defendants violated § 10(b) and Rule 10b-5:[13] "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter."   *S.E.C. v. Goble*, 682 F.3d 934, 942-43 (11th Cir. 2012) (quoting *S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007)). Similarly, the SEC must prove the following to show that Defendants violated § 17(a)(1): "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter."   *Merch. Cap.*, 483 F.3d at 766 (citing *Aaron v. SEC*, 446 U.S. 680, 697 (1980)).   The only difference concerns second element – "*in the offer* or sale of securities"

---

[12] At a very basic level, the SEC has failed to explain why Venters was "engaged in the business" of being a broker.  The SEC focuses on why certain non-exclusive factors are present without considering the bigger picture and the text of the Exchange Act itself, which "provides considerable guidance on its own."   *Murphy*, 50 F.4th at 843.  Similarly, in its reply, the SEC places substantial reliance on the Eleventh Circuit's unpublished decision in *Imperiali*, highlighting certain language that makes the case appear analogous at first glance, when, upon closer review, it is evident from the facts discussed in *Imperiali* that *Imperiali* is inapposite. Notably, in *Imperiali*, before launching an unregistered offering of stock, the defendant "branded" his company as an "investment company."   *Imperiali*, 594 F. App'x at 959.  He then launched the stock offering and stated that the proceeds of the stock offering would be invested in multiple publicly traded companies.  *Id.*  Although the defendant instead diverted funds to another company he owned, *see id.*, the fact remains that he held himself out as being engaged in the business of effecting transactions for the account of others.  In other words, he essentially held himself out as being a broker.  Venters, on the other hand, did not hold himself out as being a broker (or as being engaged in an investment business like the defendant in *Imperiali*).

[13] The scope of liability under Section 10(b) and Rule 10b-5 – a rule promulgated pursuant to Section 10(b) – is the same.  *S.E.C. v. Goble*, 682 F.3d 934, 943 n.3 (11th Cir. 2012) (citing *Merch. Cap.*, 483 F.3d at 766 n.17).

for § 17(a)(1), and "*in connection with the purchase* or sale of securities" for § 10(b) and Rule 10b-5. Claims under §§ 17(a)(2) and 17(a)(3) have similar requirements as well. To show that Defendants violated § 17(a)(2) or § 17(a)(3), the SEC must show "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." *Merch. Cap.*, 483 F.3d at 766 (citing *Aaron*, 446 U.S. at 702). Thus, the first two elements are the same as the first two elements of a § 17(a)(1) claim, but unlike § 17(a)(1) – which requires scienter – §§ 17(a)(2) and 17(a)(3) only require negligence.

**Materiality**: In this context, the test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Goble*, 682 F.3d at 943 (quoting *Merch. Cap.*, 483 F.3d at 766. "Course of action" refers to an "investment decision." *Id.* "A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019) (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011)). "In other words, materiality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the 'total mix' of information made available.'" *Id.* (quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012)). "Materiality is itself a mixed question of law and fact" that "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.* at 1320 (citation omitted). Ultimately, "[t]he question of materiality is not subject to a bright-line test, but instead depends on the specific circumstances of each case, including the totality of information available to investors." *Id.* at 1317 (internal citation omitted).

***In Connection With***: "[T]he Supreme Court has instructed that § 10(b) and its 'in connection with' requirement be construed 'flexibly to effectuate its remedial purposes.'" *Goble*, 682 F.3d at 945 (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).  The "requirement is satisfied where the fraud 'touch[es]' the transaction in some way, including situations where 'the purchase or sale of a security and the [preceding] proscribed conduct are part of the same fraudulent scheme.'" *Sec. & Exch. Comm'n v. Radius Cap. Corp.*, 653 F. App'x 744, 750 (11th Cir. 2016) (quoting *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1046 (11th Cir. 1986)).  "[T]he misrepresentations themselves need not be explicitly directed at the investing public or occur during the transaction to be 'in connection with the purchase or sale of' or 'in the offer or sale of' any security." *Id.* at 751.

***Scienter***: "Scienter may be established by a showing of knowing misconduct or severe recklessness."  *S.E.C. v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014) (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)); *see also FindWhat*, 658 F.3d at 1299 ("[S]cienter consists of intent to defraud or severe recklessness on the part of the defendant." (citation omitted)).  It can be established through direct or circumstantial evidence. *Id.*  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)).  Severely reckless misrepresentations and omissions are those "that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.*  Whether a defendant acted with scienter is generally for a factfinder to decide, though summary judgment may be appropriate in some cases. *Monterosso*, 756 F.3d at 1335.

### B.  ALLEGED MISREPRESENTATIONS

In the Motion, the SEC contends that Defendants made six types of material misrepresentations – misrepresentations regarding: (1) the number of films TMS owned; (2) the films TMS was producing and developing; (3) TMS owning a studio; (4) TMS's distribution and licensing of films; (5) TMS's use of blockchain technology; and (6) how investor funds would be used.  [DE 107] at 19-20.  Each alleged misrepresentation is discussed in the sections that follow.

#### 1.  Number of TMS Films

The SEC asserts that Defendants made material misrepresentations regarding the number of films that TMS owned.  In support of this contention, the SEC relies on paragraphs 7-9 and 12-32 of its statement of facts.

The bulk of the facts related to Defendants' alleged misrepresentations regarding the number of films TMS owned pertain to a library of films that TMS entered into an agreement to acquire but did not ultimately acquire.  By way of background, on April 20, 2016, Defendants executed an agreement for TMS to purchase the Arrowhead Film Library ("Arrowhead Agreement").  PL SMF ¶ 10 (undisputed).  This acquisition included 12 films starring well-known actors (such as Keanu Reeves, Antonio Banderas, Robert Duvall, and Samuel L. Jackson).  *Id.* ¶ 13 (undisputed).   In August 2016, TMS issued a press release, announcing the Arrowhead Agreement and stating, "Based upon information provided by Seven Arts Entertainment, Inc. . . . [in] 2009, The Salter Group valued the Arrowhead Library between $2,500,000 - $3,300,000." *Id.* ¶ 16 (undisputed).   The press release also stated that TMS "expects to begin monetizing this acquisition in the 4th quarter of 2016." *Id.*

TMS never completed its acquisition of the Arrowhead Film Library, which Venters knew.  [DE 108-21] at 7-8 (Request Nos. 10, 13, 15).  But the SEC asserts that Defendants nonetheless

told investors that TMS acquired or owned the Arrowhead Film Library (even though TMS had merely entered into an agreement to acquire it).  *See* PL SMF ¶¶ 12, 22, 23.  Defendants assert otherwise.  *See* DEF SMF ¶ 22; Venters Decl. ¶¶ 36, 65.  It is undisputed, however, that Defendants sent existing and prospective investors a marketing flyer containing images of movie posters from certain films in the Arrowhead Film Library.  *See* [DE 108-21] at 11 (Request Nos. 28-29).  The bottom of the flyer states, "A Film Library of The Movie Studio."  [DE 108-20].  Also, TMS posted sizzle reel videos [DE 108-62, 108-63] on YouTube in May 2016 (which were still publicly posted as of October 2023), which included movie clips from movies in the Arrowhead Film Library.  *Compare* PL SMF ¶¶ 14-15, *with* DEF SMF ¶¶ 14-15.  "The Movie Studio A Publicly Traded Company OTC:MVES" is listed at the top of the sizzle reel videos.  *Compare* PL SMF ¶¶ 14-15, *with* DEF SMF ¶¶ 14-15; *see also* [DE 108-62, 108-63].

It is unclear from the Motion all of the specific material misrepresentations that the SEC is contending Defendants made regarding the Arrowhead Film Library.  Part of the problem is that although the SEC provides a factual background section related to the Arrowhead Film Library, [DE 107] at 3-6, it does not fully analyze the alleged misrepresentations related to the Arrowhead Film Library in the Argument section of its Motion.  *See* [DE 107] at 19-24.  Rather, in its Argument section, the SEC just generally refers to Defendants' alleged misrepresentations regarding "the number of films TMS owned" or "how many films TMS owned."  *Id.* at 19, 20.  In fact, the Argument section of the SEC's Motion does not even mention the Arrowhead Film Library.

With that said, it is evident that, at a minimum, the SEC is contending that Defendants misrepresented to investors that TMS owned (or at least had acquired) the Arrowhead Film Library when, as noted above, TMS had only entered into an agreement to acquire the film library but

never actually acquired it.  As indicated above, however, a factual dispute exists regarding whether

Defendants explicitly told any investors that TMS owned the Arrowhead Film Library.  To be sure,

one investor states that Venters told him numerous times that TMS "owned" a film library that

included one of the movies in the Arrowhead Film Library.  *See* Declaration of Rodrigo Ignacio

Allende [DE 108-2] ¶ 21.  And a former TMS employee asserts that Venters told investors that

TMS "owned" the Arrowhead Film Library.  Declaration of Gary Thomas Metz [DE 108-3] ¶ 18.

But Venters outright denies telling any investors that TMS owned the Arrowhead Film Library.

*See* Venters Decl. ¶¶ 36, 65.  Thus, resolution of this issue (whether Venters made the alleged

statement at all) turns on credibility, which the Court cannot decide on summary judgment.[14]  *See*

*Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he

is ruling on a motion for summary judgment or for a directed verdict."); *Copeland v. Georgia*

---

[14] In its Reply, the SEC asserts that Venters' declaration is replete with vague and conclusory statements and denials, which are insufficient to create a genuine issue of material fact.  While it is true that conclusory statements without specific supporting facts lack probative value, *Bazemore*, 827 F.3d at 1333, there is a difference between, on the one hand, offering conclusions without supporting facts, and on the other hand, testifying – contrary to the testimony of another witness – that the declarant never made a particular statement (e.g., that TMS *owned* the Arrowhead Film Library).  And while Venters' testimony in this regard may be self-serving (as the SEC indicates), courts "routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citation omitted).  In fact, a party's testimony generally "cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature."  *Id.* (citations omitted). Moreover, the SEC's own evidence regarding certain statements is often vague itself and often relies on witness statements that provide little explanation, context, or other corroborating support. *Cf. id.* ("Feliciano's sworn statements are no more conclusory, self-serving, or unsubstantiated by objective evidence than the officers' assertions that . . . .").  In other words, while statements in a declaration may not always create a genuine issue of material fact, this is not a situation where Venters' denial – of the SEC's assertion that Venters told investors that TMS owned the Arrowhead Film Library – flies in the face of overwhelming specific and corroborated evidence to the contrary.

*Dep't of Corr.*, 97 F.4th 766, 774 (11th Cir. 2024) ("When determining whether there is a genuine issue of material fact, we do not weigh conflicting evidence or make credibility determinations to resolve factual disputes. Instead, we give the nonmovant the benefit of his evidence, crediting the nonmoving party's version of events, even if it is supported solely by the testimony of a party." (internal quotation marks and citations omitted) (cleaned up)).[15]

Aside from the issues pertaining to the Arrowhead Film Library, the SEC also contends that Defendants misrepresented that TMS owned hundreds or thousands of films. Specifically, although TMS only owned 17-18 films, PL SMF ¶ 9 (undisputed), one investor states that a TMS employee told him TMS owned a couple hundred movies, which contributed to his decision to invest in TMS. Declaration of Jeffrey Dean White [DE 108-11] ("White Decl.") ¶ 7. Defendants' attempt to dispute that a TMS employee made this representation is convoluted and makes little sense. Defendants seem to contend that the TMS employee who allegedly made the statement was not employed by TMS at the time that the investor made his investment, but whether that is what Defendants are saying, or whether that is all they are saying, is far from clear (once again, Defendants' contentions on this topic are largely incoherent). *See* DEF SMF ¶¶ 7-8; Venters Decl. ¶¶ 63-64.

At any rate, the problem here is that the SEC does not provide any context to grant summary judgment on the basis of the alleged misrepresentation regarding the number of films TMS owned. The SEC's contention that the alleged misrepresentation was made is solely based on one brief

---

[15] In addition to contending that Defendants explicitly told investors that TMS owned the Arrowhead Film Library, the SEC also implies that the investor flyer and sizzle reels were misleading with respect to whether TMS owned the Arrowhead Film Library. While the flyer and sizzle reels are undoubtedly a part of the total mix of information, the SEC has not shown that any reasonable jury would conclude that the flyer and sizzle reels were materially misleading on their own (i.e., without Defendants explicitly representing that TMS owned the Arrowhead Film Library, which again, is disputed).

sentence in a declaration. *See* White Decl. ¶ 7 ("Mr. Hines told me that TMS owned a couple hundred movies, which contributed to my decisions to invest."). But the declaration does not provide any context, including when the alleged representation was made. While the Court rejected Defendants' argument at the motion-to-dismiss stage that the SEC failed to plead fraud with particularity in accordance with Fed. R. Civ. P. 9(b) – in large part due to Defendants' failure to satisfy their burden as the parties seeking dismissal – the absolute lack of context the SEC provides regarding this particular representation (that TMS owned hundreds of films) makes summary judgment inappropriate on the basis of this alleged misrepresentation.

Ultimately, the SEC has failed to establish that no reasonable jury could return a verdict in Defendants' favor on the issue of whether Defendants made material misrepresentations regarding the number of films TMS owned.

### 2. Production and Development of Films

The SEC asserts that Defendants made material misrepresentations regarding the films that TMS was producing and developing. In support of this contention, the SEC relies on paragraphs 34-41 and 45 of its statement of facts.[16] It is undisputed that TMS released trailers on YouTube

---

[16] Paragraphs 34 and 35 of the SEC's statement of facts contain broad, generalized statements that are only somewhat supported. Moreover, it is questionable whether the statements cited in support paragraphs 34 and 35 (as well as paragraph 39) are made by individuals with personal knowledge regarding certain of the statements they make. Additionally, the statements cited in support of these paragraphs do not provide important context (e.g., dates).

Regarding paragraph 45 of the SEC's statement of facts, while it correctly notes that TMS issued a press release on September 15, 2016 stating, *inter alia*, that a film called Rainbows was "being filmed" [DE 108-30], the SEC does not provide adequate support for the next statement in paragraph 45 – that Rainbows was not being filmed at all. Thus, the SEC has not shown that Defendants made a false statement when they stated that Rainbows was being filmed.

Regarding paragraph 36 of the SEC's statement of facts, I do not discuss the alleged fact discussed therein given that it concerns an alleged misrepresentation that was apparently made around late

for *Cause and Effect* in February 2017 and *Pegasus* in June 2018.  PL SMF ¶ 37 (undisputed).

Additionally, in a March 28, 2018 press release, TMS "announce[d] pre-production of 2018

upcoming movies 'Cause & Effect' and 'Pegasus.'"  [DE 108-25].  The press release indicated

that "[u]pon successful pre-production of the [films], [TMS] intends to move forward with the

'locked down' locations, product placement and then proceed to securing the principal establishing

shots, talent and music and soundtrack components."  *Id.*  On February 7, 2019, TMS issued a

press release entitled "[TMS] Announces Pre-Production and Preliminary Casting of Trailer of

Upcoming Movie 'The Last Warhead' and Completes Three Picture Package for 2019."  [DE 108-

7].  In the press release, TMS "announce[d] the beginning of pre-production of 'The Last

Warhead.'"  *Id.*  The press release also stated that TMS "will begin accelerating development of

the infrastructure" for the film.  *Id.*  Additionally, the press release indicated that *The Last

Warhead*, along with *Cause & Effect* and *Pegasus*, would "round[] out [TMS's] proposed

production slate for 2019."  *Id.*  However, as of 2021, none of the three films had been completed,

and as of late 2023, two of the three films had still not been completed.  PL SMF ¶ 41 (undisputed).

A reasonable jury could find that Defendants did not make material misrepresentations

regarding TMS's production and development of films.  To be sure, the March 2018 and February

2019 press releases do contain some arguably misleading statements.  As the SEC notes, certain

statements therein suggest that the referenced films are likely to be released within a year.

However, other language in the press releases indicate that production had not yet started.

Ultimately, reasonable minds may differ regarding whether the press releases are materially

---

2013, when the Complaint is only premised upon alleged misrepresentations made during and after
2016 (each count of the Complaint is limited to conduct occurring no earlier than August 2016).

misleading.  Therefore, summary judgment is not proper on the basis of Defendants making material misrepresentations concerning TMS's production and development of films.

### 3.  Ownership of Studio

The SEC asserts that Defendants made material misrepresentations aimed at leading investors to believe that TMS owned a production or film studio (when it is undisputed that TMS did not own a studio but only occupied a studio that was around 5,200 square feet – *compare* PL SMF ¶ 44, *with* DEF SMF ¶ 44).  In support of this contention, the SEC relies on paragraphs 42-44 of its statement of facts.  First, the SEC notes that TMS's Reg1-A/A states in a "Film Studio" section that TMS:

> is an entertainment or motion picture company that has its own studio facility that is used to make films, which is handled by the production company. Most of the companies in the entertainment industry have never own[ed] their own studios, but have rented space from other companies. There are also independently owned studio facilities, which have never produced a motion picture of their own because they are not entertainment companies or motion picture companies – they are companies who sell only studio space.

[DE 108-28] at 33.  If the Court were to draw all reasonable inferences in favor of the SEC, it might conclude that the foregoing statement is materially misleading.  That is because it is reasonable to infer from the foregoing statement that Defendants were implying TMS owned its own studio unlike most companies in the entertainment industry.  However, a reasonable jury could also arguably infer from the foregoing statement that TMS had access to its own studio even if it did not own a studio (like most companies in the entertainment industry).  Given that the Court must draw reasonable inferences in favor of Defendants (the nonmovants) at this stage, the Court cannot conclude that any reasonable jury would find Defendants' statement regarding TMS having its own studio was materially misleading.  That is especially so given that TMS's Reg1-A/A listed the company's assets, which did not include real property.  *See id.* at 68.

Second, the SEC notes that TMS issued a press release announcing it formed a subsidiary to give the impression that TMS owned a studio.  It is true that TMS issued a press release announcing it formed a subsidiary (Gulfstream Movie Studios, Inc.) and that the press release referenced "the Company's newly occupied studio."  [DE 108-30].  However, the only evidence the SEC points to that indicates the press release was intended to make it appear as if TMS owned a studio is pure supposition offered by a former account agent of TMS.  *See* [DE 108-3] ¶ 22 ("I *believe* Mr. Venters *may have* created . . . .") (emphasis added).

Notwithstanding the foregoing, the SEC does point to one statement that appears to be, at the very least, potentially misleading.  Specifically, a document that the SEC describes as "marketing materials," *see* PL SMF ¶ 43b, states that TMS "enjoys a 300-million-dollar 'back lot' at Gulfstream Park . . . ."  [DE 108-55].  However, while the SEC states that the marketing material was sent to existing and prospective investors, it provides no record support for that contention.

For the foregoing reasons, whether Defendants made any material misrepresentations regarding TMS's ownership of a studio is for a jury to decide.

### 4.  Distribution and Licensing of Films

The SEC contends that Defendants made material misrepresentations regarding "TMS's distribution and licensing of films." [DE 107] at 19.  Once again, it is not entirely clear on which particular representation(s) the SEC is relying.  However, the primary alleged misrepresentation at issue appears to be that TMS received $4,000 per month from Amazon for two of its films.  *See id.* at 7, ¶ 22; *see also* PL SMF ¶ 49 (disputed).  There is no dispute that TMS did not receive $4,000 per month from Amazon for the two films.  PL SMF ¶ 50 (undisputed).  But there does appear to be a dispute regarding whether Defendants made the representation in the first instance.

In support of its contention that Defendants made the representation, the SEC solely relies on a declaration from a former TMS employee (Gary Metz) in which the former employee states: "At one point in my last few years with TMS, I heard Mr. Venters tell investors that TMS was receiving $4,000 a month in revenue from Amazon for [two] TMS[] films."  Metz Decl. ¶ 20. Although Defendants' attempt to dispute the foregoing is convoluted to say the least, Venters does at least dispute that the representation was made, Venters Decl. ¶ 38, which makes this a credibility issue for a jury.  Moreover, even without considering Venters' convoluted declaration, the SEC has probably not even satisfied its initial burden of demonstrating the absence of a genuine dispute of material fact as to this representation.  Again, we are talking about fraud.  However, the SEC's evidence on the representation at issue here (Metz's statement) is again lacking any particularity. Among other things, the SEC provides no information or evidence regarding when Venters made the alleged representation (Metz merely says at one point in his "last few years" with TMS) or to which investors Venters allegedly made the representation.

For the foregoing reasons, the SEC is not entitled to summary judgment on the basis of the alleged representation regarding TMS receiving $4,000 per month from Amazon.[17]

---

[17] Aside from the alleged representation that TMS received $4,000 per month from Amazon, the SEC also seems to contend that Defendants' alleged misrepresentations regarding the distribution and licensing of films included a representation that TMS had agreements with major studios and distributions channels.  *See* PL SMF ¶ 47.  Now, Defendant's response to paragraph 47 of the SEC's statement of facts is confusing and (potentially) unsupported.  Specifically, Defendants' response to paragraph 47 is: "Disputed. TMS purchased SAFELA and it had agreements with the studios mentioned. TMS was selling foreign market territories via Distribution Agreements."  DEF SMF ¶ 47.  Additionally, Defendant points to paragraph 99 of Venters' declaration, which contains the following difficult-to-follow explanation (that may not even be a complete sentence): "As to ¶47 of SMF (ECF 108)- Disputed. Our 'Aggregator' entered new distribution agreements 'On our behalf and the actual 'Distribution Agreement' in the movie."

But ultimately, the SEC does nothing to explain why what is stated in the marketing materials in paragraph 47 (in light of the purported explanations by Defendants) amount to a material misrepresentation (*e.g.*, why it matters that the materials said TMS had "agreements" with studios

### 5. Blockchain Technology

The SEC accuses Defendants of making material misrepresentations regarding TMS's use of blockchain technology. *See* [DE 107] at 19 (citing PL SMF ¶¶ 51-55); *see also* [DE 107] at 7-9, ¶¶ 23-26. In doing so, the SEC points to a handful of statements that Defendants made in 2020 and 2021 (in press releases and a Venters interview), including the following:

(1) Establishing worldwide distribution agreements for our current library of new and aggregated revenue-shared titles through our blockchain application is a fundamental cornerstone of our proposed reverse engineering of future revenue-share aggregated titles that, when completed, could add significant economic scalability to the Company's revenue model.

(2) If you look at the aggregation of content that we can move into that global landscape using blockchain, the capital increase for the company's balance sheet could be tremendous.

(3) We are excited to share several major material events that have occurred as part of the expansion of our vertically integrated film production and distribution architecture utilizing over-the-top (OTT) distribution platforms and blockchain technology.

PL SMF ¶¶ 51, 53 (undisputed). A slide from the Venters interview also described TMS's blockchain model as "unique." *Id.* ¶ 53. Additionally, Venters indicated in his interview that TMS delivered video on demand via blockchain technology in three markets. *Id.*

Defendants do not dispute making the foregoing statements. But the parties do dispute whether Defendants' statements were material misrepresentations or materially misleading. *Compare* PL SMF ¶¶ 54-55, *with* DEF SMF ¶¶ 54-55 *and* Venters Decl. ¶¶ 108,[18] 169, 171-73.

---

as opposed to agreements with agents working with those studios) – and more importantly, why *any reasonable jury* would conclude that what is stated in the marketing materials is a material misrepresentation. I do not doubt that there could be such an explanation that shows why the difference is a material one, but the SEC has failed to provide it. Moreover, the SEC's lack of an explanation makes it unclear the extent to which the SEC is even relying on paragraph 47 of its statement of facts in connection with the Motion, especially because the SEC does not appear to discuss paragraph 47 in its Motion at all (including in the Facts section of its Motion).

[18] Venters' declaration has two paragraph 108s. The paragraph 108 cited here is the first.

According to the SEC, the statements were material misrepresentations or materially misleading because TMS did not have a unique blockchain application but instead used the platform of a third-party company, Vuulr.  *Id.* ¶ 54 (disputed).  All the SEC relies on to support the foregoing contention is Venters' deposition testimony that Vuulr is the developer of the blockchain platform that TMS uses.  *See id.* (citing [DE 108-5] at 157).  While Defendants' attempt to dispute the SEC's statements is again incoherent, the SEC has not demonstrated that no reasonable jury could find for Defendants on whether they made material misrepresentations regarding TMS's use of blockchain technology.  Rather, the types of broad statements involved here show that the issue of whether Defendants' statements regarding blockchain were materially misleading is precisely the type of issue that a jury should resolve.  After all, materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Carvelli*, 934 F.3d at 1320.

### 6.  Use of Investor Funds

The SEC argues that Defendants misrepresented to investors how TMS would use the funds that those investors invested.  According to the SEC, Defendants represented that investor funds would be used to fund TMS projects but instead used such funds to cover operating expenses and for Venters' personal benefit.  To attempt to establish that no genuine dispute exists in this regard, the SEC relies on paragraphs 81-87 of its statement of facts.  There does not appear to be any genuine dispute that hundreds of thousands of dollars of investor funds were used for operating expenses and to pay Venters (or for his benefit).  In fact, Defendants do not dispute that Venters withdrew and transferred money from TMS to himself whenever he chose to do so.  *See* PL SMF

¶ 84 (undisputed); *see also* DEF SMF ¶ 85 (Defendants acknowledge that Venters received over $180,000, which they state was applied towards Venters' past-due salary).

However, the SEC has failed to satisfy its burden as the moving party in the first place to show that Defendants ever represented investor funds would only be used for TMS projects, or at least that such funds would not be used to pay operating expenses or Venters. In its statement of facts, the SEC states – perhaps not surprisingly, in passive voice (given the lack of record evidence backing up the statement) – that "existing and prospective investors [were] told their funds would be used to fund TMSs' projects, such as the production and acquisition of films." PL SMF ¶ 81. The problem is that the SEC has failed to point to evidence to show that Defendants made any such affirmative representation to anyone. The sole evidence that the SEC cites to support its contention that Defendants made such a representation is a few lines from the deposition of a former TMS sales agent. Specifically, when asked if investors were told that their funds were being used to pay Venters' personal expenses, the deponent responded, "No. Everything was based on the production of the movie. Based on the production and distribution of the movie." [DE 108-51] at 122. This testimony alone is plainly insufficient to establish that Defendants made the alleged representation (regarding how investor funds would be used) in the first instance. Therefore, the SEC is not entitled to summary judgment on the basis that Defendants made material misrepresentations regarding how investor funds would be used.

## IV.   <u>CONTROL PERSON LIABILITY</u>

Under section 20(a) of the Exchange Act:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Thus, "[t]he Act imposes liability not only on the person who actually commits a securities law violation, but also on an entity or individual that controls the violator." *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008).  Section 20(a) is a derivative liability statute.  *Id.* at 722, 725.  "Control person liability is secondary only and cannot exist in the absence of a primary violation."  *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1276 (11th Cir. 2016) (citation omitted).  Thus, "no § 20(a) claim can lie without first establishing a successful § 10(b) claim."  *FindWhat*, 658 F.3d at 1294 n.9.[19]

Here, because the SEC is not entitled to summary judgment on its claims under section 10(b) and Rule 10b-5, it is not entitled to summary judgment on its derivative section 20(a) claim.  *Cf. Carvelli*, 934 F.3d at 1330 ("[B]ecause we have determined that the Retirement System failed to adequately plead a violation of § 10(b) and Rule 10b–5, there is no underlying 'primary violation' on which to hang a § 20(a) claim."); *Galectin Therapeutics*, 843 F.3d at 1276 ("Because Hotz's complaint does not allege a primary violation, Hotz's § 20(a) claim fails."); *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635-36 (11th Cir. 2010) ("Because a primary violation of the securities law is an essential element of a § 20(a) derivative claim, a plaintiff who pleads a § 20(a) claim can withstand a motion to dismiss only if the primary violation is pleaded with legal sufficiency.  As the Second Amended Complaint failed to allege primary liability under § 10(b), there can be no secondary liability under § 20(a)." (internal citation omitted)).

---

[19] In fact, as reflected in the Complaint, the SEC's section 20(a) claim against Venters is predicated on TMS's alleged violations of section 10(b) and Rule 10b-5.  *See* [DE 1] ¶¶ 82-83.

## CONCLUSION

For the reasons discussed above, I respectfully **RECOMMEND** that the Motion [DE 107] be **GRANTED IN PART and DENIED IN PART**, that the Court grant summary judgment in favor of the SEC on Count I of the Complaint, and that the Court deny the Motion as to all other claims.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 26th day of July 2024.

**Jared M. Strauss**
**United States Magistrate Judge**