# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 0:21-CV-61686-DPG

**SECURITIES AND EXCHANGE COMMISSION,**

    **Plaintiff,**

**v.**

**THE MOVIE STUDIO, et al.,**

    **Defendants.**

_____/

## <u>SECURITIES AND EXCHANGE COMMISSION'S NOTICE OF FILING PLAINTIFF'R PROPOSED JURY INSTRUCTIONS AND VERDICT FORM</u>

  Plaintiff hereby files its Proposed Jury Instructions and Verdict Form. Despite its best efforts to confer with Defendants' counsel about filing *Joint* Jury Instructions and Verdict Form in this matter, and multiple telephonic conferences to achieve that goal, Defendants' did not send their proposed amendments to such instructions (which were extensive) to the undersigned until late today which did not give Plaintiff sufficient time to review and respond to such proposed additional instructions within the Court's deadline. Thus, Plaintiff is unilaterally filing Plaintiff's Proposed Jury Instructions and Verdict Form which contain the Defendants' Affirmative Defenses and Plaintiff's objections thereto that were discussed jointly.

August 1, 2025

      Respectfully submitted,

      s/**Alise Johnson**
      Alise Johnson, Esq.
      Senior Trial Counsel
      Florida Bar No. 0003270
      Direct Dial: (305) 982-6385
      Email:johnsonali@sec.gov

      Attorneys for Plaintiff

**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
(305) 982-6300

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 1, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ Alise Johnson

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 0:21-cv-61686-DPG**

**SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff,**

**v.**

**THE MOVIE STUDIO, INC.**
**and GORDON SCOTT VENTERS,**

      **Defendants.**

_____/

## **PARTIES' PROPOSED JURY INSTRUCTIONS AND VERDICT FORM[1]**

### **General Preliminary Instruction[2]**

Members of the Jury:

Now that you've been sworn, I need to explain some basic principles about a civil trial and your duty as jurors. These are preliminary instructions. I'll give you more detailed instructions at the end of the trial.

The jury's duty:

It's your duty to listen to the evidence, decide what happened, and apply the law to the facts. It's my job to provide you with the law you must apply – and you must follow the law even if you disagree with it.

What is evidence:

---

[1] Where the parties have not agreed on a proposed jury instruction, that instruction is set forth in bold type. Further, instructions proposed only by Plaintiff are underlined, and those proposed only by Defendants are italicized.

[2] Eleventh Circuit Pattern Jury Instruction 1.1.

You must decide the case on only the evidence presented in the courtroom. Evidence comes in many forms. It can be testimony about what someone saw, heard, or smelled. It can be an exhibit or a photograph. It can be someone's opinion.

Some evidence may prove a fact indirectly. Let's say a witness saw wet grass outside and people walking into the courthouse carrying wet umbrellas. This may be indirect evidence that it rained, even though the witness didn't personally see it rain. Indirect evidence like this is also called "circumstantial evidence" – simply a chain of circumstances that likely proves a fact.

As far as the law is concerned, it makes no difference whether evidence is direct or indirect. You may choose to believe or disbelieve either kind. Your job is to give each piece of evidence whatever weight you think it deserves.

What is not evidence:

During the trial, you'll hear certain things that are not evidence and you must not consider them.

First, the lawyers' statements and arguments aren't evidence. In their opening statements and closing arguments, the lawyers will discuss the case. Their remarks may help you follow each side's arguments and presentation of evidence. But the remarks themselves aren't evidence and shouldn't play a role in your deliberations.

Second, the lawyers' questions and objections aren't evidence. Only the witnesses' answers are evidence. Don't decide that something is true just because a lawyer's question suggests that it is. For example, a lawyer may ask a witness, "You saw Mr. Jones hit his sister, didn't you?" That question is not evidence of what the witness saw or what Mr. Jones did – unless the witness agrees with it.

There are rules of evidence that control what the court can receive into evidence. When a lawyer asks a witness a question or presents an exhibit, the opposing lawyer may object if [he/she] thinks the rules of evidence don't permit it. If I overrule the objection, then the witness may answer the question or the court may receive the exhibit. If I sustain the objection, then the witness cannot answer the question, and the court cannot receive the exhibit. When I sustain an objection to a question, you must ignore the question and not guess what the answer might have been.

Sometimes I may disallow evidence – this is also called "striking" evidence – and order you to disregard or ignore it. That means that you must not consider that evidence when you are deciding the case.

I may allow some evidence for only a limited purpose. When I instruct you that I have admitted an item of evidence for a limited purpose, you must consider it for only that purpose and no other.

<u>Credibility of witnesses</u>:

To reach a verdict, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of it, or none of it. When considering a witness's testimony, you may take into account:

· the witness's opportunity and ability to see, hear, or know the things the witness is testifying about;

· the witness's memory;

· the witness's manner while testifying;

· any interest the witness has in the outcome of the case;

· any bias or prejudice the witness may have;

· any other evidence that contradicts the witness's testimony;

· the reasonableness of the witness's testimony in light of all the evidence; and

· any other factors affecting believability.

At the end of the trial, I'll give you additional guidelines for determining a witness's credibility.

<u>Description of the case</u>:

This is a securities case.  Securities are investments. ***Soliciting investments, in general, is legal.***  The Securities and Exchange Commission regulates the solicitation of investments.  Its job is to make sure people and companies comply with the law.  In this case the Securities and Exchange Commission accuses the Defendants of breaking it and the Defendants contend that they complied.

This is a civil case. To help you follow the evidence, I'll summarize the parties' positions.

The Plaintiff, Securities and Exchange Commission, or the "SEC," claims the Defendant The Movie Studio, ***Inc.,*** a company that engages in film production and video streaming, and its founder, owner, and chief executive officer, Gordon Scott Venters, issued misleading press releases regarding The Movie Studio's ownership, production, and distribution of films to induce investments in The Movie Studio in violation of the securities laws that prohibit fraud in the sale of investments.

**<u>The SEC also alleges Venters operated as a broker dealer without registering with the SEC in violation of the securities laws, and that Venters, who had the power to control The Movie Studio and its policies that resulted in The Movie Studio's violations, violated the securities laws as charged.</u>**

4

The Movie Studio and Venters deny those claims and contend that they should be found not liable on all counts.  The Defendants contend that they never made any false statements and never knowingly made any ***materially misleading statements or omissions***. Defendants contend that they always included explicit disclaimers in their emails to potential investors, warning the recipients of the uncertainty which goes with investments in companies like The Movie Studio, and informing the recipients that any investment could result in the loss of their entire investment.  Defendants allege that they only solicited investments from accredited investors or those of similar qualifications. Defendants assert that Mr. Venters did not act as a broker dealer, ***and that The Movie Studio's projects would have found more success if not for the SEC filing this lawsuit against it in 2021 in the midst of the release of The Movie Studio app that was launching its own streaming platform.  Despite the filing of this case, The Movie Studio has continued with its business by completing substantial work on a major cinematic release entitled "Pegasus." Defendants contend that the SEC's case is an overreach by an excessively intrusive regulatory agency that has caused significant harm to the Movie Studio and its shareholders.***

<u>Plaintiff's Objections</u>

The SEC objects to Defendants' proposed instructions regarding the SEC's filing decision or the Commission's charging decisions. The jury has no role in evaluating the SEC's investigation, and, in any event, would be ill-equipped to do so. *See U.S. v. Cheung Kin Ping*, 555 F.2d 1069, 1073 (2d Cir. 1977) (approving a jury instruction stating in part that "law enforcement policy [i]s not [the jury's] concern").  The SEC also objects to the Defendants' speculative statements as to what happened after the SEC filed its case to TMS'

business as such comments are irrelevant to the jury's duty to evaluate the evidence as to whether a securities violation occurred.

Burden of proof:

The SEC has the burden of proving its case by what the law calls a "preponderance of the evidence." That means that the SEC must prove that, in light of all the evidence, what it claims is more likely true than not. So, if you could put the evidence favoring the SEC and the evidence favoring the Defendants on opposite sides of balancing scales, the SEC needs to make the scales tip to its side. If the SEC fails to meet this burden as to the respective counts as to each Defendant, you must find in favor of the Defendants as to the applicable counts. ***Where the SEC has proven one or more of its claims, you must determine whether the Defendants have proven one or more of their defenses. Defendants have the burden of proving each defense by a preponderance of the evidence.***

To decide whether any fact has been proved by a preponderance of the evidence, you may – unless I instruct you otherwise – consider the testimony of all witnesses, regardless of who called them, and all exhibits that the court allowed, regardless of who produced them. After considering all the evidence, if you decide a claim or fact is more likely true than not, then the claim or fact has been proved by a preponderance of the evidence.

***On certain issues, called "affirmative defenses," Defendants have the burden of proving the elements of a defense by a preponderance of the evidence. I'll instruct you on the facts Defendants must prove for any affirmative defense. After considering all the evidence, if you decide that Defendants have successfully proven that the required facts are more likely true than not, the affirmative defense is proven and your verdict must be for the Defendant or Defendants on that claim.***

While serving on the jury, you may not talk with anyone about anything related to the case. You may tell people that you're a juror and give them information about when you must be in court. But you must not discuss anything about the case itself with anyone.

You shouldn't even talk about the case with each other until you begin your deliberations. You want to make sure you've heard everything – all the evidence, the lawyers' closing arguments, and my instructions on the law – before you begin deliberating. You should keep an open mind until the end of the trial. Premature discussions may lead to a premature decision.

In this age of technology, I want to emphasize that in addition to not talking face-to-face with anyone about the case, you must not communicate with anyone about the case by any other means. This includes e-mails, text messages, phone calls, and the Internet, including social-networking websites and apps such as Facebook, Instagram, Snapchat, YouTube, and Twitter. You may not use any similar technology of social media, even if I have not specifically mentioned it here.

You must not provide any information about the case to anyone by any means whatsoever, and that includes posting information about the case, or what you are doing in the case, on any device or Internet site, including blogs, chat rooms, social websites, or any other means.

You also shouldn't Google or search online or offline for any information about the case, the parties, or the law. Don't read or listen to the news about this case, visit any places related to this case, or research any fact, issue, or law related to this case. The law forbids the jurors to talk with anyone else about the case and forbids anyone else to talk to the jurors about it. It's very important that you understand why these rules exist and why they're so

7

important. You must base your decision only on the testimony and other evidence presented in the courtroom. It is not fair to the parties if you base your decision in any way on information you acquire outside the courtroom. For example, the law often uses words and phrases in special ways, so it's important that any legal definitions you hear come only from me and not from any other source. Only you jurors can decide a verdict in this case. The law sees only you as fair, and only you have promised to be fair – no one else is so qualified.

Taking notes:

If you wish, you may take notes to help you remember what the witnesses said. If you do take notes, please don't share them with anyone until you go to the jury room to decide the case. Don't let note-taking distract you from carefully listening to and observing the witnesses. When you leave the courtroom, you should leave your notes hidden from view in the jury room.

Whether or not you take notes, you should rely on your own memory of the testimony. Your notes are there only to help your memory. They're not entitled to greater weight than your memory or impression about the testimony.

Course of the trial:

Let's walk through the trial. First, each side may make an opening statement, but they don't have to. Remember, an opening statement isn't evidence, and it's not supposed to be argumentative; it's just an outline of what that party intends to prove.

Next, the SEC will present its witnesses and ask them questions. After the SEC questions the witness, the Defendants may ask the witness questions – this is called "cross-examining" the witness. Then the Defendants will present their witnesses, and the SEC may

cross-examine them. You should base your decision on all the evidence, regardless of which party presented it.

After all the evidence is in, the parties' lawyers will present their closing arguments to summarize and interpret the evidence for you, and then I'll give you instructions on the law.

You'll then go to the jury room to deliberate.


Jury Questions[3]

During this trial, you may submit questions to a witness after the lawyers have finished their own questioning. Here is how the procedure works: After each witness has testified, and the lawyers have asked all of their questions, I'll ask if any of you have questions.  If you have a question, write it down and give it to the court staff.

You may submit a question for a witness only to clarify an answer or to help you understand the evidence. Our experience with juror questions indicates that jurors rarely have more than a few questions for any one witness, and there may be no questions at all for some witnesses.

If you submit a question, the court staff will give it to me and I'll share your questions with the lawyers in the case. If the rules of evidence allow your question, one of the lawyers or I will read your question to the witness. I may modify the form or phrasing of a question so that it's allowed under the evidence rules. Sometimes, I may not allow the questions to be read to the witness, either because the law does not allow it or because another witness is in a better position to answer the question. If I can't allow the witness to answer a question, you

---

[3] Eleventh Circuit Pattern Instruction 1.4.

9

must not draw any conclusions from that fact or speculate on what the answer might have been.

Here are several important things to keep in mind about your questions for the witnesses:

· First, you must submit all questions in writing. Please don't ask any questions aloud.

· Second, the court can't re-call witnesses to the stand for additional juror questions. If you have a question for a particular witness, you must submit it when I ask.

· Finally, because you should remain neutral and open-minded throughout the trial, you should phrase your questions in a way that doesn't express an opinion about the case or a witness. You must keep an open mind until you've heard all the evidence, the closing arguments, and my final instructions on the law.

Interim Statements[4]

At times during the trial, the lawyers will address you. You'll soon hear the lawyers' opening statements, and at the trial's conclusion you'll hear their closing arguments. Sometimes the lawyers may choose to make short statements to you, either to preview upcoming evidence or to summarize and highlight evidence they just presented. These statements and arguments are the lawyers' views of the evidence or of what they anticipate the evidence will be. They are not evidence themselves.

---

[4] Eleventh Circuit Pattern Jury Instruction 1.5.

<u>Stipulations</u>[5]

Sometimes the parties have agreed that certain facts are true. This agreement is called a stipulation. You must treat these facts as proved for this case. The parties have stipulated to the following facts:

a) The Movie Studio is a film production, distribution and content streaming company.

b) The Movie Studio has common stock publicly traded on the Over-the-Counter market and restricted shares in the company are also sold by private offerings.

c) Gordon Scott Venters is President, Chief Executive Officer, and a Director of the Movie Studio. Venters controlled The Movie Studio at all relevant times.

d) During the relevant time period, Venters was not registered as a broker or associated with a registered broker dealer.

e) During the relevant time period, Defendants issued press releases concerning events of significance to The Movie Studio. Venters drafted the press releases himself or paid third parties to draft the press releases on behalf of The Movie Studio. Venters was responsible for the content of the press releases and was often quoted in the press releases and listed as the TMS contact.

f) On April 20, 2016, Defendants executed an agreement for TMS to purchase the Arrowhead Film Library (the "Arrowhead Agreement") from the Arrowhead Target Fund Ltd. – In Liquidation as the Seller.

g) The Arrowhead Film Library acquisition was to include twelve films with well-

---

[5] Eleventh Circuit Pattern Jury Instruction 2.1.

known actors, including: (i) *Johnny Mnemonic* starring Keanu Reeves, (ii) *Never Talk to Strangers* starring Antonio Banderas, (iii) *A Shot at Glory* starring Robert Duvall, (iv) *I'll Sleep When I'm Dead* starring Clive Owens, (v) *Red Riding Hood* starring Henry Cavill, (vi) *Stander*, (vii) *No Good Deed* starring Samuel L. Jackson, (viii) *Popstar* starring Aaron Carter, and (ix) *Supercross*.

h) On August 16, 2016, Defendants issued a press release drafted by Venters entitled, "The Movie Studio to Acquire 12 Major Motion Pictures," that announced TMS' execution of the Arrowhead Agreement and stated, "Based upon information provided by Seven Arts Entertainment, Inc., n/k/a Wireless Connect, Inc., on March 31st 2009, The Salter Group [an independent advisory firm] valued the Arrowhead Library between $2,500,000 - $3,300,000." The press release also stated, TMS "expects to begin monetizing this acquisition in the 4th quarter of 2016."

i) In or around the summer of 2016, Venters had a TMS employee create a marketing flyer (the "Arrowhead Flyer"), which contained images of movie posters from some of the films in the Arrowhead Film Library and listed it as "A Film Library of The Movie Studio A Publicly Traded Company."

j) TMS never completed the acquisition of the Arrowhead Library.

k) In a March 28, 2018, press release, TMS described *Cause and Effect* and *Pegasus* as "2018 Upcoming Movies."

l) In its November 19, 2018, Form 1-A/A for its offering pursuant to Regulation A, which was signed by Venters and filed with the SEC, TMS stated that TMS "has its own studio facility that is used to make films, which is handled by the production company" and that:

> Most of the companies in the entertainment industry have
> never own[ed] their own studios, but have rented space from
> other companies.  There are also independently owned studio
> facilities, which have never produced a motion picture of their
> own because they are not entertainment companies or motion
> picture companies – they are companies who sell only studio
> space.

m) TMS has never owned its own production studio facility and has only leased spaces.

n) On February 7, 2019, EmergingGrowth.com, which TMS authorized to issue press releases on its behalf, issued another press release regarding *Cause and Effect*, *Pegasus*, and a third movie, *The Last Warhead*, now describing those movies as a "Three Picture Package for 2019," with Venters quoted in the press release and stating how the three movies "round[ed] out [TMS'] proposed production slate for 2019."

o) On December 21, 2020, TMS published its Annual Report for the Year Ended June 30, 2020 on OTC. In that annual report, TMS first disclosed that it would not be completing the acquisition of the Arrowhead Film Library, claiming that it learned in June 2020 that the library had been sold to another party.

p) In a March 18, 2021, press release, TMS claimed to "Utilize[] Blockchain Technology for Licensing of Motion Picture in Spain Through 2027," with Venters quoted as stating:

> Establishing worldwide distribution agreements for our
> current library of new and aggregated revenue-shared titles
> through our blockchain application is a fundamental
> cornerstone of our proposed reverse engineering of future
> revenue-share aggregated titles that, when completed, could
> add significant economic scalability to the Company's revenue
> model.

**q)**      On the day that the March 18, 2021, press release was issued, TMS' stock opened at $0.033/share, surged up to $0.1653/share (approximately a 500% increase), before closing at $0.047/share (approximately a 142% increase).

**r)**      **During the relevant time period, TMS owned no more than 18 films**.

**t)**      From approximately April 2017 to December 2020, The Movie Studio raised at least $1,200,000.

Use of Depositions[6]

A deposition is a witness's sworn testimony that is taken before the trial. During a deposition, the witness is under oath and swears to tell the truth, and the lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

The deposition of [name of witness], taken on [date], [is about to be/has been] presented to you [by a video/by reading the transcript]. Deposition testimony is entitled to the same consideration as live testimony, and you must judge it in the same way as if the witness was testifying in court.

Also, do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

---

[6] Eleventh Circuit Pattern Jury Instruction 2.2.

<u>Use of Recorded Conversations and Transcripts</u> [If Needed][7]

Now you're going to hear [a] recorded conversation[s]. This is proper evidence for you to consider. Please listen to it very carefully. I'm going to allow you to have a transcript of the recording [prepared by name of preparer] to help you identify speakers and guide you through the recording. But remember that it is the recording that is evidence – not the transcript. If you believe at any point that the transcript says something different from what you hear on the recording, disregard that portion of the transcript and rely instead on what you hear.

---

[7] Eleventh Circuit Pattern Jury Instruction 2.3.

15

Judicial Notice[8]

The rules of evidence allow me to accept facts that no one can reasonably dispute. The law calls this "judicial notice." I've accepted [state the fact that the court has judicially noticed] as proved even though no one introduced evidence to prove it. You must accept it as true for this case.

Use of Interrogatories[9] [If Needed]

You'll now hear answers that Defendants gave in response to written questions the other side submitted.  The questions are called "interrogatories." Before the trial, [name of party] gave the answers in writing while under oath.

You must consider [name of party]'s answers to as though [name of party] gave the answers on the witness stand.

In-Trial Instructions on News Coverage[10]

Reports about this trial may appear in the media. The reporters may not have heard all the testimony as you have, may be getting information from people who are not under oath and subject to cross examination, may emphasize an unimportant point, or may simply be wrong. You must not read, listen to, or watch anything about this trial. It would violate your oath as a juror to decide this case on anything other than the evidence presented at trial and on your own common sense. You must decide this case exclusively on the evidence you receive here in court.

---

[8] Eleventh Circuit Pattern Jury Instruction 2.5.

[9] Eleventh Circuit Pattern Jury Instruction 2.6.

[10] Eleventh Circuit Pattern Jury Instruction 2.7.

16

Post-Trial Instructions

Introduction[11]

Members of the jury:

It's my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished you will go to the jury room and begin your discussions, sometimes called deliberations.

---

[11] Eleventh Circuit Pattern Jury Instruction 3.1.

<u>The Duty to Follow Instructions – Corporate Party Involved</u>[12]

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

The fact that a corporation is involved as a party must not affect your decision in any way. A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.

---

[12] Eleventh Circuit Pattern Jury Instruction 3.2.2.

<u>The Duty to Follow Instructions – Government Entity or Agency Involved</u>[13]

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

The fact that a governmental entity or agency is involved as a party must not affect your decision in any way. A governmental agency and all other persons stand equal before the law and must be dealt with as equals in a court of justice.

---

[13] Eleventh Circuit Pattern Jury Instruction 3.2.3 (modified).

Consideration of Direct and Circumstantial Evidence;
Argument of Counsel; Comments by the Court[14]

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But, anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

_____

[14] Eleventh Circuit Pattern Jury Instruction 3.3.

20

<u>Credibility of Witnesses</u>[15]

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

1. Did the witness impress you as one who was telling the truth?

2. Did the witness have any particular reason not to tell the truth?

3. Did the witness have a personal interest in the outcome of the case?

4. Did the witness seem to have a good memory?

5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

6. Did the witness appear to understand the questions clearly and answer them directly?

7. Did the witness's testimony differ from other testimony or other evidence?

---

[15] Eleventh Circuit Pattern Jury Instruction 3.4.

<u>Impeachment of Witnesses Because of Inconsistent Statements</u>[16]

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

---

[16] Eleventh Circuit Pattern Jury Instruction 3.5.1.

Responsibility for Proof – Plaintiff's Claims
Preponderance of the Evidence[17]

In this case it is the responsibility of the SEC to prove every essential part of its claims by a "preponderance of the evidence." This is sometimes called the "burden of proof" or the "burden of persuasion."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that each of the SEC's claims are more likely true than not true.

If the proof fails to establish any essential part of a claim or contention by a preponderance of the evidence, you should find against the SEC.

When more than one claim is involved, you should consider each claim separately.

In deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of each of the SEC claims by a preponderance of the evidence, you should find for the Defendant as to that claim.

Burden of Proof - the Affirmative Defenses Raised by the Defendants

If you find that the Plaintiff has proven any of its counts by a preponderance of the evidence, you will next be required to determine whether the Defendants have proven each of their defenses to the same standard - a preponderance of the evidence.  In a few moments I will provide you with additional information about those defenses.

---

[17] Eleventh Circuit Pattern Jury Instruction 3.7.1.

<u>The SEC's Claims</u>

In this case, the SEC brings several claims. I will now give you additional instructions on each claim.

<u>Count 5 - Rule 10b-5(a) of the Securities Exchange Act of 1934 ("Exchange Act") -<br>Device, Scheme or Artifice to Defraud</u>[18]

The Securities and Exchange Commission, asserts a claim under the Securities Exchange Act. The Exchange Act is a federal statute that allows the SEC to enact rules and regulations prohibiting certain conduct in the purchase or sale of securities. Rule 10b-5(a) makes it unlawful for a person to employ any device, scheme, or artifice to defraud someone else in connection with the purchase or sale of any security.

A "security" is an investment in a commercial, financial, or other business enterprise with the expectation that profits or other gain will be produced by others. Some common types of securities are stocks, bonds and investment contracts. The stock of The Movie Studio in this case are securities.

To prove a claim under Rule 10b-5(a), the SEC must prove each of the following facts by a preponderance of the evidence:

First, you must find that Venters or The Movie Studio used an instrumentality of interstate commerce in connection with the purchase or sale of a security.

Second, you must find that Venters or The Movie Studio used a device, scheme, or artifice to defraud someone in connection with the purchase or sale of a security.

Third, you must find that Venters or The Movie Studio acted knowingly or with severe recklessness.

---

[18] Eleventh Circuit Pattern Jury Instruction 6.1.

Now I'll provide you with some additional instructions to help you as you consider the facts the SEC must prove. For the first element – that an instrumentality of interstate commerce was used in connection with the purchase or sale of a security – you must use these definitions:

"Instrumentality of interstate commerce" means the use of the mails, telephone, Internet, or some other form of electronic communication, or a telephone, Internet, or some other form of electronic communication, or an interstate delivery system such as Federal Express or UPS. It's not necessary that the facility of a national securities exchange was the means by which the defendant[s] used a device, scheme, or artifice to defraud someone. It's only necessary that the facility was used in some phase of the transaction.

For the second element, the SEC must prove that Venters or The Movie Studio used a device, scheme, or artifice to defraud in connection with the purchase or sale of a security. The SEC does not need to identify any particular purchase or sale of securities by a specific person, including Venters or The Movie Studio. Rather, it's enough if the SEC proves that the device, scheme, or artifice to defraud used by Venters or The Movie Studio  involved, or touched in any way, the purchase or sale of securities.

A "scheme" is a design or plan formed to accomplish some purpose. A "device," when used in an unfavorable sense, is a "trick" or "fraud." Put another way, the term "device, scheme, or artifice to defraud" would refer to any plan or course of action that involves: (1) false or fraudulent pretenses, (2) untrue statements of material facts, (3) omissions of material facts, or (4) representations, promises, and patterns of conduct calculated to deceive.

A misstatement or omission of fact is "material" if there is a substantial likelihood that a reasonable investor would attach importance to the misrepresented or omitted fact in

25

determining his course of action. Put another way, there must be a substantial likelihood that a reasonable investor would view the misstated or omitted fact's disclosure as significantly altering the total mix of available information. A minor or trivial detail is not a "material fact."

For the third element, the SEC must prove that Venters or The Movie Studio acted knowingly or with severe recklessness. The term "knowingly" means that Venters or The Movie Studio acted with an intent to deceive, manipulate, or defraud. But Venters or The Movie Studio didn't act knowingly if they acted inadvertently, carelessly, or by mistake. To act with "severe recklessness" means to engage in conduct that involves an extreme departure from the standard of ordinary care. A person acts with reckless disregard if it's obvious that an ordinary person under the circumstances would have realized the danger and taken care to avoid the harm likely to follow.

### *Defendants' Affirmative Defenses*

*I will now read you the affirmative defenses which are being asserted in this case by The Movie Studio, Inc. and Gordon Venters. These defenses have numbers that are out of sequence. You should not be concerned about that. Here are the affirmative defenses asserted by the Defendants to the SEC's claim against The Movie Studio and Gordon Venters for violation of Rule 10(b)-5(a) of the Securities and Exchange Act of 1933 - Device, Scheme or Artifice to Defraud:*

*Fifth affirmative defense: "Puffery." Many of the statements alleged to have been made were in the nature of mere puffery and are therefore not actionable. Many of the statements were subjective statements of opinion designed to portray the Company in a positive light. Artful phraseology in marketing, particularly in the hyperbolic realm of the cinema, does not constitute actionable fraud under the securities laws.*

### **Plaintiff's Objections**

**The SEC objects to the Fifth Affirmative Defense because this instruction is unrelated to the facts of this case and constitutes an improper denial. Even if deemed a legitimate affirmative defense, the material misrepresentations and omissions at issue are not "mere puffery" and "artful phraseology in marketing. They are actionable and deliberate factual misrepresentations that are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their**

26

importance." *Carvelli v. Ocwen Fin. Corp*., 934 F.3d 1307, 1320-21 (11th. Cir. 2019). (citation omitted). See *Basquiat ex rel. Estate of Basquiat v. Sakura Int'l*, No. 04 Civ. 1369, 2005 WL 1639413, at *5 (S.D.N.Y. July 5, 2005) (statements were not puffery where they included specific detail and were alleged to be knowingly false). Moreover, whether a misrepresentation is factual or non-actionable puffery is a question of law for the Court. *Healy v. NCL Bahamas Ltd*., No. , 2024 U.S. Dist. LEXIS 139399 (S.D. Fla. Aug. 5, 2024); *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 541 F. Supp. 2d 1151, 1162 (W.D. Wash. Jan.  28, 2008) ("the Court did not err by not giving the puffery instruction").  In addition, there is has been no evidence or proof offered to support the description that the cinema business is "hyberbolic" or that "artful phraseology" is standard practice or makes incorrect statements non-material in  offering an investment to investors.

> *Ninth Affirmative Defense: "Due Diligence." At all times material Defendants acted with due diligence to ensure the accuracy of the information provided to potential investors and presented the information to investors prior to any decision making.*

### Plaintiff's Objections

The SEC objects to the Ninth Affirmative Defense with regard to any scienter-based claims in this case because it is inapplicable. The SEC does not allege insufficient due diligence as its basis for those claims. Rather, the SEC alleges that, the defendants knowingly or recklessly made false representation as to material facts, or omitted material information, and acted with scienter.  Scienter may be established by a showing of knowing misconduct or severe recklessness. *SEC v. Carriba Air, Inc*., 681 F.2d 1318, 1324 (11th Cir. 1982); *SEC v. Spinosa*, 31 F. Supp. 3d 1371, 1377 (S.D. Fla. June 30, 2014).

> *Twelfth Affirmative Defense: "Good Faith." The Movie Studio and Gordon Venters always acted in good faith and followed securities counsel's and accountants' advice according to General Accounting Principles and filed public financial statements on OTC Markets available on all major financial search engines and Venters always acted as a fiduciary to the public company as the President and CEO.*

### Plaintiff's Objections

This Twelfth Affirmative Defense is objectionable because it attempts to invoke a reliance on counsel and other professionals defense but recasts it as a good faith defense. The SEC also objects to the purported defense of reliance on counsel because Venters has refused to waive attorney-client privilege. Furthermore, Venters cannot show that (1) he fully disclosed to his attorney or other professionals all material facts that are relevant to the advice for which they consulted the attorneys or professionals; and (2) thereafter, he relied in good faith on advice given by his attorney." *SEC v. Movie Studio, Inc.*, No.  2024 U.S. Dist. LEXIS 231678, at *4 (S.D. Fla. Dec. 23, 2024 ) citing *United States v. Hill*, 643 F.3d 807, 851 (11th Cir. 2011). *SEC v. Manor Nursing Centers*,

458 F.2d 1082, 1096 (2d Cir. 1972) (a general good faith instruction, without these elements, is not warranted). Moreover, good faith is not an absolute defense but "a relevant consideration in evaluating a defendant's scienter." *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004).

*Eighteenth Affirmative Defense: "506(b) Safe Harbor". Defendants relied on the Safe Harbor Provision and Forward-looking statements as provided on all the Company's press releases as well as an Investor Disclaimer Disclosure on the website as approved by counsel.*

**Plaintiff's Objections**

The SEC objects to the Eighteenth Affirmative Defense because Rule 506(b), which exempts securities from registration if they are private offerings, can only be claimed as an affirmative defense to a violation of Section 5 the Securities Laws. Although the SEC's Complaint charged the Defendants with a violation of Section 5, the Court granted the SEC's motion for summary judgment on the issue. [DE 185]. Therefore, the defense is inapplicable to the remaining claims in this case that are before the jury.

*Nineteenth Affirmative Defense: "506(b) Compliance". Defendants complied with and operated under the provisions of 506(b). It was disclosed in the "Qualified REG-1A+ Tier 1 Registration Statement to the SEC, who had "No Comments," as they had on other provisions of the Registration Statement that went effective on Dec 10th, 2018, for a period of 12-Months, and it contained the relevant legacy Investors that purchased shares or were issued shares for services pursuant to Rule 506(b). Because we have a qualified reg A we were allowed to solicit non-accredited investors, and we were allowed to advertise on social media. REG A provides authorization for accepting non-accredited investors and to market generally.*

**Plaintiff's Objections**

The SEC objects to the Eighteenth Affirmative Defense because Rule 506(b), which exempts securities from registration if they are private offerings, can only be claimed as an affirmative defense to a violation of Section 5 the Securities Laws. Although the SEC's Complaint charged the Defendants with a violation of Section 5, the Court granted the SEC's motion for summary judgment on the issue. [DE 185]. Therefore, the defense is inapplicable to the remaining claims in this case that are before the jury.

28

*Twenty-First Affirmative Defense: "Due Diligence" Defendants performed due diligence to comply with all state and federal laws and vetted investors' participation individually, even over the Subscription Agreements  advised all potential investors that they must be able to withstand the loss of their entire investment.*

### Plaintiff's Objections

The SEC objects to the Twenty-First Affirmative Defense, to the extent it is being asserted regarding any violations of Section 5 of the Securities Act for the reasons stated in the SEC's objection to Defendants' Eighteenth Affirmative Defense. The SEC further objects to this Affirmative Defense with regard to any scienter-based claims in this case because it is inapplicable. The SEC does not allege insufficient due diligence as its basis for those claims. Rather, the SEC alleges that, the defendants knowingly or recklessly made false representation as to material facts, or omitted material information, and acted with scienter. Scienter may be established by a showing of knowing misconduct or severe recklessness. *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982); *SEC v. Spinosa*, 31 F. Supp. 3d 1371, 1377 (S.D. Fla. June 30, 2014).

*Twenty-Second Affirmative Defense: "506(b) Investor Knowledge and Experience" Defendants' legacy investors had sufficient investment experience or knowledge for their subscription to be accepted by the Company. Defendant complied with all legal requirements and utilized reasonable care and verification of all investors and percentage of participation and suitability in-line with Security Brokers of the "know your client rule" and other considerations before "Accepting" the subscription from the Investor or Investment Company and rejected numerous subscriptions and investment Company recommendations including the re-pricing of the REG 1-A+ Tier I that would have had substantial negative impact on legacy shareholders. Defendants vetted all potential investors regarding knowledge and experience and would reject and had if the Investor did not have knowledge and experience in securities or business matters and the 100% understanding that TMS was a speculative security and the investor had to have the ability to sustain the loss of their entire investment as reflected in the Subscription Agreement executed by the investor in every instance.*

### Plaintiff's Objections

The SEC objects to the Twenty-Second affirmative for the reasons stated in the SEC's objections to the Eighteenth Affirmative Defense.

*Thirty-Fifth Affirmative Defense: "No Awareness of Violations." The Defendants relied on Securities Counsel and accountants and other professionals and was investigated by FINRA prior to the SEC qualifying the REG 1-A Tier 1 registration statement and never made Defendants aware of any violations when they commented on the registration statement prior to qualification. Defendants relied on this and were not aware of any violations of the law moving forward.*

**Plaintiff's Objections**

The SEC objects to the Thirty-Fifth Affirmative Defense because the issue of the Defendants' purported lack of awareness of the law is a purely legal issue to be decided by the Court. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972); *United States v. House*, 684 F.3d 1173, 1207 (11th Cir. 2012) ("[T]he issue of whether a [law] is void for vagueness is a question of law for the court to determine," not a jury).

*Thirty-Sixth Affirmative Defense: "Reasonable Supervision" Gordon Venters was microbial on supervision as was aware with all associates, employees, CFO Accountant Executive as a result of running a Public Company for thirty (3) years and understanding the negative impact it could have and the SEC's star witness who started this case was terminated as the Defendant found the associate stealing from the Company.  the former associate and was a computer expert whose scheme was extremely sophisticated and was discovered by Defendants.*

**Plaintiff's Objections**

The SEC objects to the Thirty-Sixth Affirmative Defense because it constitutes a denial and is not a legitimate affirmative defense to any claims in this case. The Defendants do not attempt to avoid liability while admitting to the essential facts of SEC's Complaint. Instead, they deny the allegations outright and identify alleged lack of evidence in the case or attempt to present a rebuttal to the evidence. *See, e.g. Tsavaris v. Pfizer, Inc.*, 310 F.R.D. 678, 682 (S.D. Fla. 2015) ("An affirmative defense is established only when a defendant admits the essential facts of a complaint and sets up other facts in justification or avoidance.") citing *Royal Caribbean Cruises, Ltd. v. Jackson*, 921 F. Supp. 2d 1366, 1372 (S.D. Fla. 2013); Therefore, "a defense that simply points out a defect or lack of evidence in a plaintiff's case is not an affirmative defense." *Tsavaris*, 310 F.R.D. at 682 citing *In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988).  The Defense is also non-sensical, confusing and unrelated to any facts at issue in this matter.

*Thirty-Eighth Affirmative Defense: Count 8 20(A) Control Person – Exempt from Liability" The Defendant was operating for the Company and protected by the "Corporate Shield" and always instituted his fiduciary responsibility for the shareholders and aligned with his own interest as the majority shareholder of the Company after almost 30 years of invested time and efforts in this companies' success.*

*Plaintiff's Objections*

The SEC objects to the Thirty-Eight Affirmative Defense because it constitutes a mere denial and is not a legitimate affirmative defense regarding Count 8 of the Complaint. *See, e.g. Tsavaris*, 310 F.R.D. at 682.

*Fortieth Affirmative Defense: "Exemption from Liability." Defendant Gordon Venters caused no harm or violation and utilized his best efforts as a fiduciary to the shareholders. Gordon Venters did nothing to harm the company or its investors. Gordon Venters committed no violations as it would negatively impact his substantial holdings as the Company's largest shareholder.*

Plaintiff's Objections

The SEC objects to the Fortieth Affirmative Defense because it constitutes a denial and is not a legitimate affirmative defense to any claims at issue in this case. *See, e.g. Tsavaris*, 310 F.R.D. at 682.

*Fiftieth Affirmative Defense: As to affirmative defenses for Civil Monetary Penalties - "20(D) and 21(D) - Safe Harbor Provisions" Defendants were represented by Securities Counsel, Accountants. and third-party professionals for the Companies behalf and are protected by the Corporate Shield if acting as it's fiduciary in line with the Defendants own best interest. The public news releases were reviewed by Counsel or Network News Wire regarding forward looking statements, safe harbor provisions, as well as an Investor Consideration and Disclaimer on the company's website, publishing quarterly and annual financials on OTC markets, and major search engines, Yahoo Finance etc.*

Plaintiff's Objections

Plaintiff objects to the Fiftieth Affirmative Defense because the issue of civil monetary penalties is limited to the remedies stage of the litigation to be determined by the Court. See, e.g., *Tull v. United States*, 481 U.S. 412, 425-27 (1987) (holding that there is a right to a jury trial to determine liability for civil penalties, but "the trial

court and not the jury should  determine the amount of civil penalties"). The defense is also duplicative of previous reliance on counsel (and other professionals) defense.

   ***Fifty-Ninth Affirmative Defense: "No Duty to Disclose." Defendant has a duty to disclose all material and corporate actions that are material events. In this case, there was no duty to disclose ongoing daily struggles and events involved in the movie industry and the exact status of films, timing, and daily events in the company. The Defendants complied with all needed disclosures that were material and relevant and updated the shareholders in the annual reports and press releases of events it believed should be disclosed at that time. Defendants acted in good faith and disclosed the necessary information at the relevant times.***

   **Plaintiff's Objections**

   **The SEC objects to the Fifty-Ninth Affirmative Defense because it constitutes a denial and is not a legitimate affirmative defense to any claims at issue in this case. *See, e.g. Tsavaris*, 310 F.R.D. at 682.**

   ***The verdict form will include these defenses and allow you to pick any and all of them you deem to have been established as to this count by the defense.***

<u>Count 6 - Rule 10b-5(b) of the Exchange Act– Misrepresentation or Omission of Material Fact[19]</u>

The SEC asserts a claim under Rule 10b-5(b) of the Securities Exchange Act which makes it unlawful for a person to commit a fraud in connection with the purchase or sale of a security.

A "security" is an investment in a commercial, financial, or other business enterprise with the expectation that profits or other gain will be produced by others. Some common types of securities are stocks, bonds and investment contracts. The stock of The Movie Studio in this case are securities.

To prove a claim under Rule 10b-5(b), the SEC must prove each of the following facts by a preponderance of the evidence:

First, you must find that Venters or The Movie Studio, used an instrumentality of interstate commerce in connection with the purchase or sale of a security.

Second, you must find that Venters or The Movie Studio, made a misrepresentation of a material fact, or omitted a material fact, in connection with the purchase or sale of a security.

Third, you must find that Venters or The Movie Studio, acted knowingly or with severe recklessness.

For the first element, the same definition of the term "instrumentality of interstate commerce" that I gave you in Count **5**, applies here.

For the second element, the SEC must prove that Venters or The Movie Studio either made an untrue statement of material fact or omitted a material fact, either of which would

_____

[19] Eleventh Circuit Civil Pattern Jury Instruction 6.2.

tend to mislead the prospective buyer or seller of a security. A "misrepresentation" is a statement that is not true. An "omission" is the failure to state facts that would be necessary to make the statements made by Venters or The Movie Studio not misleading. The same definition of the term "material" that I gave you in Count I, applies here.

The SEC does not need to identify any particular purchase or sale of securities by a specific person, including Venters or The Movie Studio. Rather, it's enough if the SEC proves that the misrepresentation or omission involved or touched any purchase or sale of a security in any way. The SEC claims that Venters or The Movie Studio made the following misrepresentations or omissions:

1.  Defendants misrepresented how many movies The Movie Studio owned;

2.  Defendants misrepresented that The Movie Studio acquired the Arrowhead Library;

3.  Defendants misrepresented that The Movie Studio owned the films in the Arrowhead library;

4.  Defendants falsely stated the value of the Arrowhead library and omitted limitations on the Salter Group's valuation of the Arrowhead library;

5.  Defendants misrepresented that films would be released soon even though the films had not been produced or did not have completed scripts;

6.  Defendants misrepresented that The Movie Studio owned a production studio with a $300 million back lot; and

7.  Defendants misrepresented that The Movie Studio used blockchain technology in distributing their films.

8.   Defendants mispresented how The Movie Studio would use investor's funds.

For the second element, the SEC must first prove that Venters or The Movie Studio made one or more of the alleged misrepresentations of fact or omitted facts that would be necessary to prevent other statements made by Venters or The Movie Studio from being misleading. And second, that the misrepresentation or omission involved "material" facts. If Venters or The Movie Studio has previously made false or inaccurate statements regarding material facts, such as statements made in reports filed with the SEC, information they sent to investors, or statements made in press releases, they have a duty to correct those statements if it is discovered later that those statements weren't true when made and they remain material to a shareholder's investment decision.

For the third element, the SEC must prove that  Venters or The Movie Studio made the alleged misrepresentations or omissions knowingly, or with severe recklessness. The term "knowingly" means that Venters or The Movie Studio acted with an intent to deceive, manipulate, or defraud. But Venters or The Movie Studio didn't act knowingly if they acted inadvertently, carelessly, or by mistake.

To act with "severe recklessness" means to engage in conduct that involves an extreme departure from the standard of ordinary care. A person acts with reckless disregard if it's obvious that an ordinary person under the circumstances would have realized the danger and taken care to avoid the harm likely to follow.

As an example, Venters or The Movie Studio acted "knowingly" or with severe recklessness if  they stated material facts that they knew were false or stated untrue facts with reckless disregard for their truth or falsity or didn't disclose material facts that they knew or was severely reckless in not knowing, and knew or was severely reckless in not knowing that disclosing those facts was necessary to avoid making other statements misleading.

35

If you find that the SEC has proved one or more of its claims against Venters or The Movie Studio, I alone will determine the remedy or remedies to be imposed later.

### Defendants' Affirmative Defenses

*Here are the affirmative defenses asserted by the Defendants to the SEC's claim against The Movie Studio and Gordon Venters for violation of Rule 10-b(5)(b) of the Securities and Exchange Act - Misrepresentation or Omission of Material Fact.*

*Fifth affirmative defense: "Puffery." Many of the statements alleged to have been made were in the nature of mere puffery and are therefore not actionable. Many of the statements were subjective statements of opinion designed to portray the Company in a positive light. Artful phraseology in marketing, particularly in the hyperbolic realm of the cinema, does not constitute actionable fraud under the securities laws.*

*Ninth Affirmative Defense: "Due Diligence." At all times material Defendants acted with due diligence to ensure the accuracy of the information provided to potential investors and presented the information to investors prior to any decisionmaking.*

*Twelfth Affirmative Defense: "Good Faith." The Movie Studio and Gordon Venters always acted in good faith and followed securities counsel's and accountants' advice according to General Accounting Principles and filed public financial statements on OTC Markets available on all major financial search engines and Venters always acted as a fiduciary to the public company as the President and CEO.*

*Eighteenth Affirmative Defense: "506(b) Safe Harbor". Defendants relied on the Safe Harbor Provision and Forward-looking statements as provided on all the Company's press releases as well as an Investor Disclaimer Disclosure on the website as approved by counsel.*

*Nineteenth Affirmative Defense: "506(b) Compliance". Defendants complied with and operated under the provisions of 506(b). It was disclosed in the "Qualified REG-1A+ Tier 1 Registration Statement to the SEC, who had "No Comments," as they had on other provisions of the Registration Statement that went effective on Dec 10th, 2018, for a period of 12-Months, and it contained the relevant legacy Investors that purchased shares or were issued shares for services pursuant to Rule 506(b). Because we have a qualified reg A we were allowed to solicit non-accredited investors, and we were allowed to advertise on social media. REG A provides authorization for accepting non-accredited investors and to market generally.*

*Twenty-First Affirmative Defense: "Due Diligence" Defendants performed due diligence to comply with all state and federal laws and vetted investors' participation individually, even over the Subscription Agreements  advised all potential investors that they must be able to withstand the loss of their entire investment.*

*Twenty-Second Affirmative Defense: "506(b) Investor Knowledge and Experience" Defendants' legacy investors had sufficient investment experience or knowledge for their subscription to be accepted by the Company. Defendant complied with all legal requirements and utilized reasonable care and verification of all investors and percentage of participation and suitability in-line with Security Brokers of the "know your client rule" and other considerations before "Accepting" the subscription from the Investor or Investment Company and rejected numerous subscriptions and investment Company recommendations including the re-pricing of the REG 1-A+ Tier I that would have had substantial negative impact on legacy shareholders. Defendants vetted all potential investors regarding knowledge and experience and would reject and had if the Investor did not have knowledge and experience in securities or business matters and the 100% understanding that TMS was a speculative security and the investor had to have the ability to sustain the loss of their entire investment as reflected in the Subscription Agreement executed by the investor in every instance.*

*Thirty-Fifth Affirmative Defense: "No Awareness of Violations." The Defendants relied on Securities Counsel and accountants and other professionals and was investigated by FINRA prior to the SEC qualifying the REG 1-A Tier 1 registration statement and never made Defendants aware of any violations when they commented on the registration statement prior to qualification. Defendants relied on this and were not aware of any violations of the law moving forward.*

*Thirty-Sixth Affirmative Defense: "Reasonable Supervision" Gordon Venters was microbial on supervision as was aware with all associates, employees, CFO Accountant Executive as a result of running a Public Company for thirty (3) years and understanding the negative impact it could have and the SEC's star witness who started this case was terminated as the Defendant found the associate stealing from the Company. the former associate and was a computer expert whose scheme was extremely sophisticated and was discovered by Defendants.*

*Thirty-Eighth Affirmative Defense: Count 8 20(A) Control Person – Exempt from Liability" The Defendant was operating for the Company and protected by the "Corporate Shield" and always instituted his fiduciary responsibility for the shareholders and aligned with his own interest as the majority shareholder of the Company after almost 30 years of invested time and efforts in this companies' success.*

*Fortieth Affirmative Defense: "Exemption from Liability." Defendant Gordon Venters caused no harm or violation and utilized his best efforts as a fiduciary to the shareholders. Gordon Venters did nothing to harm the company or its investors. Gordon Venters committed no violations as it would negatively impact his substantial holdings as the Company's largest shareholder.*

*Fiftieth Affirmative Defense: As to affirmative defenses for Civil Monetary Penalties - "20(D) and 21(D) - Safe Harbor Provisions" Defendants were represented by Securities Counsel, Accountants. and third-party professionals for the Companies behalf and are protected by the Corporate Shield if acting as it's fiduciary in line with the Defendants own best interest. The public news releases were reviewed by Counsel or*

*Network News Wire regarding forward looking statements, safe harbor provisions, as well as an Investor Consideration and Disclaimer on the company's website, publishing quarterly and annual financials on OTC markets, and major search engines, Yahoo Finance etc.*

*Fifty-Ninth Affirmative Defense: "No Duty to Disclose." Defendant has a duty to disclose all material and corporate actions that are material events. In this case, there was no duty to disclose ongoing daily struggles and events involved in the movie industry and the exact status of films, timing, and daily events in the company. The Defendants complied with all needed disclosures that were material and relevant and updated the shareholders in the annual reports and press releases of events it believed should be disclosed at that time. Defendants acted in good faith and disclosed the necessary information at the relevant times.*

*The verdict form will include these defenses and allow you to pick any and all of them you deem to have been established as to this count by the defense.*

The SEC objects to the above affirmative defenses for the reasons previously stated in the SEC's objections above to these identical defenses.  The SEC further objects to the affirmative defenses being repeated after every count and not being tailored to the relevant counts.

<u>Count 7- Rule 10b-5(c) of the Securities and Exchange Act –Fraudulent
Practice or Course of Dealing</u>[20]

The SEC also asserts a claim under Rule 10b-5(c) of the Securities Exchange Act,
which makes it unlawful for a person to engage in any practice or course of dealing that
would operate as a fraud in connection with the purchase or sale of any security. The stock
of The Movie Studio in this case are securities.

To prove a claim under Rule 10b-5(c), Venters or The Movie Studio must prove each
of the following facts by a preponderance of the evidence:

First, you must find that Venters or The Movie Studio used an "instrumentality of
interstate commerce" in connection with the purchase or sale of a security.

Second, you must find that Venters or The Movie Studio engaged in an act, practice,
or course of business – in connection with the purchase or sale of a security – that operated
or would operate as a fraud or deceit on any person.

Third, you must find that Venters or The Movie Studio acted knowingly or with
severe recklessness.

For the first element, the same definition of the term "instrumentality of interstate
commerce" that I gave you in Count I, applies here.

For the second element, the SEC must prove that Venters or The Movie Studio
engaged in any act, practice, or course of business, in connection with the purchase or sale
of a security, that operated or would operate as a fraud or deceit on any person.

The SEC does not need to identify any particular purchase or sale of securities by a
specific person, including Venters or The Movie Studio. Rather, it's enough if the SEC

---

[20] Eleventh Circuit Civil Pattern Jury Instruction 6.4.

proves that the act, practice, or course of business that Venters or The Movie Studio engaged in involved, or touched in any way, the purchase or sale of securities.

A "fraud or deceit" means a lie or a trick. A fraud or deceit doesn't have to relate to an investment's quality or actually result in the purchase or sale of any security. It's not necessary that Venters or The Movie Studio, who was allegedly involved in the fraud or deceit, sold or purchased securities personally if the fraudulent or deceitful conduct defrauded some person. The term "would" in the phrase "would operate as a fraud or deceit" means that the act, practice, or course of business had the capacity to defraud a purchaser or seller. It's not necessary that the act, practice, or course of business actually defrauded someone.

For the third element, the SEC must prove that Venters or The Movie Studio acted knowingly or with severe recklessness. I have previously instructed you what the terms "knowingly" and "severe recklessness" mean, and you must use those definitions.

### Defendants' Affirmative Defenses

Here are the affirmative defenses asserted by the Defendants to the SEC's claim against The Movie Studio and Gordon Venters for violation of Rule 10-b(5)(c) of the Securities and Exchange Act - Misrepresentation or Omission of Material Fact.

Fifth affirmative defense: "Puffery." Many of the statements alleged to have been made were in the nature of mere puffery and are therefore not actionable. Many of the statements were subjective statements of opinion designed to portray the Company in a positive light. Artful phraseology in marketing, particularly in the hyperbolic realm of the cinema, does not constitute actionable fraud under the securities laws.

Ninth Affirmative Defense: "Due Diligence." At all times material Defendants acted with due diligence to ensure the accuracy of the information provided to potential investors and presented the information to investors prior to any decisionmaking.

Twelfth Affirmative Defense: "Good Faith." The Movie Studio and Gordon Venters always acted in good faith and followed securities counsel's and accountants' advice according to General Accounting Principles and filed public financial statements on OTC Markets available on all major financial search engines and Venters always acted as a fiduciary to the public company as the President and CEO.

*Eighteenth Affirmative Defense: "506(b) Safe Harbor". Defendants relied on the Safe Harbor Provision and Forward-looking statements as provided on all the Company's press releases as well as an Investor Disclaimer Disclosure on the website as approved by counsel.*

*Nineteenth Affirmative Defense: "506(b) Compliance". Defendants complied with and operated under the provisions of 506(b). It was disclosed in the "Qualified REG-1A+ Tier 1 Registration Statement to the SEC, who had "No Comments," as they had on other provisions of the Registration Statement that went effective on Dec 10th, 2018, for a period of 12-Months, and it contained the relevant legacy Investors that purchased shares or were issued shares for services pursuant to Rule 506(b). Because we have a qualified reg A we were allowed to solicit non-accredited investors, and we were allowed to advertise on social media. REG A provides authorization for accepting non-accredited investors and to market generally.*

*Twenty-First Affirmative Defense: "Due Diligence" Defendants performed due diligence to comply with all state and federal laws and vetted investors' participation individually, even over the Subscription Agreements advised all potential investors that they must be able to withstand the loss of their entire investment.*

*Twenty-Second Affirmative Defense: "506(b) Investor Knowledge and Experience" Defendants' legacy investors had sufficient investment experience or knowledge for their subscription to be accepted by the Company. Defendant complied with all legal requirements and utilized reasonable care and verification of all investors and percentage of participation and suitability in-line with Security Brokers of the "know your client rule" and other considerations before "Accepting" the subscription from the Investor or Investment Company and rejected numerous subscriptions and investment Company recommendations including the re-pricing of the REG 1-A+ Tier I that would have had substantial negative impact on legacy shareholders. Defendants vetted all potential investors regarding knowledge and experience and would reject and had if the Investor did not have knowledge and experience in securities or business matters and the 100% understanding that TMS was a speculative security and the investor had to have the ability to sustain the loss of their entire investment as reflected in the Subscription Agreement executed by the investor in every instance.*

*Thirty-Fifth Affirmative Defense: "No Awareness of Violations." The Defendants relied on Securities Counsel and accountants and other professionals and was investigated by FINRA prior to the SEC qualifying the REG 1-A Tier 1 registration statement and never made Defendants aware of any violations when they commented on the registration statement prior to qualification. Defendants relied on this and were not aware of any violations of the law moving forward.*

*Thirty-Sixth Affirmative Defense: "Reasonable Supervision" Gordon Venters was microbial on supervision as was aware with all associates, employees, CFO Accountant Executive as a result of running a Public Company for thirty (3) years and understanding the negative impact it could have and the SEC's star witness who started this case was terminated as the Defendant found the associate stealing from the*

*Company.  the former associate and was a computer expert whose scheme was extremely sophisticated and was discovered by Defendants.*

*Thirty-Eighth Affirmative Defense: Count 8 20(A) Control Person – Exempt from Liability" The Defendant was operating for the Company and protected by the "Corporate Shield" and always instituted his fiduciary responsibility for the shareholders and aligned with his own interest as the majority shareholder of the Company after almost 30 years of invested time and efforts in this companies' success.*

*Fortieth Affirmative Defense: "Exemption from Liability." Defendant Gordon Venters caused no harm or violation and utilized his best efforts as a fiduciary to the shareholders. Gordon Venters did nothing to harm the company or its investors.  Gordon Venters committed no violations as it would negatively impact his substantial holdings as the Company's largest shareholder.*

*Fiftieth Affirmative Defense: As to affirmative defenses for Civil Monetary Penalties - "20(D) and 21(D) - Safe Harbor Provisions" Defendants were represented by Securities Counsel, Accountants. and third-party professionals for the Companies behalf and are protected by the Corporate Shield if acting as it's fiduciary in line with the Defendants own best interest. The public news releases were reviewed by Counsel or Network News Wire regarding forward looking statements, safe harbor provisions, as well as an Investor Consideration and Disclaimer on the company's website, publishing quarterly and annual financials on OTC markets, and major search engines, Yahoo Finance etc.*

*Fifty-Ninth Affirmative Defense: "No Duty to Disclose." Defendant has a duty to disclose all material and corporate actions that are material events. In this case, there was no duty to disclose ongoing daily struggles and events involved in the movie industry and the exact status of films, timing, and daily events in the company. The Defendants complied with all needed disclosures that were material and relevant and updated the shareholders in the annual reports and press releases of events it believed should be disclosed at that time. Defendants acted in good faith and disclosed the necessary information at the relevant times.*

*The verdict form will include these defenses and allow you to pick any and all of them you deem to have been established as to this count by the defense.*

The SEC objects to the above affirmative  defenses for the reasons previously stated in the SEC's objections to these identical defenses.  The SEC further objects to the affirmative defenses being repeated after every count and not being tailored to the relevant counts.

<u>Count 2 - Section 17(a)(1) of the Securities Act of 1933 ("Securities Act").</u> [21]

The SEC also asserts claims under the Securities Act.  The Securities Act is a federal statute prohibiting certain conduct in the offer or sale of securities.  The SEC alleges Venters and The Movie Studio violated Section 17(a)(1) of the Securities Act, which makes it unlawful for a person to employ any device, scheme or artifice to defraud in the offer or sale of any security.

To prove a claim under Section 17(a)(1) of the Securities Act, the SEC must prove each of the following facts by a preponderance of the evidence:

First, you must find that Venters or The Movie Studio used an instrumentality of interstate commerce in connection with the offer to sell or sale of a security.

Second, you must find that Venters or The Movie Studio used a device, scheme, or artifice to defraud someone in connection with the offer to sell or sale of a security.

And third, you must find that Venters or The Movie Studio acted knowingly or with severe recklessness.

For the first element – that an instrumentality of interstate commerce was used in connection with the offer to sell or sale of a security – I have previously instructed you what the terms "security" and "instrumentality of interstate commerce" and you must use those definitions.

The terms "sale" or "sell" mean the transfer of a security for value. This includes the contract for sale for value or any other disposition for value of a security or interest in a security. An "offer," "offer to sell," or "offer for sale" means attempting to dispose of a security or an interest in a security for value by inviting buyers.

---

[21] Eleventh Circuit Civil Pattern Jury Instruction 6.8.

For the second element, the SEC must prove that Venters or The Movie Studio used a device, scheme, or artifice to defraud in the offer to sell or sale of a security. The definitions of the terms "device," "scheme" and "artifice to defraud" are the same as those I previously gave you. The SEC does not need to identify any particular offer to sell or sale of securities by a specific person, including Venters or The Movie Studio. Rather, it's enough if the SEC proves that the device, scheme, or artifice to defraud Venters or The Movie Studio used or employed involved, or touched in any way, the offer to sell or sale of securities.

For the third element, the SEC must prove that Venters or The Movie Studio acted knowingly or with severe recklessness. I have previously instructed you what the terms "knowingly" and "severe recklessness" mean, and you must use those definitions.

If you find that the SEC has proved one or more of its claims against Venters or The Movie Studio, I alone will determine the remedy or remedies to be imposed later.

*Here are the affirmative defenses asserted by the Defendants to the SEC's claim against The Movie Studio and Gordon Venters for violation of Section 17(a)(1) of the Securities Act of 1933 - Device, Scheme or Artifice to Defraud:*

*Fifth affirmative defense: "Puffery." Many of the statements alleged to have been made were in the nature of mere puffery and are therefore not actionable. Many of the statements were subjective statements of opinion designed to portray the Company in a positive light. Artful phraseology in marketing, particularly in the hyperbolic realm of the cinema, does not constitute actionable fraud under the securities laws.*

*Ninth Affirmative Defense: "Due Diligence." At all times material Defendants acted with due diligence to ensure the accuracy of the information provided to potential investors and presented the information to investors prior to any decisionmaking.*

*Twelfth Affirmative Defense: "Good Faith." The Movie Studio and Gordon Venters always acted in good faith and followed securities counsel's and accountants' advice according to General Accounting Principles and filed public financial statements on OTC Markets available on all major financial search engines and Venters always acted as a fiduciary to the public company as the President and CEO.*

*Eighteenth Affirmative Defense: "506(b) Safe Harbor". Defendants relied on the Safe Harbor Provision and Forward-looking statements as provided on all the*

*Company's press releases as well as an Investor Disclaimer Disclosure on the website as approved by counsel.*

*Nineteenth Affirmative Defense: "506(b) Compliance". Defendants complied with and operated under the provisions of 506(b). It was disclosed in the "Qualified REG-1A+ Tier 1 Registration Statement to the SEC, who had "No Comments," as they had on other provisions of the Registration Statement that went effective on Dec 10th, 2018, for a period of 12-Months, and it contained the relevant legacy Investors that purchased shares or were issued shares for services pursuant to Rule 506(b). Because we have a qualified reg A we were allowed to solicit non-accredited investors, and we were allowed to advertise on social media. REG A provides authorization for accepting non-accredited investors and to market generally.*

*Twenty-First Affirmative Defense: "Due Diligence" Defendants performed due diligence to comply with all state and federal laws and vetted investors' participation individually, even over the Subscription Agreements  advised all potential investors that they must be able to withstand the loss of their entire investment.*

*Twenty-Second Affirmative Defense: "506(b) Investor Knowledge and Experience" Defendants' legacy investors had sufficient investment experience or knowledge for their subscription to be accepted by the Company. Defendant complied with all legal requirements and utilized reasonable care and verification of all investors and percentage of participation and suitability in-line with Security Brokers of the "know your client rule" and other considerations before "Accepting" the subscription from the Investor or Investment Company and rejected numerous subscriptions and investment Company recommendations including the re-pricing of the REG 1-A+ Tier I that would have had substantial negative impact on legacy shareholders. Defendants vetted all potential investors regarding knowledge and experience and would reject and had if the Investor did not have knowledge and experience in securities or business matters and the 100% understanding that TMS was a speculative security and the investor had to have the ability to sustain the loss of their entire investment as reflected in the Subscription Agreement executed by the investor in every instance.*

*Thirty-Fifth Affirmative Defense: "No Awareness of Violations." The Defendants relied on Securities Counsel and accountants and other professionals and was investigated by FINRA prior to the SEC qualifying the REG 1-A Tier 1 registration statement and never made Defendants aware of any violations when they commented on the registration statement prior to qualification. Defendants relied on this and were not aware of any violations of the law moving forward.*

*Thirty-Sixth Affirmative Defense: "Reasonable Supervision" Gordon Venters was microbial on supervision as was aware with all associates, employees, CFO Accountant Executive as a result of running a Public Company for thirty (3) years and understanding the negative impact it could have and the SEC's star witness who started this case was terminated as the Defendant found the associate stealing from the Company.  the former associate and was a computer expert whose scheme was extremely sophisticated and was discovered by Defendants.*

45

*Thirty-Eighth Affirmative Defense: Count 8 20(A) Control Person – Exempt from Liability" The Defendant was operating for the Company and protected by the "Corporate Shield" and always instituted his fiduciary responsibility for the shareholders and aligned with his own interest as the majority shareholder of the Company after almost 30 years of invested time and efforts in this companies' success.*

*Fortieth Affirmative Defense: "Exemption from Liability." Defendant Gordon Venters caused no harm or violation and utilized his best efforts as a fiduciary to the shareholders. Gordon Venters did nothing to harm the company or its investors.  Gordon Venters committed no violations as it would negatively impact his substantial holdings as the Company's largest shareholder.*

*Fiftieth Affirmative Defense: As to affirmative defenses for Civil Monetary Penalties - "20(D) and 21(D) - Safe Harbor Provisions" Defendants were represented by Securities Counsel, Accountants. and third-party professionals for the Companies behalf and are protected by the Corporate Shield if acting as it's fiduciary in line with the Defendants own best interest. The public news releases were reviewed by Counsel or Network News Wire regarding forward looking statements, safe harbor provisions, as well as an Investor Consideration and Disclaimer on the company's website, publishing quarterly and annual financials on OTC markets, and major search engines, Yahoo Finance etc.*

*Fifty-Ninth Affirmative Defense: "No Duty to Disclose." Defendant has a duty to disclose all material and corporate actions that are material events. In this case, there was no duty to disclose ongoing daily struggles and events involved in the movie industry and the exact status of films, timing, and daily events in the company. The Defendants complied with all needed disclosures that were material and relevant and updated the shareholders in the annual reports and press releases of events it believed should be disclosed at that time. Defendants acted in good faith and disclosed the necessary information at the relevant times.*

*The verdict form will include these defenses and allow you to pick any and all of them you deem to have been established as to this count by the defense.*

The SEC objects to the above affirmative  defenses for the reasons previously stated in the SEC's objections above to these identical defenses.  The SEC further objects to the affirmative defenses being repeated after every count and not being tailored to the relevant counts.

<u>Count 3 - Section 17(a)(2) of the Securities Act</u>[22]

The SEC also asserts a claim under Section 17(a)(2) of the Securities Act. Section 17(a)(2) makes it unlawful for a person to obtain money or property using any untrue statement of a material fact or by omitting any material fact necessary to make statements, in light of the circumstances under which they were made, not misleading in connection with the offer to sell or sale of a security.

To prove a claim under Securities Act § 17(a)(2), the SEC must prove each of the following facts by a preponderance of the evidence:

First, you must find that Venters or The Movie Studio used an instrumentality of interstate commerce in connection with the offer to sell or sale of a security.

Second, you must find that Venters or The Movie Studio directly or indirectly made one or more misrepresentations of material fact or omissions of material fact in the offer to sell or sale of a security.

And third, you must find that Venters or The Movie Studio was negligent in making the representation or omission.

I have previously instructed you what the terms "instrumentality of interstate commerce," "security," "sale" or "sell," "misrepresentation" and "material" mean, and you must use those definitions.

For the second element, the SEC must prove that someone made a misrepresentation of material fact or an omission of material fact. Specifically, the SEC claims that Venters or The Movie Studio made the following misrepresentations or omissions:

1.  Defendants misrepresented how many movies The Movie Studio owned;

---

[22] Eleventh Circuit Civil Pattern Jury Instruction 6.9.

2.  Defendants misrepresented that The Movie Studio acquired the Arrowhead Library;

3.  Defendants misrepresented that The Movie Studio owned the films in the Arrowhead library;

4.  Defendants falsely stated the value of the Arrowhead library and omitted limitations on the Salter Group's valuation of the Arrowhead library;

5.  Defendants misrepresented that films would be released soon even though the films had not been produced or did not have completed scripts;

6.  Defendants misrepresented that The Movie Studio owned a production studio with a $300 million back lot; and

7.  Defendants misrepresented that The Movie Studio used blockchain technology in distributing their films.

8.  Defendants mispresented how The Movie Studio would use investor's funds.

If Venters or The Movie Studio has made false or inaccurate statements regarding material facts before, such as statements made in reports filed with the Securities Exchange Commission, information sent to investors, or statements made in press releases, they have a duty to correct those statements if it is discovered later that those statements weren't true when made and they remain material to a shareholder's investment decision.

For the third element, the SEC must prove that Venters or The Movie Studio was negligent in making materially false or misleading statements or omissions in connection with the offer to sell or sale of a security. "Negligence" is the failure to exercise the due diligence, care, or competence that a reasonable person would when making representations, or failing to disclose facts, in the proxy solicitation. Ask yourself: Would a reasonable person

have omitted or made the statements?

If you find that the SEC has proved one or more of its claims against Venters or The

Movie Studio, I alone will determine the remedy or remedies to be imposed later.

*Here are the affirmative defenses asserted by the Defendants to the SEC's claim against The Movie Studio and Gordon Venters for violation of Section 17(a)(2) of the Securities Act - Obtaining money using an untrue statement of a material fact or intentional omission of a material fact:*

*Fifth affirmative defense: "Puffery." Many of the statements alleged to have been made were in the nature of mere puffery and are therefore not actionable. Many of the statements were subjective statements of opinion designed to portray the Company in a positive light. Artful phraseology in marketing, particularly in the hyperbolic realm of the cinema, does not constitute actionable fraud under the securities laws.*

*Ninth Affirmative Defense: "Due Diligence." At all times material Defendants acted with due diligence to ensure the accuracy of the information provided to potential investors and presented the information to investors prior to any decisionmaking.*

*Twelfth Affirmative Defense: "Good Faith." The Movie Studio and Gordon Venters always acted in good faith and followed securities counsel's and accountants' advice according to General Accounting Principles and filed public financial statements on OTC Markets available on all major financial search engines and Venters always acted as a fiduciary to the public company as the President and CEO.*

*Eighteenth Affirmative Defense: "506(b) Safe Harbor". Defendants relied on the Safe Harbor Provision and Forward-looking statements as provided on all the Company's press releases as well as an Investor Disclaimer Disclosure on the website as approved by counsel.*

*Nineteenth Affirmative Defense: "506(b) Compliance". Defendants complied with and operated under the provisions of 506(b). It was disclosed in the "Qualified REG-1A+ Tier 1 Registration Statement to the SEC, who had "No Comments," as they had on other provisions of the Registration Statement that went effective on Dec 10th, 2018, for a period of 12-Months, and it contained the relevant legacy Investors that purchased shares or were issued shares for services pursuant to Rule 506(b). Because we have a qualified reg A we were allowed to solicit non-accredited investors, and we were allowed to advertise on social media. REG A provides authorization for accepting non-accredited investors and to market generally.*

*Twenty-First Affirmative Defense: "Due Diligence" Defendants performed due diligence to comply with all state and federal laws and vetted investors' participation individually, even over the Subscription Agreements  advised all potential investors that they must be able to withstand the loss of their entire investment.*

49

*Twenty-Second Affirmative Defense: "506(b) Investor Knowledge and Experience" Defendants' legacy investors had sufficient investment experience or knowledge for their subscription to be accepted by the Company. Defendant complied with all legal requirements and utilized reasonable care and verification of all investors and percentage of participation and suitability in-line with Security Brokers of the "know your client rule" and other considerations before "Accepting" the subscription from the Investor or Investment Company and rejected numerous subscriptions and investment Company recommendations including the re-pricing of the REG 1-A+ Tier I that would have had substantial negative impact on legacy shareholders. Defendants vetted all potential investors regarding knowledge and experience and would reject and had if the Investor did not have knowledge and experience in securities or business matters and the 100% understanding that TMS was a speculative security and the investor had to have the ability to sustain the loss of their entire investment as reflected in the Subscription Agreement executed by the investor in every instance.*

*Thirty-Fifth Affirmative Defense: "No Awareness of Violations." The Defendants relied on Securities Counsel and accountants and other professionals and was investigated by FINRA prior to the SEC qualifying the REG 1-A Tier 1 registration statement and never made Defendants aware of any violations when they commented on the registration statement prior to qualification. Defendants relied on this and were not aware of any violations of the law moving forward.*

*Thirty-Sixth Affirmative Defense: "Reasonable Supervision" Gordon Venters was microbial on supervision as was aware with all associates, employees, CFO Accountant Executive as a result of running a Public Company for thirty (3) years and understanding the negative impact it could have and the SEC's star witness who started this case was terminated as the Defendant found the associate stealing from the Company.  the former associate and was a computer expert whose scheme was extremely sophisticated and was discovered by Defendants.*

*Thirty-Eighth Affirmative Defense: Count 8 20(A) Control Person – Exempt from Liability" The Defendant was operating for the Company and protected by the "Corporate Shield" and always instituted his fiduciary responsibility for the shareholders and aligned with his own interest as the majority shareholder of the Company after almost 30 years of invested time and efforts in this companies' success.*

*Fortieth Affirmative Defense: "Exemption from Liability." Defendant Gordon Venters caused no harm or violation and utilized his best efforts as a fiduciary to the shareholders. Gordon Venters did nothing to harm the company or its investors.  Gordon Venters committed no violations as it would negatively impact his substantial holdings as the Company's largest shareholder.*

*Fiftieth Affirmative Defense: As to affirmative defenses for Civil Monetary Penalties - "20(D) and 21(D) - Safe Harbor Provisions" Defendants were represented by Securities Counsel, Accountants. and third-party professionals for the Companies behalf and are protected by the Corporate Shield if acting as it's fiduciary in line with the Defendants own best interest. The public news releases were reviewed by Counsel or*

*Network News Wire regarding forward looking statements, safe harbor provisions, as well as an Investor Consideration and Disclaimer on the company's website, publishing quarterly and annual financials on OTC markets, and major search engines, Yahoo Finance etc.*

*Fifty-Ninth Affirmative Defense: "No Duty to Disclose." Defendant has a duty to disclose all material and corporate actions that are material events. In this case, there was no duty to disclose ongoing daily struggles and events involved in the movie industry and the exact status of films, timing, and daily events in the company. The Defendants complied with all needed disclosures that were material and relevant and updated the shareholders in the annual reports and press releases of events it believed should be disclosed at that time. Defendants acted in good faith and disclosed the necessary information at the relevant times.*

*The verdict form will include these defenses and allow you to pick any and all of them you deem to have been established as to this count by the defense.*

**Plaintiff's Objections**

The SEC objects to the above affirmative  defenses for the reasons previously stated in the SEC's objections to these identical defenses.  The SEC further objects to the affirmative defenses being repeated after every count and not being tailored to the relevant counts.

<u>Count 4 - Section 17(a)(3) of the Securities Act[23]</u>

The SEC alleges Venters and The Movie Studio violated Section 17(a)(3) of the Securities Act, which makes it unlawful for a person, in connection with the offer or sale of a security, to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

To prove a claim under Section 17(a)(3), the SEC must prove each of the following facts by a preponderance of the evidence:

First, you must find that Venters or The Movie Studio used an instrumentality of interstate commerce in connection with the offer to sell or sale of the security.

Second, you must find that Venters or The Movie Studio engaged in a transaction, practice, or course of business, in connection with the offer to sell or sale of a security, that operated or would operate as a fraud or deceit upon a purchaser; and

Third, you must find that Venters or The Movie Studio acted negligently.

For the first and second elements, you should use the definitions of "instrumentality of interstate commerce," "sale," and "offer to sell" that I previously gave you. For the third element, you should use the same definition of "negligence" that I previously gave you.

The SEC does not need to identify any particular offer to sell or sale of securities by a specific person, including Venters or The Movie Studio. Rather, it is enough if the SEC

---

[23] There is no Eleventh Circuit pattern instruction for Section 17(a)(3). The SEC relies on Securities Act Section 17(a)(3), 15 U.S.C. § 77q(a)(3); *SEC v. Michael Furman*, Case No. 20-CV-81205-Ruiz, Court's Instructions to the Jury, DE 1100, Dec. 15, 2021; *SEC v. City of Miami*, Case No. 13-22600-CIV-Altonaga, Court's Instructions to the Jury, DE 238, September 13, 2016; and *SEC v. Levin*, Case No. 12-CV-21297-UU, Court's Instructions to Jury, DE 295, April 2, 2015.

proves that the act, practice, or course of business that Venters or The Movie Studio engaged in, involved, or touched in any way, the offer to sell or sale of securities.

A "fraud or deceit" means a lie or a trick. A fraud or deceit doesn't have to relate to an investment's quality or actually result in the purchase or sale of any security. It is not necessary that Venters or The Movie Studio, who were allegedly involved in the fraud or deceit, sold or purchased securities personally if the fraudulent or deceitful conduct defrauded some person.

The term "would" in the phrase "would operate as a fraud or deceit" means that the act, practice, or course of business had the capacity to defraud a purchaser or seller. It's not necessary that the act, practice, or course of business actually defrauded someone.]

*Here are the affirmative defenses asserted by the Defendants to the SEC's claim against The Movie Studio and Gordon Venters for violation of Section 17(a)(3) of the Securities Act - Engaging in transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser:*

**Fifth affirmative defense: "Puffery." Many of the statements alleged to have been made were in the nature of mere puffery and are therefore not actionable. Many of the statements were subjective statements of opinion designed to portray the Company in a positive light. Artful phraseology in marketing, particularly in the hyperbolic realm of the cinema, does not constitute actionable fraud under the securities laws.**

**Ninth Affirmative Defense: "Due Diligence." At all times material Defendants acted with due diligence to ensure the accuracy of the information provided to potential investors and presented the information to investors prior to any decisionmaking.**

**Twelfth Affirmative Defense: "Good Faith." The Movie Studio and Gordon Venters always acted in good faith and followed securities counsel's and accountants' advice according to General Accounting Principles and filed public financial statements on OTC Markets available on all major financial search engines and Venters always acted as a fiduciary to the public company as the President and CEO.**

**Eighteenth Affirmative Defense: "506(b) Safe Harbor". Defendants relied on the Safe Harbor Provision and Forward-looking statements as provided on all the**

*Company's press releases as well as an Investor Disclaimer Disclosure on the website as approved by counsel.*

*Nineteenth Affirmative Defense: "506(b) Compliance". Defendants complied with and operated under the provisions of 506(b). It was disclosed in the "Qualified REG-1A+ Tier 1 Registration Statement to the SEC, who had "No Comments," as they had on other provisions of the Registration Statement that went effective on Dec 10th, 2018, for a period of 12-Months, and it contained the relevant legacy Investors that purchased shares or were issued shares for services pursuant to Rule 506(b). Because we have a qualified reg A we were allowed to solicit non-accredited investors, and we were allowed to advertise on social media. REG A provides authorization for accepting non-accredited investors and to market generally.*

*Twenty-First Affirmative Defense: "Due Diligence" Defendants performed due diligence to comply with all state and federal laws and vetted investors' participation individually, even over the Subscription Agreements  advised all potential investors that they must be able to withstand the loss of their entire investment.*

*Twenty-Second Affirmative Defense: "506(b) Investor Knowledge and Experience" Defendants' legacy investors had sufficient investment experience or knowledge for their subscription to be accepted by the Company. Defendant complied with all legal requirements and utilized reasonable care and verification of all investors and percentage of participation and suitability in-line with Security Brokers of the "know your client rule" and other considerations before "Accepting" the subscription from the Investor or Investment Company and rejected numerous subscriptions and investment Company recommendations including the re-pricing of the REG 1-A+ Tier I that would have had substantial negative impact on legacy shareholders. Defendants vetted all potential investors regarding knowledge and experience and would reject and had if the Investor did not have knowledge and experience in securities or business matters and the 100% understanding that TMS was a speculative security and the investor had to have the ability to sustain the loss of their entire investment as reflected in the Subscription Agreement executed by the investor in every instance.*

*Thirty-Fifth Affirmative Defense: "No Awareness of Violations." The Defendants relied on Securities Counsel and accountants and other professionals and was investigated by FINRA prior to the SEC qualifying the REG 1-A Tier 1 registration statement and never made Defendants aware of any violations when they commented on the registration statement prior to qualification. Defendants relied on this and were not aware of any violations of the law moving forward.*

*Thirty-Sixth Affirmative Defense: "Reasonable Supervision" Gordon Venters was microbial on supervision as was aware with all associates, employees, CFO Accountant Executive as a result of running a Public Company for thirty (3) years and understanding the negative impact it could have and the SEC's star witness who started this case was terminated as the Defendant found the associate stealing from the Company.  the former associate and was a computer expert whose scheme was extremely sophisticated and was discovered by Defendants.*

*Thirty-Eighth Affirmative Defense: Count 8 20(A) Control Person – Exempt from Liability" The Defendant was operating for the Company and protected by the "Corporate Shield" and always instituted his fiduciary responsibility for the shareholders and aligned with his own interest as the majority shareholder of the Company after almost 30 years of invested time and efforts in this companies' success.*

*Fortieth Affirmative Defense: "Exemption from Liability." Defendant Gordon Venters caused no harm or violation and utilized his best efforts as a fiduciary to the shareholders. Gordon Venters did nothing to harm the company or its investors. Gordon Venters committed no violations as it would negatively impact his substantial holdings as the Company's largest shareholder.*

*Fiftieth Affirmative Defense: As to affirmative defenses for Civil Monetary Penalties - "20(D) and 21(D) - Safe Harbor Provisions" Defendants were represented by Securities Counsel, Accountants. and third-party professionals for the Companies behalf and are protected by the Corporate Shield if acting as it's fiduciary in line with the Defendants own best interest. The public news releases were reviewed by Counsel or Network News Wire regarding forward looking statements, safe harbor provisions, as well as an Investor Consideration and Disclaimer on the company's website, publishing quarterly and annual financials on OTC markets, and major search engines, Yahoo Finance etc.*

*Fifty-Ninth Affirmative Defense: "No Duty to Disclose." Defendant has a duty to disclose all material and corporate actions that are material events. In this case, there was no duty to disclose ongoing daily struggles and events involved in the movie industry and the exact status of films, timing, and daily events in the company. The Defendants complied with all needed disclosures that were material and relevant and updated the shareholders in the annual reports and press releases of events it believed should be disclosed at that time. Defendants acted in good faith and disclosed the necessary information at the relevant times.*

*The verdict form will include these defenses and allow you to pick and any all of them you deem to have been established as to this count by the defense.*

The SEC objects to the above affirmative  defenses for the reasons stated in the SEC's objections above to these identical defenses.  The SEC further objects to the affirmative defenses being repeated after every count and not being tailored to the relevant counts.

<u>Count 8 - Section 20(a) of the Exchange Act- Controlling Person Liability</u>[24]

The SEC also contends Venters violated Section 20(a) of the Exchange Act. Under Section 20(a), an individual may be liable if he was a "controlling person" of a company that itself has violated the securities laws.

To prove that Venters is liable as the controlling person under Section 20(a), the SEC must establish by a preponderance of the evidence that:

(1) The Movie Studio committed a violation of Section 10(b) of the Exchange Act or Rule 10b-5 thereunder;

(2) Venters had the power to control the general business affairs of The Movie Studio; and

(3) Venters had the power to directly or indirectly control or influence the specific corporate policy which resulted in The Movie Studio's violation.

The term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownerships of voting securities, by contract, or otherwise.[25]

If you conclude that The Movie Studio is liable for a violation of Section 10(b) of the Exchange Act or Rule 10b-5 thereunder, then the first element is met.

If you find that the SEC has proven these elements, then, to avoid liability under this claim, the burden shifts to Venters to prove both of the following two elements by a

---

[24] 15 U.S.C. § 78t(a)(Section 20(a) of the Exchange Act; *Curry v. TD Ameritrade, Inc.,* 662 Fed. Appx. 769, 772 (11th Cir. 2016); *Mizzaro v. Home Depot, Inc.,* 544 F. 3d 1230, 1237 (11th Cir. 2008);  Ninth Circuit Model Civil Jury Instructions, 18.10-Controlling Person Liability (2017)(updated June 2024).

[25] 17 C.F.R. § 230.405.

preponderance of the evidence:

    (1) that he acted in good faith; and

    (2) that he did not directly or indirectly induce the violation.

    Here are the affirmative defenses asserted by Gordon Venters to the SEC's claim

against him under Section 20(a) of the Exchange Act for Control Person Liability:

    *Fifth affirmative defense: "Puffery." Many of the statements alleged to have been made were in the nature of mere puffery and are therefore not actionable. Many of the statements were subjective statements of opinion designed to portray the Company in a positive light. Artful phraseology in marketing, particularly in the hyperbolic realm of the cinema, does not constitute actionable fraud under the securities laws.*

    *Ninth Affirmative Defense: "Due Diligence." At all times material Defendants acted with due diligence to ensure the accuracy of the information provided to potential investors and presented the information to investors prior to any decisionmaking.*

    *Twelfth Affirmative Defense: "Good Faith." The Movie Studio and Gordon Venters always acted in good faith and followed securities counsel's and accountants' advice according to General Accounting Principles and filed public financial statements on OTC Markets available on all major financial search engines and Venters always acted as a fiduciary to the public company as the President and CEO.*

    *Eighteenth Affirmative Defense: "506(b) Safe Harbor". Defendants relied on the Safe Harbor Provision and Forward-looking statements as provided on all the Company's press releases as well as an Investor Disclaimer Disclosure on the website as approved by counsel.*

    *Nineteenth Affirmative Defense: "506(b) Compliance". Defendants complied with and operated under the provisions of 506(b). It was disclosed in the "Qualified REG-1A+ Tier 1 Registration Statement to the SEC, who had "No Comments," as they had on other provisions of the Registration Statement that went effective on Dec 10th, 2018, for a period of 12-Months, and it contained the relevant legacy Investors that purchased shares or were issued shares for services pursuant to Rule 506(b). Because we have a qualified reg A we were allowed to solicit non-accredited investors, and we were allowed to advertise on social media. REG A provides authorization for accepting non-accredited investors and to market generally.*

    *Twenty-First Affirmative Defense: "Due Diligence" Defendants performed due diligence to comply with all state and federal laws and vetted investors' participation individually, even over the Subscription Agreements  advised all potential investors that they must be able to withstand the loss of their entire investment.*

*Twenty-Second Affirmative Defense: "506(b) Investor Knowledge and Experience" Defendants' legacy investors had sufficient investment experience or knowledge for their subscription to be accepted by the Company. Defendant complied with all legal requirements and utilized reasonable care and verification of all investors and percentage of participation and suitability in-line with Security Brokers of the "know your client rule" and other considerations before "Accepting" the subscription from the Investor or Investment Company and rejected numerous subscriptions and investment Company recommendations including the re-pricing of the REG 1-A+ Tier I that would have had substantial negative impact on legacy shareholders. Defendants vetted all potential investors regarding knowledge and experience and would reject and had if the Investor did not have knowledge and experience in securities or business matters and the 100% understanding that TMS was a speculative security and the investor had to have the ability to sustain the loss of their entire investment as reflected in the Subscription Agreement executed by the investor in every instance.*

*Thirty-Fifth Affirmative Defense: "No Awareness of Violations." The Defendants relied on Securities Counsel and accountants and other professionals and was investigated by FINRA prior to the SEC qualifying the REG 1-A Tier 1 registration statement and never made Defendants aware of any violations when they commented on the registration statement prior to qualification. Defendants relied on this and were not aware of any violations of the law moving forward.*

*Thirty-Sixth Affirmative Defense: "Reasonable Supervision" Gordon Venters was microbial on supervision as was aware with all associates, employees, CFO Accountant Executive as a result of running a Public Company for thirty (3) years and understanding the negative impact it could have and the SEC's star witness who started this case was terminated as the Defendant found the associate stealing from the Company.  the former associate and was a computer expert whose scheme was extremely sophisticated and was discovered by Defendants.*

*Thirty-Eighth Affirmative Defense: Count 8 20(A) Control Person – Exempt from Liability" The Defendant was operating for the Company and protected by the "Corporate Shield" and always instituted his fiduciary responsibility for the shareholders and aligned with his own interest as the majority shareholder of the Company after almost 30 years of invested time and efforts in this companies' success.*

*Fortieth Affirmative Defense: "Exemption from Liability." Defendant Gordon Venters caused no harm or violation and utilized his best efforts as a fiduciary to the shareholders. Gordon Venters did nothing to harm the company or its investors.  Gordon Venters committed no violations as it would negatively impact his substantial holdings as the Company's largest shareholder.*

*Fiftieth Affirmative Defense: As to affirmative defenses for Civil Monetary Penalties - "20(D) and 21(D) - Safe Harbor Provisions" Defendants were represented by Securities Counsel, Accountants. and third-party professionals for the Companies behalf and are protected by the Corporate Shield if acting as it's fiduciary in line with the Defendants own best interest. The public news releases were reviewed by Counsel or*

*Network News Wire regarding forward looking statements, safe harbor provisions, as well as an Investor Consideration and Disclaimer on the company's website, publishing quarterly and annual financials on OTC markets, and major search engines, Yahoo Finance etc.*

*Fifty-Ninth Affirmative Defense: "No Duty to Disclose." Defendant has a duty to disclose all material and corporate actions that are material events. In this case, there was no duty to disclose ongoing daily struggles and events involved in the movie industry and the exact status of films, timing, and daily events in the company. The Defendants complied with all needed disclosures that were material and relevant and updated the shareholders in the annual reports and press releases of events it believed should be disclosed at that time. Defendants acted in good faith and disclosed the necessary information at the relevant times.*

*The verdict form will include these defenses and allow you to pick any and all of them you deem to have been established as to this count by the defense.*

<u>**Plaintiff's Objections**</u>

**The SEC objects to the above affirmative defenses for the reasons stated in the SEC's objections previously identified to these identical defenses. The SEC further objects to the affirmative defenses being repeated after every count and not being tailored to the relevant counts.**

59

<u>Count 9-  Section 15(a)(1) of the Exchange Act Against Venters-Unregistered Broker
Dealer</u>

The SEC has also charged Venters with violation of Section 15(a)(1) of the Exchange

Act. Section 15(a)(1) of the Exchange Act makes it unlawful  for a "broker" to effect any

transaction in, or to induce or attempt to induce the purchase or sale of, any security unless

such broker: (1) is registered with the SEC; (2) in the case of a natural person, is an associated

person of a registered broker-dealer; or (3) satisfies the conditions of an exemption or safe

harbor. The SEC need only show that a defendant functioned as a "broker" or "dealer" as the

term is defined in the Exchange Act, regardless of the person's intent, to establish a violation.

A "broker" is defined in the Exchange Act as a person engaged in the business of

effecting transactions in securities for the accounts of others.[26] A "dealer" means a person

engaged in the business of buying and selling securities (not including certain exceptions not

relevant here) for such person's own account through a broker or otherwise. Those who buy

and sell securities for their own account or as part of a regular business must register with

the SEC as securities dealers.[27]

 *Defendant Gordon Venters contends that he did not act as a broker or dealer and*

*that as the result he did not violate Section 15(a)(1) of the Exchange Act.*

**<u>The parties agree, and do not dispute that:</u>**

1) **<u>Venters was never registered as a broker-dealer with the SEC;</u>**

2) **<u>Venters was not an associated person of a registered SEC broker-dealer.</u>**

---

[26] 15 U.S.C. § 78c(a)(4).
[27] 15 U.S.C. §§ 78c(a)(5)(A) & (B).

**A defendant claiming an exemption from registration under Exchange Act Rule 15(a) bears the burden of establishing that an exemption applies.[28]**

*The only defense asserted by Gordon Venters to this count is that he did not act as a broker or dealer and that as the result he did not violate Section 15(a)(1) of the Exchange Act.*

The SEC objects to this defense because it constitutes a mere denial and is not a legitimate affirmative defense regarding Count 9 of the Complaint. ***See, e.g.*** *Tsavaris*, 310 F.R.D. at 682.

---

[28] *UBS Asset Mng't (New York) Inc. v. Wood Gundy Corp.,* 914 F. Supp. 66, 70 (S.D.N.Y. 1996) (*citing SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

<u>Duty to Deliberate When Both Plaintiff and Defendant Claim Damages</u>

<u>or When Damages are not an Issue</u>[29]

Your verdict must be unanimous – in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

---

[29] Eleventh Circuit Pattern Jury Instruction 3.8.2.

## **Court's Duty to Decide Remedies**[30]

If you determine that the Commission has proved any Defendant liable on any of the Claims, then I alone will determine the remedy or remedies to impose at a later date.

---

[30] Eleventh Circuit Pattern Jury Instructions 6.1, 6.2, 6.3.2, 6.4, 6.7, 6.8, and 6.9.

## **Note-taking**[31]

You've been permitted to take notes during the trial. Most of you – perhaps all of you – have taken advantage of that opportunity.

You must use your notes only as a memory aid during deliberations. You must not give your notes priority over your independent recollection of the evidence. And you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

---

[31] Adapted from Eleventh Circuit Criminal Pattern Jury Instructions (2024), Instruction S-5.

**Election of Foreperson Explanation of Verdict Form[32]**

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.

A verdict form has been prepared for your convenience.

[Explain verdict]

Take the verdict form with you to the jury room. When you've all agreed on the verdict, your foreperson must fill in the form, sign it and date it. Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me and I'll respond as promptly as possible – either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.

---

[32] Eleventh Circuit Pattern Jury Instruction 3.9.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 0:21-cv-61686-DPG**

**SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff,**

**v.**

**THE MOVIE STUDIO, INC. and**
**GORDON SCOTT VENTERS,**

      **Defendants.**

_____/

**<u>VERDICT FORM</u>**

We the jury unanimously respond to the following questions as follows:

**1.**    **Count I- Section 10(b) of the Securities Exchange Act and Rule 10b-5(a)**

Did the Defendants violate Section 10(b) of the Securities Exchange Act and Rule 10b-5(a) thereunder?

As to Gordon Scott Venters:

      Yes:_____      No:_____

As to The Movie Studio:

      Yes:_____      No:_____

**2.**    **Count II- Section 10(b) of the Securities Exchange Act and Rule 10b-5(b)**

Did the Defendants violate Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) thereunder?

As to Gordon Scott Venters:

      Yes:_____      No:_____

66

As to The Movie Studio:

        Yes:_____       No:_____

**3.**      **Count III- Section 10(b) of the Securities Exchange Act  and Rule 10b-5(c)**

Did the Defendants violate  Section 10(b) of the Securities Exchange Act and Rule 10b-5(c) thereunder?

As to Gordon Scott Venters:

        Yes:_____       No:_____

As to The Movie Studio:

        Yes:_____       No:_____

**4.**      **Count IV- Section 17(a)(1) of the Securities Act**

Did Defendants violate Section 17(a)(1) of the Securities Act?

As to Gordon Scott Venters:

        Yes:_____       No:_____

As to The Movie Studio:

        Yes:_____       No:_____

**5.**      **Count V- Section 17(a)(2) of the Securities Act**

Did Defendants violate Section 17(a)(2) of the Securities Act?

As to Gordon Scott Venters:

        Yes:_____       No:_____

As to The Movie Studio:

      **Yes:**_____       **No:**_____

**6.**      **Count VI- Section 17(a)(3) of the Securities Act**

Did Defendants violate Section 17(a)(3) of the Securities Act?

As to Gordon Scott Venters:

      Yes:_____       No:_____

As to The Movie Studio:

      Yes:_____       No:_____

**7.**  **Count VII – Section 20(a) of the Exchange Act:**

Did Gordon Scott Venters violate Section 20(a) of the Exchange Act?

      Yes_____       No_____

**8.**  **Count VIII- Section 15(a) the Exchange Act:**

Did Gordon Scott Venters violate Section 15(a) of the Exchange Act?

      Yes _____       No_____

      If you have answered all three questions, please have foreperson sign and date the verdict form.

SO SAY WE ALL

Foreperson's Signature_____

Date_____